FILED

JUL 17 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

RECEIVED

JUL 17 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| In the Matter of the Extradition of ALEJANDRO TOLEDO MANRIQUE | Case No. 3 19 71055 MAG |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT — REDACTED

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____2004-2012_____ in the county of _____Peru_____ in the _____ District of _____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Section 3184 | Being a fugitive from Peru, which has sought his provisional arrest with a view towards extradition on the charges of influence peddling, in violation of Section 400 of the Peruvian Criminal Code; collusion, in violation of Section 384 of the Peruvian Criminal Code; and money laundering, in violation of Article 1 of Peruvian Act No. 27765, pursuant to the extradition treaty between the United States and Peru, and 18 U.S.C. § 3184. |

This criminal complaint is based on these facts:

See attached complaint

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Elise LaPunzina, Assistant United States Attorney
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____July 15, 2019____

City and state: ____San Francisco, California____

_____
*Judge's signature*

THOMAS S. HIXSON, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE EXTRADITION
OF ALEJANDRO TOLEDO MANRIQUE

COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.      In this matter, I represent the United States in fulfilling its treaty obligation to Peru.

2.      There is an extradition treaty in force between the United States and Peru, the Extradition Treaty Between the United States of America and the Republic of Peru, U.S.-Peru, July 26, 2001, S. Treaty Doc. No. 107-6 (2002) (the "Treaty").[1]

3.      Pursuant to the Treaty, the Government of Peru has submitted a formal request through diplomatic channels for the extradition of Alejandro Toledo Manrique ("Toledo").

4.      According to information provided by the Government of Peru, Toledo was charged with influence peddling, in violation of Section 400 of the Peruvian Criminal Code; collusion, in violation of Section 384 of the Peruvian Criminal Code; and money laundering, in violation of Article 1 of Peruvian Act No. 27765.

5.      These offenses were committed within the jurisdiction of Peru. A warrant for Toledo's arrest was issued on February 9, 2017, by Judge Richard Augusto Concepcion Carhuancho of the First National Preliminary Investigation Court in Lima, Peru.

6.      According to information provided by the Government of Peru, the warrant was issued on

---

[1] A copy of the Treaty is attached hereto as Attachment A.

the basis of the following facts:

## Background

7.     Toledo served as President of Perú from 2001 to 2006.  During his presidency, the Peruvian government undertook the Peru-Brazil Southern Interoceanic Highway Project ("Project"), to construct a highway spanning between Peru and Brazil ("Highway").  Toledo signed legislation and executive decrees to facilitate the Highway's construction, including: (1) Act No. 28214 of April 30, 2004, declaring the Project to be a "public need, national interest and priority execution"; (2) Supreme Executive Resolution No. 044-2004-EF of May 10, 2004, appointing certain members of the Private Investment Promotion Agency ("Proinversion") Committee on Infrastructure and Public Services Projects, which conducted the bidding process for the Project[2]; and (3) Supreme Executive Resolution No. 156-2004-EF of December 21, 2004, ratifying Proinversion's proposed tender process.  According to information provided by Peruvian authorities, Toledo solicited a US$35 million bribe from the Highway contractor and ultimately received US$20 million, which he directed to be laundered through various companies and off-shore accounts, as described further below.

## The Charges

### I.     Influence Peddling and Collusion

8.     Section 400 of the Peruvian Criminal Code criminalizes influence peddling.  In particular,

---

[2] Proinversion is a Peruvian state agency created via a Supreme Executive Order issued in 2002, with a board of directors composed of several government ministers.  Pursuant to Executive Resolution No. 044-2004-EF of May 10, 2004,          _          was appointed Chairman of the Proinversion Committee for Assets, Projects and State Companies and the Proinversion Committee for Infrastructure and Public Services Projects;                               was appointed Permanent Member of the Proinversion Committee for Infrastructure and Public Services Projects; and .                          was appointed Permanent Member of the Proinversion Committee for Assets, Projects and State Companies.

it provides:

> Whoever, invoking real or simulated influences, receives, makes someone give or
> promise for himself or for third parties, donations or promises or any other
> advantage or benefit offering to mediate before a public official or civil servant who
> hears, is hearing or has heard a judicial or administrative case, shall be punished by
> imprisonment for not less than four (4) and not more than six (6) years.  If the
> perpetrator is an official or public servant, he shall be punished by imprisonment
> for not less than four (4) and not more than eight (8) years and disqualification
> pursuant to subsections 1 and 2 of Section 36 of the Criminal Code.

9.     Section 384 of the Peruvian Criminal Code criminalizes collusion.  In particular, it

provides:

> The government officials or civil servants who, in contracts, supplies, tenders,
> competitive biddings, auctions or any other similar operation in which they
> participate by reason of their office or on a special commission, swindle the
> Peruvian State or State-supported bodies or entities, pursuant to law, by making
> arrangements with the concerned parties in agreements, adjustments, liquidations
> or supplies, shall be punished by imprisonment for not less than three (3) years and
> not more than fifteen (15) years.

10.    Near the end of 2004, at a social event held at the government palace in Lima, Peru,

_____, a close friend and advisor of Toledo who served as Toledo's chief

of security, approached _____, superintendent of Constructora

Norberto Odebrecht S.A. ("Odebrecht") in Peru.[3] According to _____, introduced himself

as an intermediary of Toledo, and offered to favor Odebrecht in the tenders for the construction of

sections 2, 3, and 4 of the Highway Project.

11.    Thereafter, _____ invited _____ to attend a series of meetings about the tenders held at

the government palace.  For those meetings, _____ entered through a side door, without recording

his visits on the official register.  During one of the meetings, _____ told _____ that if Odebrecht

_____

[3] Odebrecht is a subsidiary of Odebrecht S.A., a Brazil-based company that has been implicated
in a massive transnational bribery scheme, involving hundreds of millions of dollars in bribes paid
to foreign officials and others in multiple different countries.

3

was successful in the tenders, it would need to pay Toledo a sum of money, the amount of which would be detailed later by associates of                    , another close friend and advisor of Toledo.

