STEVEN G. KALAR
Federal Public Defender
Northern District of California
GRAHAM ARCHER
MARA K. GOLDMAN
Assistant Federal Public Defenders
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:   (510) 637-3507
Email:        graham_archer@fd.org

Counsel for ALEJANDRO TOLEDO MANRIQUE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF ALEJANDRO TOLEDO MANRIQUE. | Case No. 19-mj–71055 MAJ (TSH) **ALEJANDRO TOLEDO'S OPPOSITION TO THE UNITED STATES' REQUEST FOR DETENTION** |

1
2

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 1

I.   Dr. Toledo's Personal History .......................................................................... 1

II.  Dr. Toledo's Presidency .................................................................................... 2

III. The Ongoing Efforts of Dr. Toledo's Political Adversaries to Implicate Him in
     the Odebrecht Scandal ..................................................................................... 3

HISTORY OF THE CASE ........................................................................................ 4

ARGUMENT ........................................................................................................... 5

I.   This Court Has the Authority to Release Dr. Toledo on Bail ........................... 5

II.  Dr. Toledo Is Not a Flight Risk ........................................................................ 6

     A.   Dr. Toledo Lacks the Financial Ability to Flee ...................................... 6

     B.   Dr. Toledo Lacks the Practical Ability to Flee ....................................... 8

     C.   Dr. Toledo Lacks the Desire to Flee ........................................................ 8

     D.   Dr. Toledo Has Substantial Ties to the Community and Significant Sureties ............... 9

III. Several Special Circumstances Justify Dr. Toledo's Release on Bail ............. 10

     A.   This Court Has Broad Discretion to Determine What Constitutes a
          Special Circumstance ............................................................................. 10

     B.   Dr. Toledo's Confinement in "Administrative Separation" for the Duration
          of the Extradition Proceedings is a Special Circumstance Justifying Release ........... 13

     C.   The Complexity of the Issues and Likely Duration of the Extradition Proceedings
          Are Special Circumstances Justifying Release ....................................... 15

          1.   Challenge Based on the Lack of Formal Charges ............................ 16

          2.   Probable Cause Challenge Based on Witness Coercion .................. 17

     D.   The Lack of Flight Risk Is a Special Circumstance .............................. 18

     E.   Dr. Toledo's Extraordinary Community Support Is a Special Circumstance ............... 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IV.     The Lack of Urgency Shown by the United States Weighs Against the Court's
        Concerns About the Potential for Diplomatic Embarrassment ...........................................19

CONCLUSION ...........................................................................................................................20

1

## TABLE OF AUTHORITIES

2

### Federal Cases

3
4
*Kamrin v. United States*,
725 F. 2d 1225 (9th Cir. 1984) ............................................................................5

5
6
*Garcia v. Benov*,
2009 WL 6498194 (C.D. Cal. Apr. 13, 2009) ......................................................6

7
8
*Hu Yau-Leung v. Soscia*,
649 F.2d 914 (2d Cir. 1981) ........................................................................12, 15

9
*In re Extradition of Gonzalez*,
52 F. Supp. 2d 725 (W.D. La. 1999) ..................................................................10

10
11
*In re Extradition of Nacif-Borge*,
829 F. Supp. 1210 (D. Nev. 1993) .............................................. 6, 11-12, 17

12
13
*In re Extradition of Santos*,
473 F. Supp. 2d 1030 (C.D. Cal. 2006) ....................................6, 12, 15, 18

14
*In re Mitchell*,
171 F. 289 (S.D.N.Y. 1909) ........................................................... 11-12

15
16
*Matter of Extradition of Blasko*,
2018 WL 3691859 (E.D. Cal. Aug. 1, 2018) ................................. 6, 11-12

17
18
*Matter of Extradition of Mirela*,
2018 WL 1634393 (D. Conn. Apr. 5, 2018) ..............................................12, 19

19
*In re Extradition of Chapman*,
459 F. Supp. 2d 1024 (D. Haw. 2006) .........................................12-13, 18-19

20
21
*Matter of Extradition of Gonzalez*,
2015 WL 1409327 (N.D. Cal. March 27, 2015) .....................................................6

22
23
*Matter of Extradition of Kirby*,
106 F.3d 855 (9th Cir. 1996) ....................................................... 11-12, 15, 19

24
25
*Matter of Extradition of Porumb*,
2018 WL 814568 (W.D. La. Feb. 9, 2018) ............................................ 11-12

26
*Munoz Santos v. Thomas*,
2012 WL 12964319 (C.D. Cal. June 29, 2012) ......................................................6

27
28
*Salerno v. United States*,
878 F.2d 314 (9th Cir. 1992) ....................................................... 11-12, 17

*Sandin v. Conner*,
515 U.S. 472 (1995) ........................................................................................15

*Santos Munoz v. Thomas*,
830 F.3d 987 (9th Cir. 2016) (en banc) .........................................................17

*United States v. Castaneda-Castillo*,
739 F. Supp. 2d 49 (D. Mass. 2010) ........................................................ 11-12

*United States v. Kamrin*,
No. 82-251M-01 (W.D. Wash. Dec. 10, 1982) .................................................5

*United States v. Taitz*,
130 F.R.D. 442 (S.D. Cal. 1990) ..............................................7, 11-12, 15-16

*United States v. Williams*,
611 F.2d 914 (1st Cir. 1979) ..........................................................................12

*Wilkinson v. Austin*,
545 U.S. 209 (2005) ........................................................................................15

*Wright v. Henkel*,
190 U.S. 40 (1903) ............................................................................................6

*Wroclawski v. United States*,
634 F. Supp. 2d 1003 (D. Ariz. 2009) ........................................... 11-13, 18-19

### Federal Statutes

18 U.S.C. § 3142(g) ...........................................................................................6

### Miscellaneous Sources

Extradition Treaty with Peru, July 26, 2001, U.S.-Peru,
S. Treaty Doc. No. 107-6 ................................................................................17

Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique,*
47 Crime & Just. 365 (2018) ..........................................................................14

1
2
3
4
5
6
7
8
9
10
11

**INTRODUCTION**

Dr. Toledo should be released from custody on a secured bond with appropriate conditions because he is a longtime resident of the United States (32 years) and the Northern District of California (24 years) with deeply rooted community ties, and because he lacks the means, ability, or desire to flee this jurisdiction. Dr. Toledo has been aware of the attempt to extradite him since February 10, 2017 when the Peruvian government announced its intention to the world, and he did not flee. His friends, distinguished community members, are prepared to put forth significant security in the form of cash and property to secure his release. Additionally, his current conditions of incarceration, solitary confinement, are inhumane for a short period of detention, let alone the time necessary to litigate this particularly complex and novel extradition request.