12.     Also around the end of 2004, Toledo told          that he was planning to establish a foundation for which he would receive "donations" that might total substantial amounts.  Toledo requested          's support in receiving those funds, and stated that he would provide more details later.  Although          suspected the "donations" might in fact be intended to cover up illicit activity, he did not ask questions in that regard because of his longstanding friendship with Toledo.

13.     The details of Toledo's bribe were further confirmed on or around November 4, 2004, when          attended a meeting in Brazil with Toledo,          ,          , and two of          's associates,          and          .  At the meeting, Toledo said he wanted Odebrecht to win the Highway contracts, and would ensure that the schedule for the tenders was not delayed and that the terms of the tenders would be modified to make it difficult or impossible for other companies to participate in them.  Also during that meeting,          and          approached          and told him that, if Toledo ensured that the tender schedule would not be delayed and that the terms would be modified such that Odebrecht was awarded the Project contracts, Odebrecht should give Toledo US$35 million, via payments made to various companies owned or controlled by          using fictitious contracts with Odebrecht.

14.              told Peruvian authorities that at the meeting in Brazil, he spoke with          , who said that there would be donations for Toledo's foundation, without providing any details.          and          agreed to meet in Lima, Peru to discuss the donations further at the end of the month.  They held subsequent meetings, some of which were attended by Toledo, through the end of 2004

4

and beginning of 2005 at            's residence or businesses.

15.     To bid on the Highway Project, Odebrecht entered into joint ventures with three Peruvian companies.[4]            told Peruvian authorities that he informed the chairmen of the boards of directors of all three companies about the agreement with Toledo generally, and that the chairmen understood that the companies would pay the requested bribe, with each one assuming a portion of the payment.

16.     On December 22, 2004, Proinversion's board of directors held a meeting (Session No. 87) to discuss several infrastructure projects, including the Highway Project. The meeting was held at the government palace, which was not the usual meeting place, because Toledo wanted to be informed about the progress of the Project. In what a number of witnesses considered to be a highly unusual move, Toledo attended a portion of the meeting which was dedicated to discussion of the Highway Project. At the meeting, Toledo asked whether it was possible to shorten the deadlines for the Project. The board ultimately agreed to a nine-month timeline, with the invitation for bids to be issued on January 24, 2005, and the signing of the contracts to occur on September 26, 2005. This timeline was much shorter than usual; as bidding usually lasted approximately two years.

17.     Although proposed public works projects in Peru were usually subject to mandatory assessments regarding their feasibility and suitability to be executed at the pre-investment stage, no such assessment was conducted for the Highway Project as a result of Supreme Executive Resolution No. 022-2005-EF, which Toledo signed on February 9, 2005, exempting the Project

---

[4] Their agreement was formalized with the incorporation of Interoceanica Sur Tramo 2 S.A. (the joint venture that bid on the contract for section 2 of the Highway) and Interoceanica Sur Tramo 3 S.A. (the joint venture that bid on the contract for section 3 of the Highway) in *July 2005*.

from the applicable regulations.

18.     On June 23, 2005, Proinversion decided to award the contracts for constructing sections 2 and 3 of the Highway, for US$31,858,000 and US$40,682,000, respectively, to the Odebrecht joint ventures.[5]  A public ceremony for signing the contracts was scheduled to be held on August 4, 2005, over a month ahead of schedule.

19.     Proinversion's board of directors convened a meeting (Session No. 109) on August 4, 2005, at the Ministry of Economy and Finance to review the bidding process for the Highway Project. At approximately 10:00 a.m. that day, Peruvian Vice Comptroller General

("Vice Comptroller") sent an official letter to the Proinversion board, stating that Odebrecht and one of its joint venture partners had pending litigation with the State of Peru, which, if true, would disqualify the joint venture from bidding on the Highway Project.  Per regulation, in this situation, Proinversion should have requested an opinion from its legal manager and from an experienced private law firm, suspended the bidding process, and, if necessary, returned the bids.

20.     According to Peruvian Minister of Transportation and Communications and Proinversion board member                               , Toledo appeared annoyed at the possibility that the contract signing would be disrupted.  However, within just a few hours, the Proinversion board reconvened at the government palace, upon Toledo's request.  As recorded in the minutes for the board meeting,                               , a Proinversion Committee Chairman who had been appointed by Toledo, informed the board that he had received a report from attorney

, concluding that the litigation referenced in the Vice Comptroller's letter did not in fact involve companies in the Odebrecht joint venture and, therefore, the concerns

---

[5] The contract for section 4 of the Highway was awarded to another bidder.

raised in the letter were unfounded.  Also as recorded in the board minutes,          further

informed the board that he had also received a report prepared by Proinversion's Legal Manager,

                        , expressing his opinion that the allegation that members of the

Odebrecht joint venture were involved in legal proceedings with Peru was inaccurate in light of

both          's report and also supplemental sworn statements provided by the companies

contradicting the allegation.  However, in subsequent statements to Peruvian authorities,

asserted that in fact he did not send Proinversion his report until several days after the board

meeting, on August 8, 2005, and could not have prepared the report in just a few hours; and

asserted that he did not send Proinversion his report until later in the afternoon on August 4, 2005,

after the board meeting and signing ceremony had concluded.

21.     The Highway contracts were signed later in the day on August 4, 2005.[6]  Toledo was

present for the signing, even though it was unusual for him to appear at such an event.

22.     On January 26, 2006, legislation (specifically, Law No. 28670, which had been proposed

by Peru Possible, Toledo's political party) was passed ratifying the validity of the Odebrecht

contracts, thereby preventing any further review by Peru's Comptroller General's Office into the

validity of the bidding process.

23.     Although Odebrecht had been awarded the Highway contracts, because Toledo failed to

modify the bidding terms to prevent or discourage other companies from bidding,          decided

to pay him US$20 million instead of the initially requested US$35 million.  According to          ,

the US$20 million was taken out of the profits realized by Odebrecht and its three Peruvian

---

[6]      told Peruvian authorities that he was not present when the board reconvened on August
4, 2005, contrary to the minutes of the meeting noting his presence, but that he participated in part
of the meeting by telephone.

partners from the Highway Project. As noted in an expert financial report prepared on behalf of Peruvian prosecutors, Odebrecht's Peruvian partners paid their portions of the bribe through an irregular assignment of dividends to Odebrecht under the cover of "additional risks."