12
13

**BACKGROUND**[1]

**I.    Dr. Toledo's Personal History**

14
15
16
17
18
19
20
21
22
23
24
25
26

Alejandro Toledo refers to the path of his life as a "statistical error." Dr. Toledo was born in 1946 in the mountain town of Cabana in the Andes mountains of Peru. The son of indigenous Quechuan farmers, he grew up in extreme poverty. Of Dr. Toledo's 15 siblings, 7 died in their first year of life. When Dr. Toledo was four-and-a-half, his family moved down from the Andes to the port city of Chimbote. During the day he attended school; at night, he worked to help support his family by shining shoes and selling lottery tickets and newspapers to sailors in bars. In high school, he won a writing contest, and the prize was a job as a correspondent for the Chimbote office of the national newspaper *La Prensa*. When some members of the Peace Corps, Nancy Deeds (now Meister) and Joel Meister, arrived in Chimbote in 1964, they were struck by this young man's love of writing and curiosity about the world. Another Peace Corps volunteer, Marjorie Leon, helped to teach him English. After he won a grant to study in the United States, a friend of the Meisters was able to help Dr. Toledo obtain a visa and find a job in America. They enabled him to support himself while he studied English and, later, attended the University of San Francisco.

27
28

[1] To the extent that English-language documents are available, they are submitted with this motion. The defense is in the process of translating the relevant Spanish-language documents. The defense anticipates supplementing future filings with extensive documentation of the proceedings in Peru.

OPPOSITION TO REQUEST FOR DETENTION
*TOLEDO MANRIQUE*, 19–MJ–71055 MAJ

1    Dr. Toledo arrived in the United States in 1965.  He would spend much of the next 45 years in
2  this country, most of that time in the Bay Area.

3    After earning his undergraduate degree from USF, Dr. Toledo went to Stanford University,
4  where he was a student from 1970 to 1976.  At Stanford, Dr. Toledo earned Master's Degrees in
5  International Education and Economics, and a Ph.D. in International Education.  He returned to
6  Stanford as a Visiting Scholar for the 1978-79 academic year.

7    While at Stanford, he also met his wife, Eliane Karp, whom he married in Sunnyvale in 1979.
8  They will celebrate their fortieth anniversary later this year.

9    From 1979 to 1981, Dr. Toledo worked for the World Bank in Washington, D.C.  He then spent
10  several years in Peru before returning to the United States in 1990 as a Visiting Research Associate at
11  the Harvard Institute for International Development (HIID).  He remained at HIID through the 1992-
12  1993 academic year.

13    After a year as a visiting professor at a university in Tokyo, Dr. Toledo returned to Peru, where
14  he dedicated himself to political and social reform.  These efforts culminated in his six-year term as
15  President.

16    After his presidency ended in 2006, Dr. Toledo returned to Northern California and to Stanford.
17  He spent the next three years at Stanford, first as a Senior Research Fellow and then as a Visiting
18  Professor.  From 2009 to 2010, he went to Washington, D.C., where he was a non-resident Senior
19  Fellow at the Brookings Institute and a Visiting Scholar at the Johns Hopkins Center for Advanced
20  Studies.  In 2011, he returned once again to Stanford.  When he was arrested in connection with this
21  case, he was a Visiting Research Scholar at Stanford, and was at work on a new book, tentatively
22  titled *The Urgency for Leadership to Improve the Quality of Education in the World*.

23  **II.    Dr. Toledo's Presidency**

24    In December of 1994, Dr. Toledo created a political organization called Possible Country and
25  announced his candidacy for the 1995 presidential election.  At the time, Peru was controlled by
26  Alberto Fujimori, and was in desperate need of new leadership.  During his presidency, Fujimori
27  would disband Congress, dismiss judges, suspend the Peruvian Constitution, and oversee shocking
28  human rights violations.

1   Dr. Toledo ran against Fujimori in 1995, but lost.  Undaunted, Dr. Toledo challenged Fujimori

2   again in April of 2000.  The official tally showed Fujimori with 49.8% of the vote compared to Dr.

3   Toledo with 40.3%.  Electoral fraud was widely suspected, however, not only by Fujimori's

4   opponents, but also by objective international observers, including the United States.  By this time,

5   Dr. Toledo had emerged as the leader of a broad democratic coalition against Fujimori's increasingly

6   authoritarian rule.  After repeated protests and calls for a new election, Dr. Toledo was elected

7   President of Peru on June 3, 2001.  He was the first indigenous Peruvian leader in five hundred years.

8   During his presidency, the Peruvian economy grew.  Inflation, which had plagued Peru in the

9   past, nearly disappeared.  Dr. Toledo worked tirelessly to reform the judicial system, although much

10  of that progress has been undone by subsequent leaders.  He was a strong ally to the United States in

11  its fight against narcotics trafficking.  His efforts to expose Fujimori's wrongdoing ultimately

12  resulted in Fujimori's criminal conviction for human rights violations, murder, and kidnapping.

13  Until Peru's campaign to discredit him and brand him an international fugitive, Dr. Toledo was

14  in demand as a speaker on topics including poverty, early childhood, nutrition, and indigenous rights.

15  **III.   The Ongoing Efforts of Dr. Toledo's Political Adversaries to Implicate Him in the
        Odebrecht Scandal**

16

17  In 2015 and 2016, numerous executives at Odebrecht, a Brazilian construction conglomerate,

18  were arrested in connection with a bribery scandal involving contracts with a Brazilian state oil

19  company.  The executives pled guilty and agreed to identify corrupt officials in return for shorter

20  sentences.[2]  These executives implicated officials in numerous countries, including Peru.

21  Peruvian prosecutors have now accused Dr. Toledo of receiving bribes, through intermediaries,

22  from Odebrecht in return for favorable treatment in bidding for contracts to build an international

23  highway.  These accusations are based primarily on recent statements from Josef Maiman.  There are

24  compelling reasons to doubt the reliability and veracity of those statements.

25  In a July 2013 statement to Peruvian prosecutors, and again in a September 2013 statement to a

26  Peruvian congressional committee, Maiman gave statements fully exonerating Dr. Toledo of any

27

28  [2] Odebrecht has entered into a plea agreement with the United States and Switzerland which calls for
    fines exceeding $2.5 billion.