**II. Money Laundering**

24.     Article 1 of Peruvian Act No. 27765 criminalizes money laundering. In particular, it provides:

> Whoever converts or transfers money, property, instruments, or proceeds, knowing or suspecting their unlawful origin, with the intention to prevent the identification of their origin, their seizure or forfeiture, shall be punished by imprisonment for not less than eight (8) and not more than fifteen (15) years, and by a fine of one hundred and twenty (120) to three hundred fifty (350) days.

25.     According to            , at some point after Toledo had first discussed the "donations" for which he needed            's assistance in receiving, Toledo had clarified that the "donations" would amount to approximately US$20 million. Also according to            , in early 2006, Toledo told him to expect the first "donations" to come in.            told Peruvian authorities that he understood that Toledo wanted to use            's accounts because Toledo did not want to be linked to the transactions.

26.     According to            , Odebrecht made payments of approximately US$20 million to Toledo in a phased manner from 2006 to 2010, via bank transfers of "unrecorded slush funds," and possibly also funds disbursed through fictitious contracts, to offshore companies owned by            .            reported that on one occasion in 2010 after Toledo had left office, Toledo summoned            to his home in Camacho to pressure            to continue the payments.

27.     Odebrecht's records document at least US$9,626,010 of the US$20 million bribe. As described further below, Peruvian authorities have traced those funds as having filtered through numerous accounts:

8

*First*, Odebrecht transferred the funds to two of          's companies,

                    and                              , as well as to a third company          used

as a funds receiving agent,

*Second*,            transferred the funds to another of his companies,

            , and then to two Costa Rican companies which had been designated by          for

receiving the funds,                                          and

*Third*, the funds were transferred to another Costa Rican company,

            , the chairman of which was nominally                    , Toledo's

*Finally*, at            's direction, at least some of the funds were transferred to two Peruvian bank

accounts, one held by          and another held by a person named

            , and were used to purchase properties (and to pay mortgages for properties) in Peru.

28.    These transfers are summarized on the following chart:



29.     Transfers were made from Odebrecht, through several different accounts, to accounts held

by            and            at Citibank of London, and to an account held by            at Barclays

Bank.[7]  Odebrecht transferred at least US$750,000 to            , US$2,950,000 to            , and

$5,549,010 to            , as follows[8]:

| Expiración Date | Receiving Company | Amount |
|---|---|---|
| 6/23/2006 | | $750,000 |
| 1/11/2010 | | $1,000,000 |
| 3/4/2010 | | $550,000 |
| 3/17/2010 | | $450,000 |
| 3/29/2010 | | $450,000 |
| 5/24/2010 | | $250,000 |
| 6/3/2010 | | $250,000 |
| 7/28/2008 | | $500,000 |
| 8/5/2008 | | $500,000 |
| 11/27/2008 | | $500,000 |
| 12/16/2008 | | $500,000 |
| 12/22/2008 | | $500,010 |
| 3/31/2009 | | $505,000 |
| 3/31/2009 | | $495,000 |
| 11/18/2009 | | $499,000 |
| 1/11/2010 | | $1,000,000 |
| 1/22/2010 | | $550,000 |

---

[7] According to            , the            and            accounts were also funded by illicit
payments to Toledo made by            , one of the companies in the joint venture that was
awarded the contract for section 4 of the Highway.  In particular,            reported that he was
supposed to receive between US$4 million and US$5 million from            for            ,
and that he had verified that            had transferred US$760,000 to the
account (which was then transferred to an Israeli account owned by            ) and US$3,224,334
to the            account.

[8] Odebrecht also identified that it transferred $377,000 to            on October 14, 2008, as
part of the bribe payment.

11

30.   On          's instructions, on or about June 18, 2006, and July 13, 2006, the funds transferred to             were then transferred (in installments of US$530,000 and US$250,000) to an Israeli account owned by          , and were used to cover that company's expenses. However,          stated that he funded the          account with the same amount of money out of his own pocket, such that the US$750,000 paid by Odebrecht to          effectively ended up in the          account.  In addition, according to          , US$900,000 was transferred from          to          , and the remaining funds in          's account were used to cover the company's expenses.  Thus, in total, the          account received at least $7,199,010 in bribe payments from Odebrecht.

31.   According to          , per his instructions, all of those funds were remitted to          . To that end,          entered into an agreement with          on or about May 8, 2006.  The agreement provided that          would manage certain payments owed to          by Odebrecht for "certain services" rendered, in exchange for a commission.          told Peruvian authorities that this agreement was simply a device to funnel payments from Odebrecht to Toledo, and that there was never a services contract between          and Odebrecht.  Amounts received by          from 2006 to 2010 were transferred to          's account at LGT Bank in Zurich.

32.   Although not fully documented in bank records provided by Peruvian authorities, according to          , in total, the          account received approximately US$17.5 million in bribe payments from Odebrecht.

33.   At the end of 2006 or beginning of 2007, Toledo told          that          would provide him the names of the companies to which          should transfer the money received from Odebrecht.  In or around October or November 2006,          visited          in Israel and provided the names of companies including          and          ,          , along with their Costa

12

Rican bank account numbers.          served as president of the boards of both companies at

different points in time.

34.     Between December 2006 and May 2010,          made eighteen payments totaling

US$9,052,650 to          and seventeen payments totaling US$8,474,350 to          (i.e.,

US$17,527,000) as follows[9]:

Payments from _____ to _____        Payments from _____ to _____

| Date | Amount | | Date | Amount |
|------|--------|-|------|--------|
| 2/22/2007 | $489,000 | | 12/1/2006 | $500,000 |
| 4/3/2007 | $483,650 | | 12/21/2006 | $500,000 |
| 6/18/2007 | $550,000 | | 2/22/2007 | $548,000 |
| 7/16/2007 | $480,000 | | 4/3/2007 | $516,350 |
| 7/16/2007 | $400,000 | | 6/18/2007 | $490,000 |
| 8/22/2007 | $600,000 | | 7/16/2007 | $520,000 |
| 10/17/2007 | $600,000 | | 8/22/2007 | $600,000 |
| 11/19/2007 | $450,000 | | 10/17/2007 | $490,000 |
| 1/28/2008 | $450,000 | | 11/19/2007 | $610,000 |
| 1/28/2008 | $550,000 | | 1/28/2008 | $360,000 |
| 2/12/2008 | $450,000 | | 1/28/2008 | $640,000 |
| 7/10/2008 | $500,000 | | 2/12/2008 | $300,000 |
| 9/19/2008 | $300,000 | | 5/26/2008 | $500,000 |
| 12/9/2008 | $600,000 | | 7/2/2008 | $600,000 |
| 1/29/2009 | $600,000 | | 9/19/2008 | $350,000 |
| 1/8/2010 | $500,000 | | 1/8/2010 | $500,000 |
| 2/23/2010 | $600,000 | | 5/4/2010 | $450,000 |
| 5/4/2010 | $450,000 | | | |

35.     In order to "validate" these transfers,          signed certain agreements with the two

Costa Rican companies, which, according to          , were sham contracts to facilitate the transfer

of funds.

_____
[9] Each transaction involved a small fee, which is not reflected herein.

36.     In turn, between March 2011 and December 2012,          and          transferred

US$8,274,048.47 and US$8,096,207.51, respectively (US$16,370,255.98 in total), to another

Costa Rican company,          , as follows[10]:

Payments from          to                    Payments from          to

| Transfer Date | Amount |
|---|---|
| 3/18/2011 | $140,000.00 |
| 3/21/2011 | $1,500,000.00 |
| 4/20/2011 | $999,876.00 |
| 4/20/2011 | $61,000.00 |
| 5/26/2011 | $483,583.00 |
| 7/26/2011 | $547,311.89 |
| 10/27/2011 | $966,306.88 |
| 11/25/2011 | $1,915,219.05 |
| 12/16/2011 | $328,751.65 |
| 1/13/2012 | $72,000.00 |
| 1/19/2012 | $490,000.00 |
| 2/7/2012 | $500,000.00 |
| 3/2/2012 | $270,000.00 |

| Transfer Date | Amount |
|---|---|
| 3/18/2011 | $50,000.00 |
| 4/18/2011 | $999,876.00 |
| 4/20/2011 | $516,283.00 |
| 4/20/2011 | $36,000.00 |
| 5/26/2011 | $490,000.00 |
| 6/3/2011 | $403,156.23 |
| 6/13/2011 | $180,452.43 |
| 7/11/2011 | $879,755.00 |
| 7/26/2011 | $917,412.83 |
| 10/27/2011 | $601,968.93 |
| 12/28/2011 | $1,042,303.09 |
| 1/10/2012 | $1,050,000.00 |
| 1/13/2012 | $100,000.00 |
| 1/19/2012 | $500,000.00 |
| 12/19/2012 | $329,000.00 |

37.     Although Toledo has denied participating in the creation of          , a Costa Rican notary

public ("Notary") told Peruvian authorities that on January 19 and 20, 2012, Toledo and

met with him to discuss incorporating          , and that Toledo had chosen the name of the

company and had directed that his mother in law,          , who was then approximately 80

years old, should be named chairman of it.  Travel records corroborate Toledo and          's

presence in Costa Rica for these meetings.

---

[10] These payments were made in the form of one-year certificates of deposit.

38.   In the summer of 2012, Toledo told the Notary that          would be traveling to Costa Rica to meet with him.  The meeting between          and the Notary occurred on or about July 18, 2012.  At the meeting,          said she wanted to transfer some money from          to Peru.  Accordingly, between July and November 2012, at          's direction, US$5.3 million was transferred from          to two Banco Credito del Peru ("BCP") accounts in Peru, namely, US$3.45 million to a BCP account held by          , and US$1.85 million to          's BCP account, as follows:

Payments from          to.

| Date | Amount |
|------|--------|
| 7/24/2012 | $3,297,681 |
| 7/24/2012 | $152,319 |

Payments from          to

| Date | Amount |
|------|--------|
| 7/24/2012 | $130,000 |
| 8/8/2012 | $500,000 |
| 8/9/2012 | $500,000 |
| 9/14/2012 | $300,000 |
| 10/17/2012 | $300,000 |
| 11/26/2012 | $120,000 |

39.   The  funds  transferred  to          's  BCP  account  appear  to  have  been  payment  for          's  purchase  of          's house located in          , at          , on or about July 26, 2012.[11]

40.   The funds transferred to          's account were used to purchase the following property and pay the following mortgage loans:

   a.   an office, three parking spaces, and a storage unit located in the Torre Omega building, at the intersection of Monterrico and Cruz del Sur avenues, lot 84, block

---

[11] The total purchase price for the          house was US$3.75 million.

15

E, Urbanización Los Granados, Santiago de Surco, for approximately US$882,400, on or about September 5, 2012;

b.    mortgage loan for a property owned by Toledo's daughter, located at

("       "), for approximately US$217,007 on or about December 14, 2012 (Toledo's daughter then transferred title of the property to her parents on or about October 7, 2013);

c.    mortgage loan for a property located in the

("    "), for approximately US$277,309, owned by Toledo and his wife, and acquired by them on or about September 4, 2012.

41.    While      purchased the Omega Torre property, Toledo negotiated the purchase price in June 2012, according to the seller's general manager.

42.    Toledo has admitted to owning the      and      houses. While he claimed that the mortgages were paid off via a loan from     ,      stated that he was not aware of the payments that were made, and that Toledo controlled the funds that were used in the transactions.

## Conclusion

43.    Toledo may be found within the jurisdiction of this Court at      , California,

44.    Katherine C. Fennell, an attorney in the Office of the Legal Adviser of the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Treaty, stating that the offenses for which extradition is demanded are provided for by the Treaty, and confirming that the documents supporting the request for extradition are properly certified by the principal

16

U.S. diplomatic or consular officer in Peru, in accordance with 18 U.S.C. § 3190, so as to enable them to be received into evidence.

45.    The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic note from Peru, a copy of the Treaty, and the certified documents submitted in support of the request, will subsequently be filed with this Court and are incorporated by reference herein.

WHEREFORE, the undersigned requests that a warrant for the arrest of ALEJANDRO TOLEDO MANRIQUE be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Peru, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered.