OPPOSITION TO REQUEST FOR DETENTION
*TOLEDO MANRIQUE*, 19–MJ–71055 MAJ

3

1    involvement in the Odebrecht scandal.  Maiman's statement changed dramatically after Peru began

2    putting extreme pressure on Maiman and his family.  Suddenly, Maiman found himself the subject of

3    an arrest warrant and an INTERPOL Red Notice.  He was threatened with international seizure of his

4    bank accounts, and warned that his family could soon also be targets of criminal investigation.

5    Maiman agreed to become a "collaboration witness" for the Peruvian government.  In return for

6    Maiman's testimony and the payment of a $1.2 million fine, Peru has agreed to absolve Maiman of

7    any criminal wrongdoing.  Maiman, in turn, now admits that somewhere between $20 million and

8    $35 million found in his bank accounts was bribe money from Odebrecht, and claims that he was a

9    middleman who was supposed to give the money to Dr. Toledo.

10        Even though Dr. Toledo has lived openly in California throughout the Odebrecht investigation,

11   and has fully cooperated with investigators, the Peruvian authorities have falsely painted him as an

12   international fugitive.  On February 10, 2017, despite knowing Dr. Toledo's place of work and his

13   home address, Peru publicly announced a $30,000 reward for information on his whereabouts or his

14   "capture."

15                                    **HISTORY OF THE CASE**

16        In February of 2017, the government of Peru requested Dr. Toledo's provisional arrest with an

17   eye toward extradition.  Dr. Toledo was aware of this request, which received extensive coverage in

18   both the Peruvian and international press.  He retained counsel, and his attorneys began

19   corresponding with the State Department on February 13, 2017.  *See* Declaration of Graham Archer

20   ("Archer Decl."), attached hereto as Exhibit A, at ¶ 23.  Although Dr. Toledo's whereabouts were

21   known, the United States did not act on Peru's request.

22        In May of 2018, Peru submitted a second request for Dr. Toledo's arrest and extradition.  For

23   more than a year, the United States did not act on this request.  It was not until July 15, 2019, that the

24   United States government filed a criminal complaint against Dr. Toledo and obtained a warrant for

25   his arrest in connection with Peru's request for extradition.  Dkt. No. 1.

26        On July 16, 2019, Dr. Toledo was arrested at his home.  The FBI also conducted an exhaustive

27   search of the home, seizing and imaging computer hard drives and personal papers.

28        The same day, Dr. Toledo made his initial appearance before this Court.  His retained counsel

1  specially appeared, but informed the Court that he would be withdrawing because Dr. Toledo's funds

2  had been exhausted.  Dr. Toledo was remanded to custody.  *See* Dkt. No. 4.

3    A detention hearing was held on July 19, 2019.  The day before the hearing, the government

4  filed an extensive memorandum entitled Memorandum of Extradition Law and Request for Detention

5  Pending Extradition Proceedings ("Govt. Memo").  Dkt. No. 8.  At the conclusion of the hearing, the

6  Court ordered Dr. Toledo detained as a flight risk.  In a subsequent written order, the Court specified

7  that its decision had been based upon the following factors:  (1) Because of Dr. Toledo's status as the

8  former President of Peru, it would be a "diplomatically significant failure" if the United States were

9  to release him and he then fled; (2) during the search of Dr. Toledo's home, the FBI found $40,000 in

10  a suitcase, demonstrating "mobility and financial ability to travel"; (3) Dr. Toledo is a "well-traveled

11  person with numerous international connections"; and (4) Dr. Toledo failed to demonstrate any

12  special circumstances warranting release.  *See* Detention Order, Dkt. No. 16.

13    On August 8, 2019, the Court agreed to entertain further briefing and argument regarding

14  whether Dr. Toledo should be released on bond during the extradition proceedings, and a hearing was

15  set for August 22, 2019.  Dkt. No. 17.

16  **ARGUMENT**

17  **I.**  **This Court Has the Authority to Release Dr. Toledo on Bail**

18    Because an international extradition proceeding is not a criminal case, the Bail Reform Act

19  does not apply.  *Kamrin v. United States*, 725 F.2d 1225, 1227-28 (9th Cir. 1984).  This does not

20  mean that bail is not permitted, however.[3]  In the Northern District, courts frequently release

21  extraditees on bail while the extradition proceedings are pending, even when they are accused of

22  violent crimes.  *See, e.g.,* Minute Order, *United States v. Gonzalez*, No. 09-mj-70576-DRM (N.D.

23  Cal. 2009), attached hereto as Exhibit B (granting bail to extraditee accused of attempted murder);

24  Order Granting Request for Bail in Extradition Proceeding, *Matter of Extradition of Ramirez Luna*,

25  No. 16-xr-90095 NC (N.D. Cal. 2016) ("*Ramirez Luna* Bail Order"), attached hereto as Exhibit C

26  (granting bail to extraditee accused of second degree murder); Order Granting Release on Secured

27  _____

28  [3] Indeed, the extraditee in *Kamrin* was released on bail while his extradition case was pending.  *See United States v. Kamrin*, No. 82-251M-01 (W.D. Wash. Dec. 10, 1982).

1  Bond, *United States v. Kollmar*, No. 19-mj-70677-MAG-1 (KAW) (N.D. Cal. 2019) ("*Kollmar* Bond

2  Order"), attached hereto as Exhibit D (granting bail to extraditee accused of sexual abuse of a minor);

3  *see also Matter of Extradition of Kirby*, 106 F.3d 855 (9th Cir. 1996) (affirming Northern District

4  court's grant of bail to extraditees accused of escaping from prison).

5      While there is a presumption against bail in extradition cases, it is well-established that courts

6  have the power to grant bail in extradition cases where the extraditee can demonstrate the presence of

7  "special circumstances." *Wright v. Henkel*, 190 U.S. 40, 63 (1903).  In this Circuit, the general

8  consensus is that the extraditee "must establish the existence of special circumstances by a

9  preponderance of the evidence."  *Matter of Extradition of Blasko,* 2018 WL 3691859, *4 (E.D. Cal.

10  Aug. 1, 2018) (citing *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1035 (C.D. Cal. 2006)); *see*

11  *also, e.g., Matter of Extradition of Gonzalez*, 2015 WL 1409327, *5 (N.D. Cal. March 27, 2015);

12  *Munoz Santos v. Thomas*, 2012 WL 12964319, *2 (C.D. Cal. June 29, 2012); *Garcia v. Benov*, 2009

13  WL 6498194, *3 (C.D. Cal. Apr. 13, 2009).[4]

14      In addition to determining whether there are special circumstances, the Court must be satisfied

15  that the extraditee is neither a flight risk nor a danger to the community.  *See Santos,* 473 F. Supp. 2d

16  at 1035-36.  Even though the Bail Reform Act is not strictly applicable to extradition proceedings,

17  courts generally look to the factors identified in 18 U.S.C. § 3142(g) to assess whether "'there are

18  conditions of release that will reasonably assure the appearance of the person as required and the

19  safety of any other person and the community.'"  *Santos*, 473 F. Supp. 2d at 1041 (quoting 18 U.S.C.