_____
Assistant United States Attorney

Sworn to before me and subscribed in my presence this 15 day of July, 2019, at San Francisco, California.

_____
United States Magistrate Judge

17

# ATTACHMENT A

| 107TH CONGRESS 2d Session | SENATE | TREATY DOC. 107–6 |
| --- | --- | --- |

## EXTRADITION TREATY WITH PERU

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMER-
ICA AND THE REPUBLIC OF PERU, SIGNED AT LIMA ON JULY
26, 2001



MAY 8, 2002.—Treaty was read the first time, and together with the
accompanying papers, referred to the Committee on Foreign Relations
and ordered to be printed for the use of the Senate

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 2002

99–118

## LETTER OF TRANSMITTAL

————

THE WHITE HOUSE, *May 8, 2002.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Extradition Treaty Between the United States of America and the Republic of Peru, signed at Lima on July 26, 2001.

In addition, I transmit for the information of the Senate, the report of the Department of State with respect to the Treaty. As the report explains, the Treaty will not require implementing legislation.

The provisions in this Treaty follow generally the form and content of modern extradition treaties recently concluded by the United States and will replace the outdated extradition treaty in force between the two countries signed in 1899. The Treaty will, upon entry into force, enhance cooperation between the law enforcement communities of the two countries. It will make a significant contribution to international law enforcement efforts against serious offenses, including terrorism, organized crime, and drug-trafficking.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

GEORGE W. BUSH.

## LETTER OF SUBMITTAL

———

APRIL 20, 2002.

THE PRESIDENT: I have the honor to submit to you the Extradition Treaty Between the United States of America and the Republic of Peru, signed at Lima on July 26, 2001. Upon its entry into force, the Treaty would replace the outdated extradition treaty now in force between the two countries that was signed in 1899. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty follows generally the form and content of other extradition treaties recently concluded by the United States. The Treaty represents a major step forward in U.S. efforts to strengthen cooperation with countries in the region in combating terrorism, organized crime, drug trafficking and other offenses. It is an important part of a concerted effort by the Department of State and the Department of Justice to modernize the legal tools available for the extradition of serious offenders.

The Treaty is designed to be self-executing and will not require implementing legislation.

Article I obligates each Contracting State to extradite to the other, pursuant to the provisions of the Treaty, persons whom the authorities in the Requesting State have charged with, found guilty of, or sentenced for an extraditable offense.

Article II concerns extraditable offenses. Article II(1) defines an extraditable offense as one punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty. Use of such a "dual criminality" clause rather than a list of offenses covered by the Treaty, as in the 1899 extradition treaty, obviates the need to renegotiate or supplement the Treaty as additional offenses become punishable under the laws in both Contracting States.

Article II(2) defines an extraditable offense further as including an attempt or conspiracy to commit, or association or participation in the commission of, an offense described in paragraph 1.

Additional flexibility is provided by Article II(3), which provides that an offense shall be an extraditable offense regardless of (a) whether the laws in the Contracting States place the offense within a different category of offenses or describe the offense by different terminology, so long as the underlying conduct is criminal in both States; (b) whether the offense is one for which the laws of the Requesting State require the showing of such matters as interstate transportation, or use of the mails or other facilities affecting interstate or foreign commerce for the purpose of establishing jurisdiction of its courts; or (c) where the offense was committed.

VI

Finally, Article II(4) provides that if extradition is granted for one or more extraditable offenses, it shall also be granted for any other offense specified in the request even if that offense does not meet the minimum penalty requirement, provided that all other extradition requirements are met.

Article III provides that extradition shall not be refused on the ground that the person sought is a national of the Requested State.

Article IV sets forth bases for the denial of extradition. Paragraph 1 bars extradition: (a) if the person sought has been tried and convicted or acquitted in the Requested State for the same offense (but does not preclude extradition if the competent authorities in the Requested State have decided not to prosecute such person for the same acts or have decided to discontinue criminal proceedings against the person for those acts); or (b) if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requested State.

As customary in extradition treaties, Article IV(2) provides that extradition shall not be granted if the offense for which extradition is requested constitutes a political offense. It also specifies the following specific categories of offenses that are not to be considered political offenses: (a) a murder or other violent crime against a Head of State of one of the Contracting States, or a member of a Head of State's family; (b) genocide, as described in the Convention on the Prevention and Punishment of the Crime of Genocide, done at Paris on December 9, 1948; (c) an offense for which both Contracting States have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution, including but not limited to illicit drug trafficking and related offenses, as described in the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, done at Vienna on December 20, 1988; and offenses related to terrorism, as set forth in multilateral international agreements to which both Contracting States are parties (e.g., the Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague on December 16, 1970); and (d) an attempt or conspiracy to commit, or association or participation in the commission of, any of the foregoing offenses.

Article IV(3) requires that extradition not be granted if the executive authority of the Requested State determines that the request was politically motivated.

Article IV(4) provides that the executive authority of the Requested State may also refuse extradition for offenses under military law which are not offenses under ordinary criminal law (e.g., desertion).

Finally, under Article IV(5), the executive authority of the Requested State may refuse extradition if the person sought would be tried, or punished as the result of a trial, under extraordinary criminal laws or procedures in the Requesting State. This provision was included in the Treaty at the instance of the U.S. delegation in response to concerns over due process before special terrorism tribunals in Peru. Under this paragraph, the executive authority of the Requested State would have discretion to deny extradition if the person sought would be or has been tried in a special terrorism

VII

tribunal and there were no procedures in place to safeguard the due process rights of the accused.

Article V concerns capital punishment. Under Article V, when an offense for which extradition is sought is punishable by death under the laws in the Requesting State but not under the laws in the Requested State, the executive authority of the Requested State may refuse extradition unless the Requesting State provides an assurance that the person sought will not be executed. The United States has agreed to similar formulations in other modern extradition treaties (e.g., those with Argentina, the Republic of Korea and India). In cases in which such an assurance is provided, the death penalty shall not be carried out, even if imposed by the courts in the Requesting State. Article V(2) provides further that, except in instances in which the death penalty applies, extradition shall not be refused, nor conditions imposed, on the basis that the penalty for the offense is greater in the Requesting State than in the Requested State.