20  § 3142(g)) (additional citations omitted).

21  **II.  Dr. Toledo Is Not a Flight Risk**

22      **A.   Dr. Toledo Lacks the Financial Ability to Flee**

23      The government has repeatedly offered speculation about money that it thinks Dr. Toledo

24  theoretically might have.  One by one, these hypothetical sources of funds have proven illusory.

25      First the government argued that Dr. Toledo was "alleged to have received US$20 million."

26  ─────────────────────

27  [4] As the government notes, a few courts have applied the clear and convincing standard.  *See* Govt.
    Memo at 22 n.16.  But both of the cases cited by the government are based on the reasoning set forth

28  *In re Extradition of Nacif-Borge*, 829 F. Supp. 1210 (D. Nev. 1993), reasoning which has been
    persuasively rejected as a misreading of Ninth Circuit precedent.  *See Santos*, 473 F. Supp. 2d at
    1035; *Garcia*, 2009 WL 6498294 at *3.

1    Govt. Memo at 24.  In fact, Peru has alleged that *Joseph Maiman* has received $20 million.  Indeed,

2    the $20 million was located in Maiman's bank accounts.  While Maiman is reportedly now claiming

3    that this money was meant to eventually go to Dr. Toledo, it did not.

4         Next the government pointed out that Dr. Toledo owns "multiple properties" in Peru.  Govt.

5    Memo at 24.  This is true, but as the government has since acknowledged, these properties have been

6    seized by the Peruvian government.  *See* Extradition Request, Supp. 2.[5]  The same is true of Dr.

7    Toledo's pension and bank accounts.  *See id.*

8         The government then suggested that Dr. Toledo had "other possible sources of income."  Govt.

9    Memo at 24.  Yet the government has been unable to identify these hypothetical sources of funds,

10   despite monitoring his bank accounts and executing a search warrant at his home.  The government

11   suggests that Dr. Toledo has lucrative speaking engagements or publishing royalties.  It is true that

12   Dr. Toledo was formerly very much in demand as a public speaker.  Unfortunately, Peru's relentless

13   campaign to discredit him and paint him as an international fugitive has eliminated that demand.  As

14   the Court knows from Dr. Toledo's financial affidavit, his current income is minimal.

15        Finally, at the July 16th hearing, the government made much of the fact that a suitcase

16   containing $40,000 was found at Dr. Toledo's home.  As an initial matter, that money was his wife's.

17   By the time their home was searched, it had been two years since Peru announced its intention to

18   have Dr. Toledo extradited.  Most of his assets had been seized, and what remained had been spent on

19   lawyers.  The Toledos were struggling and Dr. Toledo's mother-in-law gave them money to help

20   cover their everyday living expenses.  Having already watched as Dr. Toledo's assets, including his

21   bank accounts, were seized in Peru, it is understandable that his wife felt the need to have cash

22   available to pay their bills.

23        In *Taitz*, as here, the government "implied that [the extraditee] may have money from the

24   alleged fraud hidden away."  *United States v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1990).  Noting

25   the absence of actual *evidence* of "any substantial financial assets," the *Taitz* court concluded that

26   "[n]o evidence exists to allow such an inference."  *Id.*  The same is true here.

27   ───────────────

28   [5] The defense is informed and believes that the government has manually provided a hard copy of this document to the Court.

OPPOSITION TO REQUEST FOR DETENTION
*TOLEDO MANRIQUE*, 19–MJ–71055 MAJ

7

**B.     Dr. Toledo Lacks the Practical Ability to Flee**

The government claims that Dr. Toledo is a flight risk because he traveled the world, something completely normal for a 74 year old former head of state.  Now, his ability to do so is entirely curtailed.  Even if he had the financial wherewithal or inclination to flee, doing so would be practically impossible.

Dr. Toledo's Peruvian passport has expired, and Peru will certainly not issue an updated passport while this matter is pending. As he is a legal permanent resident, nor will the United States.

The government arrested Dr. Toledo at his home without notice, and found no fraudulent travel documents or evidence of preparations to flee the country.  Further, Peru has issued a Red Notice to INTERPOL, which would result in Dr. Toledo being arrested and detained for extradition at any border crossing.

Dr. Toledo is willing to submit to restrictive bond conditions including GPS monitoring and a condition that he stay away from all airports.  Compounding these already insurmountable practical hurdles to flight, Dr. Toledo is well known internationally.  To the extent that he was not well known before February 10, 2017, his face has now graced the area above bylines in hundreds of stories published around the world about the Peruvian government's attempts to arrest him.

The government has argued that Dr. Toledo might flee to Israel due to his history of good political relations with Israel, and his wife's Belgian-Israeli citizenship.  That argument was foreclosed by the Israeli government on February 12, 2017, when Israel's Foreign Ministry announced publicly that Dr. Toledo would not be permitted into Israel until his matters were settled in Peru.

In the aggregate, these factors make any attempt to flee by Dr. Toledo completely impractical.

**C.     Dr. Toledo Lacks the Desire to Flee**

Dr. Toledo has known about the Peruvian attempts to have him arrested in the United States since February of 2017 when they were publicly announced by Peruvian authorities.  He responded by hiring counsel to defend himself against the accusations, and by remaining at home in Menlo Park.  At that point, his family finances were in much better shape, and he had a valid passport, yet he remained in the United States to contest the charges without submitting to unjust investigatory

1  detention in Peru.

2  **D.     Dr. Toledo Has Substantial Ties to the Community and Significant Sureties**

3  Contrary to the government's prior assertion, Dr. Toledo has longstanding and significant ties

4  to the United States, and specifically to the Northern District of California.  While in custody, Dr.

5  Toledo prepared a chronology of his residency and employment for the Court's consideration.  It has

6  been typed up and is attached as Exhibit E.  As Dr. Toledo notes, he has spent 32 years in the United

7  States, and he has spent 24 of those years in the Northern District of California, primarily at Stanford

8  University as both a student and teacher.

9  In spite of the allegations publicized in the press for the last several years, Dr. Toledo enjoys

10  significant community support, and still has many friends and supporters in our District and across

11  the country.  Since his arrest in this matter, a number of friends have stepped forward to offer money

12  and property to secure his release from custody and assure his appearance in court.  Amongst those

13  supporters are people who have known Dr. Toledo for decades, and who have had the opportunity to

14  assess his personal character and professional capacities.