Article VI establishes the procedures and describes the documents that are required to support a request for extradition. All requests for extradition must be submitted through the diplomatic channel. Among other requirements, Article VI(3) provides that a request for the extradition of a person sought for prosecution must be supported by such evidence as would be sufficient to justify committal for trial of the person if the offense had been committed in the Requested State. Under Article VII(5), if the Requested State requires additional evidence or information to enable it to decide on the request for extradition, such evidence or information shall be submitted to it within such time as that State shall require.

Article VII requires that all documents submitted by the Requesting State be accompanied by a translation into the language of the Requested State and establishes the procedures under which such documents shall be received and admitted as evidence in the Requested State.

Article VIII sets forth procedures and describes the information that is required for the provisional arrest and detention of the person sought, in case of urgency, pending presentation of the formal request for extradition. In particular, Article VIII(4) provides that if the Requested State's executive authority has not received the extradition request and supporting documents required by Article VI within sixty days from the date of the provisional arrest, the person may be discharged from custody. Article VIII(5) explicitly provides that such a discharge from custody shall not be an obstacle to the person's re-arrest and extradition if the formal extradition request is received later.

Article IX specifies the procedures governing a decision on the extradition request and the surrender of the person sought. It requires the Requested State to process the extradition request in accordance with the procedures set forth in its law and the Treaty, and to promptly notify the Requesting State, through the diplomatic channel, of its decision regarding a request. If extradition is granted, the Contracting States shall agree on the time and place for the surrender of the person sought. If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, if any, the person may

VIII

be discharged from custody and the Requested State may there-
after refuse extradition for the same offense. Article IX also pro-
vides that if unforeseen circumstances prevent the surrender of the
person sought, the States shall agree on a new date, consistent
with the laws of the Requested State. If the request is denied in
whole or in part, Article IX(4) requires the Requested State to pro-
vide an explanation of the reasons for the denial and, upon request,
copies of pertinent decisions.

Article X addresses deferred and temporary surrender. Under Ar-
ticle X(1) if a person whose extradition is sought is being pros-
ecuted or is serving a sentence in the Requested State, that State
may postpone the extradition proceedings against, or the surrender
of, that person until its prosecution has been concluded or the sen-
tence has been served. Alternatively, Article X(2) provides that in
such circumstances the Requested State may, in exceptional cases,
temporarily surrender the person to the Requesting State exclu-
sively for the purpose of prosecution. The person so surrendered is
to be kept in custody in the Requesting State and returned to the
Requested State after the conclusion of the proceedings against
that person, on conditions agreed between the Contracting States.

Article XI provides a non-exclusive list of factors to be considered
by the executive authority of the Requested State in determining
to which State to surrender a person whose extradition is sought
by more than one State.

Article XII provides that the Requested State may, to the extent
permitted under its law, seize and surrender to the Requesting
State all articles, documents and evidence connected with the of-
fense for which extradition is granted. Such items may be surren-
dered even if the extradition cannot be carried out due to the
death, disappearance, or escape of the person sought. Surrender of
such items may be deferred for such time as is deemed necessary
for an investigation or proceeding in the Requested State or may
be made on condition that they be returned to the Requested State
as soon as practicable. Article XII(3) provides that the rights of the
Requested State or of third parties in such items must be duly re-
spected.

Article XIII sets forth the rule of specialty under international
law. Paragraph 1 provides, subject to specific exceptions set forth
in paragraph 3, that a person extradited under the Treaty may not
be detained, tried or punished in the Requesting State except for
any offense (a) for which extradition was granted, or a differently
denominated offense based on the same facts as the offense for
which extradition was granted, provided such offense is extra-
ditable, or is a lesser included offense; (b) committed after the ex-
tradition of the person; or (c) for which the executive authority of
the Requested State consents to the person's detention, trial or
punishment. Article XIII (2) provides that a person extradited
under the Treaty may not be extradited to a third State for an of-
fense committed prior to surrender unless the surrendering State
consents. Under paragraph 3, these restrictions do not apply if the
person has left the jurisdiction of the State to which surrendered
and voluntarily returned or has had the opportunity to leave and
has not done so within ten days.

IX

Article XIV permits surrender without further proceedings if the person sought consents to be surrendered.

Article XV governs the transit through the territory of one Contracting State of a person being surrendered to the other Contracting State by a third country.

Article XVI contains provisions on representation and expenses that are similar to those found in other modern U.S. extradition treaties. Specifically, the Requested State is required to advise, assist, appear in court on behalf of, and represent the interests of the Requesting State in any proceedings arising out of a request for extradition. The Requested State also bears all expenses incurred in that State by reason of the extradition proceedings, except that the Requesting State pays expenses related to translation of documents and the transportation to the Requesting State of the person sought. Article XVI (3) specifies that neither Contracting State shall make any pecuniary claim against the other arising out of the arrest, detention, custody, examination, or surrender of persons under the Treaty.

Article XVII provides that the U.S. Department of Justice and the Peruvian Ministry of Justice may consult with each other directly in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of the Treaty.

Article XVIII, like the parallel provisions in almost all recent U.S. extradition treaties, makes the Treaty applicable to extradition requests pending on the date of its entry into force and to subsequent extradition requests, even if the crimes were committed prior to the date of entry into force, so long as they constituted offenses under the laws in both Contracting States at the time of their commission.

Article XIX contains final clauses dealing with the Treaty's entry into force and termination. It provides that the Treaty is subject to ratification and that the Treaty shall enter into force upon the exchange of instruments of ratification, which is to take place as soon as possible. Either State may terminate the Treaty with six months written notice to the other State. Article XIX (2) provides that, upon entry into force of the Treaty, the Treaty on Extradition Between the United States of America and the Republic of Peru, signed at Lima November 28, 1899, and the related agreement of February 15, 1990, done at Cartagena, Colombia, shall become null and void.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the U.S. negotiating delegation, consisting of representatives from the Departments of State and Justice, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate at the earliest possible date.

Respectfully submitted,

COLIN L. POWELL.