15  - Dr. Martin Carnoy has known Dr. Toledo since 1970, when Dr. Carnoy was an Assistant
16    Professor of Education and Economics at the Stanford Graduate School of Education, and Dr.
17    Toledo was applying to Dr. Carnoy's graduate program.  Dr. Carnoy has been a professor at
18    that program since 1968, becoming a leading scholar in the political economy of the
       educational system. He attended Dr. Toledo's presidential inauguration, and is one of Dr.
       Toledo's closest friends.[6]

19  - Dr. Alberto Martin is the Registrar at the Stanford Law School, and has been a longtime friend
20    of Dr. Toledo.  Dr. Martin met Dr. Toledo at Stanford where they played soccer together in the
21    early 1970s while studying for their graduate degrees. Their friendship endures to this day.

22  - Marjorie Leon has known Dr. Toledo since 1964 when she traveled to Peru as a Peace Corps
23    volunteer.  Ms. Leon briefly stayed with Dr. Toledo's family, and gave him his first English
       lessons. She also helped him relocate to San Francisco to study at the University of San
24     Francisco.

25

26

27

28  [6] *See* Exhibit F – San Francisco Chronicle – From president of Peru to just Palo Alto guy, February
    11, 2007.

- Nancy Meister first met Dr. Toledo in 1964 when she lived with his family as a Peace Corps volunteer.  She and her future husband were instrumental in aiding Dr. Toledo in traveling to the United States to continue his education, and they visited him when he lived in Peru.[7]

- Dr. H. Andrea Neves has known Dr. Toledo since they studied together in their doctoral programs at Stanford.  Now retired as a professor of education at Sonoma State University, Dr. Neves is a world-renowned scholar in education and serves on a number of local boards of academic and arts organizations.

- Dr. Larry Diamond is a widely published scholar and expert on democratic development, and a friend and colleague of Dr. Toledo.  He teaches courses on democratic development and supervises the democracy program at Stanford's Center on Democracy, Development, and the Rule of Law.  He is also a senior fellow at the Hoover Institution.  He has also served as an advisor to a number of governmental and international organizations, including the U.S. Department of State, USAID, the United Nations and the World Bank.

As of this filing, surety information is being organized to present to United States Pretrial Services.  While the total amount of security available for a bond is not yet determined, it will be significant.

**III.   Several Special Circumstances Justify Dr. Toledo's Release on Bail**

In this case, there are several special circumstances that, either taken alone or considered together, justify Dr. Toledo's release on bail during these proceedings.

**A.      This Court Has Broad Discretion to Determine What Constitutes a Special Circumstance**

"[T]he determination of what constitutes a 'special circumstance' is left to the sound discretion of the trial judge."  *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 736 (W.D. La. 1999).  The list of "potential 'special circumstances' is not limited to those previously recognized in published decisions," and special circumstances must be assessed on a case-by-case basis.  *Id.*  The fact that one judge declined to consider a circumstance in one case does not preclude another judge (or even the same judge) from considering that same circumstance in a different case.

In its Memorandum, the government presents a long list of circumstances that have been rejected as grounds for granting bail.  *See* Govt. Memo at 23-24.  It is true that at least one judge has rejected each of these circumstances.  But it is equally true that, in almost every instance, more than

---

[7] *See* Exhibit G – Tucson Weekly – The Peace Corps President, September 8, 2005.

1    one judge has *granted* bail based on the very same circumstances.

2         For example, the government asserts that courts have rejected "complexity of pending

3    litigation" concerning the extradition, but this was found to be a special circumstance justifying bail

4    in both *Taitz*, 130 F.R.D. at 445, and *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 59 (D.

5    Mass 2010).

6         Likewise, the government notes that the need to consult with an attorney and participate in

7    pending litigation has been rejected, *see* Govt. Memo at 23, but these were precisely the special

8    circumstances that prompted the court to grant bail in *In re Mitchell*, 171 F. 289, 290 (S.D.N.Y.

9    1909), and *Blasko*, 2018 WL 3691859 at *10-*11.

10        Similarly, while the government points to cases in which courts have refused to consider "the

11   pendency of naturalization or other immigration proceedings," Govt. Memo at 23, it fails to mention

12   cases in which courts have found special circumstances based on the extraditee's pending asylum

13   proceedings, *see Blasko*, 2018 WL 3691859 at *10-*11; or the fact that the extraditee had been

14   granted asylum in the United States, *see Matter of Extradition of Porumb*, 2018 WL 814568, *5

15   (W.D. La. Feb. 9, 2018).

16        The government notes that some courts have declined to consider the extraditee's character,

17   background and ties to the community.  *See* Govt. Memo at 23.  But courts in the Ninth Circuit and

18   the Northern District of California have found those factors to be special circumstances supporting

19   release.  *See, e.g., Kirby*, 106 F.3d at 864-65; *Ramirez Luna* Bail Order at 4-5; *Kollmar* Bond Order at

20   4-5; *see also Wroclawski v. United States*, 634 F. Supp. 2d 1003, 1007-08 (D. Ariz. 2009).

21        Finally, the government notes that some courts have rejected the availability of bail for the

22   charged offense in the requesting country as a special circumstance.  *See* Govt. Memo at 24.  Again,

23   this is true, but it is also true that an equal number of courts have concluded that the availability of

24   bail in the requesting country *is* a special circumstance.  *See, e.g., Castaneda-Castillo,* 739 F. Supp.

25   2d at 57-58; *Wroclawski,* 634 F. Supp. 2d at 1007; *In re Extradition of Morales,* 908 F. Supp. 1368,

26   1376 (S.D. Cal. 1995); *of Nacif-Borge,* 829 F. Supp. at 1221; *Taitz*, 130 F.R.D. at 477.

27        In truth, a special circumstance can be virtually anything that is "not faced by all individuals

28   facing extradition."  *Wroclawski,* 634 F. Supp. 2d at 1008.  Among the many special circumstances

---

OPPOSITION TO REQUEST FOR DETENTION
*TOLEDO MANRIQUE*, 19–MJ-71055 MAJ

11

that courts have found can justify release in extradition cases are:

- A high likelihood of success on the merits. *See, e.g., Salerno v. United States*, 878 F.2d 317, 317; *Nacif-Borge*, 829 F. Supp. at 1215.

- Uncertainty regarding the outcome on the merits. *See, e.g., In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1040 (C.D. Cal. 2006).

- The complexity of the case. *See, e.g., Castaneda-Castillo*, 739 F. Supp. 2d at 59; *Taitz*, 130 F.R.D. at 445.