EXTRADITION TREATY

BETWEEN

THE UNITED STATES OF AMERICA

AND

THE REPUBLIC OF PERU

(1)

2

2

The United States of America and the Republic of Peru  (hereinafter also, the "Contracting States"),

Recalling the Treaty on Extradition Between the United States of America and the Republic of Peru, signed at Lima November 28, 1899, and related agreement of February 15, 1990, done at Cartagena, Colombia;

Desiring to enhance cooperation between the two States in the suppression of crime;

Have agreed as follows:

3

3

## Article I

### Obligation to Extradite

The Contracting States agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting State have charged with, found guilty of, or sentenced for, the commission of an extraditable offense.

## Article II

### Extraditable Offenses

1.      An offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty.

2.      An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or association or participation in the commission of, any offense described in paragraph 1.

3.      For the purposes of this Article, an offense shall be an extraditable offense, regardless of:

(a)      whether the laws in the Contracting States place the offense within a different category of offenses or describe the offense by different terminology, so long as the underlying conduct is criminal in both States;

(b)      whether the offense is one for which the laws of the Requesting State require, for the purpose of establishing jurisdiction of its courts, evidence of interstate transportation, or the use of the mails or other facilities affecting interstate or foreign commerce, as elements of the specific offense;  or

(c)      where the offense was committed.

4.      If extradition has been granted for one or more extraditable offenses, it shall also be granted for any other offense specified in the request even if the latter offense is punishable by one year or less of deprivation of liberty, provided that all other requirements for extradition are met.

4

4

## Article III

### Extradition of Nationals

Extradition shall not be refused on the ground that the person sought is a national of the Requested State.

## Article IV

### Bases for Denial of Extradition

1.  Extradition shall not be granted:

    (a)   if the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested. However, extradition shall not be precluded by the fact that the authorities in the Requested State have decided not to prosecute the person sought for the same acts for which extradition is requested, or to discontinue any criminal proceedings that have been instituted against the person sought for those acts; or

    (b)   if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State.

2.   Extradition shall not be granted if the offense for which extradition is requested constitutes a political offense.  For the purposes of this Treaty, the following offenses shall not be considered to be political offenses:

    (a)   a murder or other violent crime against the person of a Head of State of one of the Contracting States, or of a member of the Head of State's family;

    (b)   genocide, as described in the Convention on the Prevention and Punishment of the Crime of Genocide, done at Paris on December 9, 1948;

    (c)   an offense for which both Contracting States have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution, including, but not limited to:

    (i)   illicit drug trafficking and related offenses, as described in the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, done at Vienna on December 20, 1988;  and

    (ii)   offenses related to terrorism, as set forth in multilateral international agreements to which both Contracting States are parties; and

5

3.    Extradition shall not be granted if the executive authority of the Requested State determines that the request was politically motivated.

4.    The executive authority of the Requested State may refuse extradition for offenses under military law which are not offenses under ordinary criminal law.

5.    The executive authority of the Requested State may refuse extradition if the person sought would be tried, or punished as the result of a trial, under extraordinary criminal laws or procedures in the Requesting State.

## Article V

### Death Penalty

1.    When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the executive authority of the Requested State may refuse extradition unless the Requesting State provides an assurance that the person sought will not be executed.  In cases in which such an assurance is provided, the death penalty shall not be carried out, even if imposed by the courts in the Requesting State.

2.    Except in instances in which the death penalty applies, extradition shall not be refused, nor conditions imposed, on the basis that the penalty for the offense is greater in the Requesting State than in the Requested State.

## Article VI

### Extradition Procedures and Required Documents

1.    All requests for extradition shall be made in writing and submitted through the diplomatic channel.

2.    All requests for extradition shall be supported by:

(a)    documents, statements, or other types of information that describe the identity and probable location of the person sought;

(b)    information describing the facts of the offense and the procedural history of the case;

(c)    the text of the laws describing the essential elements of, and the applicable punishment for, the offense for which extradition is requested;

(d)    the text of the laws indicating that neither the prosecution nor the execution of the penalty are barred by lapse of time in the Requesting State;  and

(e)    the documents, statements, or other types of information specified in paragraph 3 or paragraph 4 of this Article, as applicable.

6

6

3.      A request for extradition of a person who is sought for prosecution shall also be supported by:

        (a)      a copy of the warrant or order of arrest issued by a judge or other competent authority;

        (b)      a copy of the charging document; and

        (c)      such evidence as would be sufficient to justify the committal for trial of the person if the offense had been committed in the Requested State.

4.      A request for extradition relating to a person who has been found guilty of, or sentenced for, the offense for which extradition is sought shall also be supported by:

        (a)      a copy of the judgment of conviction or, if such copy is not available, a statement by a competent judicial authority that the person has been found guilty;

        (b)      evidence or information establishing that the person sought is the person to whom the finding of guilt refers; and

        (c)      a copy of the sentence imposed, if the person sought has been sentenced, and, if applicable, a statement establishing to what extent the sentence has been carried out.

5.      If the Requested State requires additional evidence or information to enable it to decide on the request for extradition, such evidence or information shall be submitted to it within such time as that State shall require.


Article VII

Translation and Admissibility of Documents

1.      All documents submitted by the Requesting State shall be accompanied by a translation into the language of the Requested State.

2.      The documents that accompany an extradition request shall be admitted as evidence in extradition proceedings if:

        (a)      the documents are certified or authenticated by the appropriate accredited diplomatic or consular officer of the Requested State in the Requesting State; or

        (b)      the documents are certified or authenticated in any other manner accepted by the laws in the Requested State.

7

7

## Article VIII

### Provisional Arrest

1.      In case of urgency, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition. A request for provisional arrest shall be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the Republic of Peru.

2.      The application for provisional arrest shall contain:

(a)      a description of the person sought;

(b)      the location of the person sought, if known;

(c)      a brief statement of the relevant facts of the case, including, if possible, the time and location of the offense;

(d)      a description of the law or laws violated;

(e)      a statement of the existence of a warrant of arrest, or of a finding of guilt or judgment of conviction, against the person sought; and

(f)      a statement that a request for extradition for the person sought will follow.

3.      The Requesting State shall be notified without delay of the disposition of its application for provisional arrest and the reasons for any denial of such application.

4.      A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the request for extradition and the supporting documents required in Article VI.