- Anticipated length of the extradition proceedings. *See, e.g., Matter of Extradition of Kirby*, 106 F.3d 855, 863 (9th Cir. 1996); *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979); *In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1027 (D. Haw. 2006); *Santos*, 473 F. Supp. 2d at 1036; *Taitz*, 130 F.R.D. at 445-46.

- Lack of a suitable detention facility. *See, e.g., Hu Yau-Leung v. Soscia*, 649 F.2d 914, 920 (2d Cir. 1981).

- Serious health problems. *See, e.g., Salerno*, 878 F.2d at 317; *Taitz*, 130 F.R.D. at 446.

- Inability to observe religious customs in detention facility. *See, e.g., Taitz*, 130 F.R.D. at 446.

- Risk of financial harm to extraditee if unable to participate in civil litigation. *See In re Mitchell*, 171 F. 289, 290 (S.D.N.Y. 1909).

- The need to prepare for and participate in asylum-related litigation. *See, e.g., Blasko*, 2018 WL 3691859 at *10-*11.

- Fact that extraditee was granted asylum from requesting country. *See, e.g., Porumb*, 2018 WL 814568 at *5.

- Delay in requesting country's decision to seek extradition. *See, e.g., Kollmar* Bond Order at 5-6; *Blasko*, 2018 WL 3691859 at *9; *Matter of Extradition of Mirela*, 2018 WL 1634393, *2 (D. Conn. Apr. 5, 2018); *Castaneda-Castillo*, 739 F. Supp. 2d at 58-59; *Wroclawski*, 634 F. Supp. 2d at 1008.

- Availability of bail during extradition proceedings in requesting country. *See, e.g., Kollmar* Bond Order at 6-7; *Nacif-Borge*, 829 F. Supp. at 1221; *Taitz*, 130 F.R.D. at 447.

- Availability of bail for the alleged offense in requesting country. *See, e.g., Castaneda-Castillo*, 739 F. Supp. 2d at 57-58; *Wroclawski*, 634 F. Supp. 2d at 1007; *Morales*, 908 F. Supp. at 1376; *Nacif-Borge*, 829 F. Supp. at 1221; *Taitz*, 130 F.R.D. at 447.

- Role as caretaker for family member. *See, e.g., Mirela*, 2018 WL 1634393 at *2; *Ramirez Luna* Bail Order at 4.

- Community support and personal character. *See, e.g., Kirby*, 106 F.3d at 864-65; *Kollmar* Bond Order at 4-5; *Mirela*, 2018 WL 1634393 at *2; *Ramirez Luna* Bail Order at 5-6; *Wroclawski*, 634 F. Supp. 2d at 1007-08.

- Absence of flight risk. *Wroclawski*, 634 F. Supp. 2d at 1007; *Chapman*, 459 F. Supp. 2d at 1027.

Not only does the court have wide discretion to consider these and other circumstances, "there need not be one overriding circumstance justifying an extraditee's release on bail. Rather, the cumulation of several factors can constitute special circumstances that justify release in extradition proceedings." *Morales*, 966 F. Supp. at 1373.

## B.   Dr. Toledo's Confinement in "Administrative Separation" for the Duration of the Extradition Proceedings Is a Special Circumstance Justifying Release

Dr. Toledo has been in custody at the Santa Rita Jail since his arrest on July 16, 2019. Unfortunately, because of the high-profile nature of this case, the Classification Unit at Santa Rita has determined that it would be unsafe for Dr. Toledo him to be housed anywhere other than a "separation unit." *See* Archer Decl. at ¶¶ 8-9. For this reason, instead of being housed with the general population, Dr. Toledo is in Administrative Separation, the highest security classification at Santa Rita. *See id.* at ¶ 6.

Dr. Toledo spends 47 of each 48 hour period in a cell approximately 6 feet by 15 feet. *Id.* at ¶ 7. Although he is housed in a "pod" with 13 other inmates, none of the inmates in Administrative Separation – including Dr. Toledo – are allowed contact with another inmate. *See id.* ¶¶ 10-11. In theory, there is an 8-hour period each day when the inmates in the pod are permitted to leave their cells for an hour to go to an adjacent indoor recreation area. Because the inmates are not permitted to have contact, however, only one inmate can be in the recreation area at a time. This means that on any given day, at most only 8 of the 14 inmates in Dr. Toledo's pod will have the chance to leave their cells to go to the recreation area. *See id.* at ¶ 12. Jail lockdowns, medical appointments, visits, and other events may interfere with the short window of time available for access to the recreation area. *Id.* at ¶ 13. Even under ideal circumstances, at most Dr. Toledo is permitted to leave his cell to go, alone, to the recreation area for one hour every two days. *See id.* at ¶ 14.

Because the time in the recreation area is the only time during which Dr. Toledo is able to

make phone calls, including calls to counsel, Dr. Toledo's ability to reach counsel by phone has been impaired.  *See id.* at ¶ 15.  Not only is the window of opportunity brief, but there is no way to predict in advance when he will be allowed to go to the recreation area.

There is an exercise yard available, but it is shared by approximately 300 similarly classified inmates, and only one inmate can be in the exercise yard at any given time.  *See id.* at ¶ 16.  The goal is to get each inmate to the exercise yard once a week.  However, as of August 13, 2019, Dr. Toledo had been in custody for 29 days and he had only been permitted to go outside once, for 45 minutes, a fact that has been confirmed by a Classification Sergeant.  *See id.* at ¶¶ 17-18.

Even though Dr. Toledo is in Administrative Separation for his own safety and not because he poses any threat to anyone, his hands have been handcuffed and shackled to a waist chain every time that he has met with counsel.  *See id.* at ¶ 19.  When counsel has asked that the handcuffs be removed, he has been told that this is not possible due to Dr. Toledo's classification level, i.e., the fact that he is in administrative separation.  *Id.*

It would be difficult to overstate the harmful effects of administrative segregation.  Empirical studies have identified a multitude of "frequently occurring adverse psychological reactions," including: sleep disturbances, anxiety and panic, aggression and rage, paranoia, violent fantasies, dysfunction, hypersensitivity to stimuli, hallucinations, loss of emotional control, lethargy, depression, and increased suicidality and instances of self-harm.  *See* Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime & Just. 365, 371-72 (2018).[8]  Tellingly, subjecting prisoners to long periods of isolation is "a common form of mistreatment to which prisoners of war have been subjected."  *Id.*  It is also "frequently used as a component of torture."  *Id.*  The National Commission on Correctional Health Care has concluded that placement in solitary confinement or other forms isolation for more than *15 days* is "cruel, inhumane, and degrading treatment" that is "harmful to an individual's health."  *Id.* at 368.  By the

---

[8] Although Professor Haney's article uses the term "solitary confinement," he explains that this term "subsumes a range of prison nomenclature including 'administrative segregation,' 'security housing units,' 'high security,' and 'close management,' among others."  *Id.* at 366 n.1.  It includes all "forms of prison isolation in which prisoners are housed involuntarily in their cells for upward of 23 hours per day and denied the opportunity to engage in normal and meaningful social interaction and congregate activities."  *Id.*

1    time this motion is heard, Dr. Toledo will already been in the administrative separation unit more

2    than twice that long; by the time his extradition case is resolved, he will likely have been there for

3    two years or more.  *See* Archer Decl. at ¶¶ 20-21.