5.      The discharge from custody of the person sought pursuant to paragraph 4 of this Article shall not be an obstacle to the rearrest and extradition of that person if the extradition request is received later.

8

8

## Article IX

### Decision on the Extradition Request and
### Surrender of the Person Sought

1.      The Requested State shall process the request for extradition in accordance with the procedures set forth in its law and this Treaty, and shall promptly notify the Requesting State, through the diplomatic channel, of its decision regarding such request.

2.      If extradition is granted, the Contracting States shall agree on the time and place for the surrender of the person sought.  If that person is not removed from the territory of the Requested State within the time prescribed by the law of that State, if any, that person may be discharged from custody, and the Requested State may thereafter refuse extradition for the same offense.

3.      If unforeseen circumstances prevent the surrender of the person sought, the affected Contracting State shall inform the other State, and such States shall agree on a new date for the surrender, consistent with the laws of the Requested State.

4.      If the request is denied in whole or in part, the Requested State shall provide an explanation of the reasons for the denial and, upon request, shall provide copies of pertinent decisions.

## Article X

### Deferred and Temporary Surrender

1.      The Requested State may postpone the extradition proceedings against, or the surrender of, a person who is being prosecuted or who is serving a sentence in that State.  The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.  The Requested State shall notify the Requesting State as soon as possible of any postponement pursuant to this paragraph.

2.      If extradition is granted in the case of a person who is being proceeded against or is serving a sentence in the Requested State, such State may, in exceptional cases, temporarily surrender the person sought to the Requesting State exclusively for the purpose of prosecution.  The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by agreement of the Contracting States.

9

9

## Article XI

### Concurrent Requests

If the Requested State receives requests from the other Contracting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State it will surrender the person.  In making its decision, the Requested State shall consider all relevant factors, including the following:

    (a)    whether the requests were made pursuant to treaty;

    (b)    the place where each offense was committed;

    (c)    the respective interests of the requesting States;

    (d)    the gravity of each offense;

    (e)    the possibility of further extradition between the requesting States; and

    (f)    the chronological order in which the requests were received by the Requested State.

## Article XII

### Seizure and Surrender of Property

1.    To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all articles, documents, and evidence connected with the offense for which extradition is granted.  The items mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2.    The Requested State may defer the surrender of the items described in paragraph 1 of this Article for such time as it is deemed necessary for an investigation or proceeding in that State.  The Requested State may also surrender such items on condition that they be returned to that State as soon as practicable.

3.    The rights of the Requested State or of third parties in such items shall be duly respected.

10

10

Article XIII

Rule of Speciality

1.      A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)    an offense for which extradition was granted, or a differently denominated offense, provided that such differently denominated offense:

(i)    is based on the same facts on which extradition was granted, and would itself be an extraditable offense; or

(ii)   is a lesser included offense of an offense for which extradition was granted;

(b)    an offense committed after the extradition of the person; or

(c)    an offense for which the executive authority of the Requested State consents to the person's detention, trial, or punishment.  For the purpose of this subparagraph:

(i)    the Requested State may require the submission of the documents specified in Article VI; and

(ii)   the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request is being processed.

2.      A person extradited under this Treaty may not be extradited to a third State for an offense committed prior to such person's surrender unless the surrendering State consents.

3.      Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the subsequent extradition of that person to a third State, if that person:

(a)    leaves the territory of the Requesting State after extradition and voluntarily returns to it; or .

(b)    does not leave the territory of the Requesting State within 10 days of the day on which that person is free to leave.

11

11

## Article XIV

### Simplified Procedure for Surrender

If the person sought consents to surrender to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

## Article XV

### Transit

1.      Either Contracting State may authorize, upon request of the other Contracting State, transit through its territory of a person surrendered to such other State by a third State. A request for transit shall be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the Republic of Peru. Such request shall contain a description and identification of the person being transported and a brief statement of the facts of the case. A person in transit may be detained in custody during the period of transit.

2.      No authorization shall be required if one Contracting State is transporting a person surrendered to it by a third State using air transportation and no landing is scheduled on the territory of the other Contracting State. If an unscheduled landing occurs on the territory of a Contracting State, that State may require a transit request as provided in paragraph 1 of this Article. If required, any such request shall be provided within ninety-six (96) hours of the unscheduled landing. The Contracting State in which the unscheduled landing occurs may detain the person to be transported until the transit is effected.

## Article XVI

### Representation and Expenses

1.      The Requested State shall advise, assist, appear in court on behalf of, and represent the interests of the Requesting State in any proceedings arising out of a request for extradition.

2.      The Requesting State shall bear the expenses related to the translation of documents and the transportation to that State of the person sought. The Requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

3.      Neither Contracting State shall make any pecuniary claim against the other State arising out of the arrest, detention, custody, examination, or surrender of persons sought under this Treaty.

12

12

### Article XVII·

### Consultation

The United States Department of Justice and the Ministry of Justice of the Republic of Peru may consult with each other directly in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of this Treaty.

### Article XVIII

### Application

The provisions of this Treaty shall apply from the date of its entry into force:

(a)     to pending extradition requests for which a final decision has not yet been rendered; and

(b)     to extradition requests initiated subsequent to such entry into force, even if the crimes were committed prior to that date, provided that at the time of their commission they constituted offenses under the laws in both Contracting States.

13

13

## Article XIX

### Final Clauses

1.    This Treaty shall be subject to ratification, and will enter into force upon exchange of the instruments of ratification. The instruments of ratification shall be exchanged as soon as possible.

2.    Upon the entry into force of this Treaty, the Treaty on Extradition Between the United States of America and the Republic of Peru, signed at Lima November 28, 1899, and related agreement of February 15, 1990, done at Cartagena, Colombia, shall become null and void.

3.    Either Contracting State may terminate this Treaty when it deems such action appropriate by giving written notice thereof to the other Contracting State. The termination shall be effective six months after the date of such notice.


IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective governments, have signed this Treaty.

DONE in duplicate, at Lima, in the English and the Spanish languages, both texts being equally authentic, this 26th day of July , 2001.


FOR THE UNITED STATES
OF AMERICA:

FOR THE REPUBLIC
OF PERU:

O