4        In addition to the risk of serious long-term psychological effects, Dr. Toledo's ongoing

5    confinement in administrative separation raises concerns about his constitutional right to due process.

6    The Supreme Court has recognized that the right to due process is implicated by conditions of

7    custody that "impose[] atypical and significant hardship on the inmate in relation to the ordinary

8    incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995); *see also Wilkinson v.*

9    *Austin*, 545 U.S. 209, 224 (2005) (restrictive conditions of confinement create a liberty interest when

10   they "impose an atypical and significant hardship within the correctional context").

11       In the past, courts have found that bail was warranted because the available detention facilities

12   were unsuitable.  *See, e.g., Hu Yau-Leung*, 649 F.2d at 920 (no facility suitable for a juvenile); *Taitz*,

13   130 F.R.D. at 446 (allergic reaction to detention center laundry detergent); *id.* (detention center

14   impeded ability to practice religion).  Santa Rita, the only facility available for federal detainees in

15   the Northern District of California, has determined that it cannot guarantee Dr. Toledo's safety from

16   other inmates unless he is kept in virtual isolation, able to leave his cell for the recreation room only

17   one hour out of every 48.  The prospect of keeping Dr. Toledo, who has never been accused, much

18   less convicted, of any act of violence and, indeed, has not been convicted of any crime at all, in such

19   punitive conditions for what will likely be years of litigation is a special circumstance that verges on

20   the unconscionable.  He should be released on this basis alone.

21   **C.    The Complexity of the Issues and Likely Duration of the Extradition Proceedings**
         **Are Special Circumstances Justifying Release**
22

23       Extradition cases can take years to resolve.  To give two recent examples from the Northern

24   District, litigation involving the extradition of Eustolio Gonzalez lasted more than five years, while

     litigation involving the extradition of Israel Ramirez Luna lasted nearly two-and-a-half years.  *See*
25
     Archer Decl. at ¶¶ 20-21.
26
         The Ninth Circuit has held that "highly probable lengthy delays," both during the extradition
27
     proceedings and during the appeals that follow, can be special circumstances supporting release.
28

*Kirby*, 106 F.3d at 863;[9] *see also Santos*, 473 F. Supp. 2d at 1036 ("[D]elay in the extradition proceeding is a circumstance, either alone or in combination with other factors, which may justify granting bail.").

Dr. Toledo's case will almost certainly take years to resolve, particularly if Dr. Toledo is certified for extradition and has to seek a writ of habeas corpus and/or appeal to the Ninth Circuit. *See Santos*, 473 F. Supp. 2d at 1037 (granting bail based, in part, on delay that would result given likelihood that "Santos will appeal any decision certifying his extraditability by seeking habeas review").

The extradition package submitted by Peru contains an extraordinary number of documents. There are more than 6,000 English-language documents.[10]  Reviewing and organizing these documents, which have no accompanying index, will be a time-consuming but essential project.  *See Taitz*, 130 F.R.D. at 445 (finding a special circumstance based on the anticipated delay where the government "submitted to the court a carton containing the exhibits it intend[ed] to use at the extradition hearing," and the documents would "need to be analyzed by the parties and the court before arguments [could] be made and a decision rendered").  Beyond that, the need to translate and review documents in the course of the defense's own investigation adds delay.

In addition, Dr. Toledo expects to make numerous challenges to Peru's request, many of which present legal questions of first impression.  *See Taitz*, 130 F.R.D. at 446 (granting bail where resolution of novel issues "will no doubt involve habeas corpus proceedings in the district court and the Court of Appeals," and the extraditee "would have to remain incarcerated during this lengthy period"); *see also id.* at 445 (noting that other courts have granted bail where "the factual issues involved in the extradition were of extreme complexity and involved issues of first impression").  While Dr. Toledo anticipates raising several challenges, there are a few that are particularly noteworthy for purposes of his request for bail:

---

[9] This is true even if the extraditee is partly responsible for the delays.  *See id.*

[10] Oddly, these 6,000+ documents have been presented as the official translations of fewer than 3,000 corresponding Spanish documents.  One of many tasks awaiting the defense will be an attempt to reconcile the two sets of documents.

### 1.    Challenge Based on the Lack of Formal Charges

The extradition treaty between the United States and Peru is unusual in that it requires the requesting country to provide both an arrest warrant *and* a charging document.  *See* Extradition Treaty with Peru, July 26, 2001, U.S.-Peru, S. Treaty Doc. No. 107-6, art. VI(3)(a) (requiring "a copy of the warrant or order of arrest"); *id.* at art. VI(3)(b) (requiring "a copy of the charging document"). This is significant because in Peru the criminal system is divided into an "investigative" stage and a "charging" stage.  While the Peruvian government has provided an order from the First National Preliminary Investigation Court granting the prosecutor's request for provisional arrest of Dr. Toledo, this is not sufficient to satisfy Article VI(3).  The extradition documents do not contain an *auto de enjuiciamiento* or prosecution order, which undersigned counsel is informed and believes is the document that is required to commence the charging stage, i.e., the charging document required by Article VI(3)(b) of the Treaty.[11]

The Ninth Circuit has explicitly identified the high probability of success on the merits as a special circumstance warranting release on bail.  *See Salerno*, 878 F.2d at 317.  At a minimum, the interpretation of Article VI of the Treaty appears to be an issue of first impression, which is itself a special circumstance.

### 2.    Probable Cause Challenge Based on Witness Coercion

According to the government's memorandum, the extraditee's "right to present evidence is severely constrained."  Govt. Memo at 19.  Yet the government omits any mention of *Santos Munoz v. Thomas,* 830 F.3d 987 (9th Cir. 2016) (en banc), the Ninth Circuit's leading decision on extradition procedures and the extraditee's right to present evidence.  In particular, *Santos Munoz* makes it clear that an extraditee is entitled to present evidence of witness coercion, "because a coerced statement is not competent evidence and cannot support probable cause."  *Id.* at 1001.

Here, Peru's case appears to rest almost entirely on the statements of Josef Maiman and Jorge Barata.  These statements have varied dramatically over time, and Dr. Toledo has reason to believe

---

[11] The defense is in the process of obtaining the assistance of an expert in Peruvian criminal procedure, *see Morales,* 906 F. Supp. at 1376; *Nacif-Borge*, 829 F. Supp. at 1221, and anticipates presenting a more detailed and nuanced discussion in the substantive motion on this issue.

OPPOSITION TO REQUEST FOR DETENTION
*TOLEDO MANRIQUE*, 19–MJ–71055 MAJ

1    that the statements implicating him were coerced.  After a series of public statements exonerating Dr.

2    Toledo, Maiman's statement implicating Dr. Toledo was given in response to extreme pressure from

3    the Peruvian government.  Peru's tactics included the issuance of an INTERPOL Red Notice, which

4    made it impossible for Maiman to leave Israel, threats to seize his international bank accounts, and

5    threats to make his family targets of criminal investigation.  In return for his statement inculpating

6    Dr. Toledo, Maiman has been officially absolved of all criminal responsibility, and has been let off

7    with only a $1.2 million fine, despite admitting that he accepted at least $20 million in bribes from

8    Odebrecht.

9          In contrast to Maiman's later "change of heart," Barata's early statements while in Brazilian

10   prison implicated Dr. Toledo. In recorded testimony given on April 29, 2019, Barata acknowledged

11   that he had no evidence of any payments being made to Dr. Toledo, nor any knowledge of payments

12   made to Maiman being later directed to Dr. Toledo.  Tellingly, he indicated that based on press

13   accounts he thought that money had made its way to Dr. Toledo.  The recording of this exculpatory

14   interview was not produced to Dr. Toledo's defense counsel in Peru until July 22, 2019.

15         If Dr. Toledo succeeds in demonstrating that the witnesses were coerced, there is a high

16   likelihood that his probable cause challenge will succeed on the merits since "a coerced statement is

17   not competent evidence and cannot support probable cause."  *Id.*  And while it is too early to say with

18   certainty that Dr. Toledo will be able to obtain the necessary evidence to prove coercion, the

19   possibility that Dr. Toledo will prevail "make[s] the government's probability of success sufficiently

20   unclear that it constitutes a special circumstance warranting [his] release on bail."  *Santos*, 473 F.

21   Supp. 2d at 1040.  Either way, it is inevitable that the need to investigate this issue will result in

22   considerable delay, since it will involve the investigation of events occurring in at least three

23   countries (Peru, Brazil, and Israel).

24         **D.     The Lack of Flight Risk Is a Special Circumstance**

25         At least two courts in this Circuit have concluded that the absence of flight risk can be a special

26   circumstance justifying release on bail.  *See Wroclawski*, 634 F. Supp. 2d at 1007; *Chapman*, 459 F.

27   Supp. 2d at 1027.  The same should be true here.  Dr. Toledo has known about Peru's accusations and

28   about its extradition request for over two years.  Yet he did not flee.  He did not go into hiding.

1  Instead, he continued to live in openly in the Bay Area, as he had done for much of his adult life.  Dr.

2  Toledo does not have the financial ability to flee nor does he have the practical ability.  He is the

3  subject of an INTERPOL Red Notice.  He has no passport and there is no country that would issue

4  one to him.  He is a "visible, well-known public figure[] who could not easily go into hiding."

5  *Chapman*, 459 F. Supp. 2d at 1027.  This Court also has the power to set restrictive conditions that,

6  particularly when coupled with the strong package of sureties that Dr. Toledo will present, would

7  further deter any possibility of flight.

8  **E.      Dr. Toledo's Extraordinary Community Support Is a Special Circumstance**

9  As discussed in Section II.D, *supra*, Dr. Toledo enjoys extraordinary community support.  As

10  the Ninth Circuit has recognized, this is significant not only as an indicator that he will not flee, but

11  also as a special circumstance supporting release in the extradition context.  *See Kirby*, 106 F.3d at

12  864-65; *see also Kollmar* Bond Order at 4-5; *Mirela*, 2018 WL 1634393 at *2; *Ramirez Luna* Bail

13  Order at 5-6; *Wroclawski*, 634 F. Supp. 2d at 1007-08.

14  **IV.   The Lack of Urgency Shown by the United States Weighs Against the Court's Concerns About the Potential for Diplomatic Embarrassment**

15

16  The government contends that Dr. Toledo must be detained because of the diplomatic

17  embarrassment that would result if Dr. Toledo fled and the United States were unable to comply with

18  its treaty obligations.  The actions of the United States government, however, suggest that it has not

19  been particularly concerned about this possibility.

20  Peru first requested Dr. Toledo's extradition more than two years ago, in February of 2017.

21  The request was not a secret.  It was heavily publicized, not only in Peru but internationally.  It

22  certainly was not a secret from Dr. Toledo, whose counsel contacted the State Department within

23  days of the request.  *See* Archer Decl. at ¶ 23.  Yet the United States government does not appear to

24  have had any concerns about the possibility that Dr. Toledo would flee the country.  In response to

25  Peru's request, the United States government took no action at all.

26  Peru sent a second extradition request in May of 2018.  Again, Dr. Toledo was aware of the

27  request.  *See* Archer Decl. at ¶ 22.  Again, the United States government appears to have concluded –

28  correctly – that there was no reason to fear that Dr. Toledo would run.  For more than a year, the

1  United States again took no action on Peru's request.

2      The United States government's decision to leave Dr. Toledo out of custody for more than two

3  years is compelling evidence that it was unconcerned about the risk that he would cause diplomatic

4  embarrassment by fleeing.

5      In this particular case, it is also worth considering the diplomatic implications of holding an

6  internationally known political figure for months or even years in administrative segregation, when

7  he has not been convicted of any crime.

8  **CONCLUSION**

9      For the foregoing reasons, Dr. Toledo has met his burden to establish that there are special

10  conditions justifying his release, and has established that he is neither a flight risk, nor danger to the

11  community.  Balanced with the cruel conditions of confinement to which he is currently subjected,

12  Dr. Toledo respectfully requests that the Court grant him bond with appropriate conditions of release.

13

14

15

16

17  Dated:    August 15, 2019          Respectfully submitted,

18                 STEVEN G. KALAR
Federal Public Defender
19                 Northern District of California

20                        /S

21                 GRAHAM ARCHER
MARA K. GOLDMAN
22                 Assistant Federal Public Defenders

23

24

25

26

27

28