STEVEN G. KALAR
Federal Public Defender
Northern District of California
GRAHAM ARCHER
MARA K. GOLDMAN
Assistant Federal Public Defenders
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone: (510) 637-3500
Facsimile: (510) 637-3507
Email: Graham_Archer@fd.org

Counsel for ALEJANDRO TOLEDO MANRIQUE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF ALEJANDRO TOLEDO MANRIQUE. | Case No. 19–71055 MAG (TSH)<br><br>**ALEJANDRO TOLEDO'S SUR-REPLY RE: BAIL PENDING EXTRADITION PROCEEDINGS** |

## INTRODUCTION

The government has been in communication with Peru about this case for more than two years, has complete information about the seizure of Dr. Toledo's property and bank accounts, knows that Dr. Toledo has been vehemently contesting both the case in Peru as well as the pending extradition request since their inception, and has now had a month and a half to review Dr. Toledo and his wife's most private documents after seizing them on July 16, 2019. If there were evidence of Dr. Toledo's ability or intention to flee, it would be before the Court.

Instead, the government asks the Court to detain Dr. Toledo based on speculation, old

1  information about his finances, his unsuccessful request to renew his passport, and the renewal of his
2  California driver's license to conform with the REAL ID Act. The government contends that Dr.
3  Toledo is a flight risk, but fails to explain why he would suddenly attempt to flee now, when he has
4  known for more than two years that Peru is seeking his extradition.  The government claims that there
5  is no new information before this Court, even though when the Court made its initial decision, it had
6  not been presented with any sureties, much less the prospect of a substantial secured bond package,
7  and it did not yet have detailed information regarding Dr. Toledo's ties to the community or his
8  finances. All of this information supports the conclusion that Dr. Toledo is not a flight risk.

9        The government also argues that solitary confinement should not be a "per se" special
10 circumstance.  Dr. Toledo agrees.  He is not asking the Court to find that solitary confinement is a
11 special circumstance in every case.  He is asking only that the Court find that in *this* case, requiring
12 Dr. Toledo to spend years in what amounts to solitary confinement, when he has never been accused
13 of an act of violence, much less committed one, and when the only reason he is being held in such
14 inhumane conditions is that the detention facility has no other way to guarantee his safety, this is a
15 special circumstance justifying bail.

16       **ARGUMENT**

17 **I.  Dr. Toledo Is Not a Flight Risk**

18       The government contends that Dr. Toledo presents "no new information" regarding risk of
19 flight.  Govt. Reply at 1.  On the contrary, Dr. Toledo has presented this Court with significant new
20 information.  When the Court made its initial decision, no sureties had been identified.  Now, several
21 sureties have come forward who are prepared to secure a bond by posting a substantial amount of
22 money and property on Dr. Toledo's behalf.

23       At the initial hearing, the Court did not yet know that Dr. Toledo's assets in Peru had been
24 seized, significantly diminishing his financial ability to flee.  Nor had the Court yet had the
25 opportunity to review Dr. Toledo's financial affidavit.  And finally, the Court had little detail about
26 Dr. Toledo's longstanding ties to the Bay Area, whereas the Court now has a chronology of Dr.
27 Toledo's time in the United States, beginning more than 50 years ago when he came to study at the
28 University of San Francisco.

The government argues that Dr. Toledo has the financial means to flee, but what the government's presentation demonstrates is that Dr. Toledo had a greater financial ability to flee in 2017 when he became aware of the attempt to extradite him to Peru, and that he chose not to flee. As noted in the defense's prior briefing, Dr. Toledo's finances have deteriorated significantly since Peru publicly announced that they sought his arrest and extradition in February 2017. The government refers to Dr. Toledo's "family land in Peru" that is "worth millions," *see* Govt. Reply at 3, but the government is well aware that all of Dr. Toledo's holdings in Peru have been seized. The government notes that until recently Dr. Toledo had retained counsel, *see id.*, but as the government knows, Dr. Toledo no longer has the money to pay them and is now represented by the public defender. The government notes that the Toledos' rent is high, which is one reason they were forced to borrow money from family just to meet their regular living expenses. The government asserts that Dr. Toledo's wife "appears to have had" bank accounts with significant amounts of money, *see id.*, and that "at times" the combined balances of her accounts were "in excess of $400,000," *see* Declaration of AUSA Elise LaPunzina at ¶ 9. But the government does not say when the accounts had those balances or how much money is currently in the accounts.

The government's argument that Dr. Toledo has the ability to flee should be couched in the past tense. Instead, at present, it serves to emphasize the extent to which he is *not* a flight risk: Since early 2017, Dr. Toledo has known about Peru's desire to extradite him and, according to the government, that entire time he has had the financial means and international connections to flee. Yet he never did.

Nor does the government have any actual evidence that Dr. Toledo was preparing to flee when he was arrested on July 16, 2019. The day of Dr. Toledo's arrest, the FBI conducted an exhaustive search of his home. They seized countless documents, including materials that have no possible relevance to this case, such as his wife's personal records of family members who disappeared in the Holocaust. They seized hard drives and imaged computers. In effect, they seized a record of Dr. Toledo and his wife's entire life. But they found no plane tickets, itineraries or other travel documents. No passports or Visas. No falsified documents to evade the INTERPOL Red Notice.

Having failed during its search to uncover any of the items that would seem to be basic

necessities for flight, the government instead argues that Dr. Toledo's request to renew his passport "suggests his desire to flee." Govt. Reply at 4. But with an INTERPOL Red Notice, his passport would only ensure that he would be arrested if he tried to leave the country.[1] The government questions Dr. Toledo's decision to renew his driver's license even though it "was valid for a couple more years," LaPunzina Decl. at ¶ 5, but the REAL ID requirements would have gone into effect before his license expired, meaning that he, like many other Californians, had no choice but to renew his license early. Notably, Dr. Toledo renewed his license with an updated photo and his true name, actions inconsistent with a desire to go into hiding or forge a new identity.

Finally, the government notes that Dr. Toledo gave the address of a close family friend on both his license and vehicle registration. This is true, but again, not indicative of an intent to flee. As the government itself points out, the Toledos' rent was extremely high. As their financial situation worsened, they began preparing for the possibility that they would need to find a smaller, more affordable place to rent. Because of the uncertainty, it seemed best to use an address where they could always be reached and where they would likely be staying if they had to move out before they found a new place to rent.

Even if Dr. Toledo once had the ability to flee, he clearly chose not to do so. He has strong ties to the local community and numerous sureties who have pledged substantial money and property on his behalf. To the extent that the Court has lingering concerns, they can be addressed with strict conditions of release.

## II. Dr. Toledo's Conditions of Confinement Are a Special Circumstance

The government argues that if this Court finds that Dr. Toledo's conditions of confinement are a special circumstance, the result will be to the release of violent offenders who are in administrative segregation, since "any prisoner subject to administrative separation could automatically have a basis for obtaining release from detention during extradition proceedings." Govt. Reply at 6. But Dr. Toledo has never suggested that administrative segregation or solitary confinement is a special

---

[1] In her declaration, the AUSA seems to suggest that there was something improper in Dr. Toledo's decision not to go to the Peruvian Consulate to renew his passport. It is understandable, though, that a person trying to remain in the United States would not present himself at the consulate of the country seeking to extradite him.

ALEJANDRO TOLEDO'S SUR-REPLY RE: BAIL
*TOLEDO MANRIQUE*, NO. 19–71055 MAG (TSH)

circumstance *per se*. Indeed, the very idea of a *per se* special circumstance is contrary to the requirement that special circumstances must be assessed on a case-by-case basis. *See In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 736 (W.D. La. 1999). Nor is it likely that a violent offender would have much success analogizing his situation to that of Dr. Toledo, a nonviolent man who has been isolated from the general population solely because the jail is worried about its ability to keep him safe.

For similar reasons, the government's attempt to analogize to *United States v. Nolan,* 2009 WL 4544699 (N.D. Ill. Dec. 1, 2009), is unavailing. In that case, the extraditee was in solitary confinement because he had attempted to escape from federal custody while his extradition case was being litigated, and he was denied bail because of the resulting charges now pending against him in United States district court. *See id.* at *2.

The government next argues that the only adverse consequence of his confinement that Dr. Toledo has identified is his limited ability to contact counsel. Govt. Reply at 7. As set forth in detail in Graham Archer's Declaration, this is only one of the serious consequences that Dr. Toledo suffers as a result of his placement in administrative separation. In the first 29 days of custody, Dr. Toledo was permitted to go outside once, for 45 minutes. Declaration of Graham Archer ("Archer Decl.") at ¶¶ 17-18. For 47 out of every 48 hours, he is confined to a cell about the size of a Honda Civic,[2] *id.* at ¶ 7; he cannot have contact with other inmates, *id.* at ¶¶ 10-11; and he must be handcuffed and shackled to meet with his attorney, even though the jail agrees that he poses no safety risk to others, *id.* at ¶ 19. The damaging effect of these restrictions is described in Professor Haney's article, which the government does not address.

The negative impact of Dr. Toledo's confinement will only increase the longer he remains in administrative separation. Unfortunately, as discussed below, the anticipated length of these proceedings indicate that he can expect to spend years in what is essentially solitary confinement.

**III. The Duration and Complexity of the Proceedings, Particularly When Combined with the Conditions of Confinement, Are a Special Circumstance**

---

[2] The 2019 Honda Civic Sedan is 182.7 inches long and 70.9 inches wide. *See* https://owners.honda.com/vehicles/information/2019/Civic-Sedan/specs#mid6FC2E6KEW.

1     The government does not dispute that extradition cases in this district often take years to resolve.  Govt. Reply at 7.  Instead, the government argues that such delay is too common to be a special circumstance.  Here, however, the problem is not just the expected length of the case.  It is the combination of the fact that this case will likely last years and the fact that Dr. Toledo will spend those years in administrative separation.

    The government next argues that Dr. Toledo should not be released based on "purported potential complexities" in this case.  Govt. Reply at 9.  The issues Dr. Toledo intends to raise are not mere "potential complexities," however.  In particular, the construction of Article VI of the U.S.-Peru Treaty is complex question of first impression.  The government argues that this Court should defer to Peru, citing *Emami v. U.S. Dist. Court for N. Dist. Calif.*, 834 F.2d 1444, 1449 (9th Cir. 1987).  Govt. Reply at 10-11.  Yet *Emami* itself was a case in which the Court construed the meaning of an extradition treaty to determine whether Germany's production of an arrest warrant was sufficient to comply with the treaty's requirements.  *See Emami*, 834 F.2d at 1448.  Notably, in that case, the Court concluded that no charging document was required because the treaty's list of documents only included an arrest warrant; the U.S.-Peru Treaty, which was revised after *Emami* was decided, specifically requires production of both an arrest warrant and the charging document.

### IV.  Community Support and Lack of Flight Risk Are Special Circumstances

    The government argues that the Ninth Circuit rejected the lack of flight risk as a special circumstance in *Salerno v. United States*, 878 F.2d 317 (9th Cir. 1989).  Govt. Reply at 12.  In *Wroclawski v. United States*, 634 F. Supp. 2d 1003 (D. Ariz. 2009), however, now-Circuit Judge Murguia persuasively explained that *Salerno* did *not* hold that lack of flight risk cannot be a special circumstance.  *See Wroclawski*, 634 F. Supp. 2d at 1007.  Rather, *Salerno* merely "stated that whether someone was a flight risk was not the appropriate test" in an extradition case.  *Id.*  Nothing in *Salerno* says that the lack of flight risk cannot be used to satisfy the actual test, i.e., whether there are special circumstances.

    The government's argument against using community support as a special circumstance is equally unavailing.  The government points to out-of-district cases in which courts have found that community support was not a special circumstance, but fails to address the cases in the Northern

District of California where courts have concluded that community support *is* a special circumstance. *See, e.g., Kollmar* Bond Order, attached to Toledo's Opposition as Exhibit D; *Ramirez Luna* Bail Order, attached to Toledo's Opposition as Exhibit C; *see also Matter of Extradition of Kirby*, 106 F.3d 855 (9th Cir. 1996) (affirming bail order from Northern District of California).

## CONCLUSION

The government asks the Court to detain Dr. Toledo based on speculation that he might flee. At this stage in the case, with more than two years of communications between Peru and the government, two years during which Dr. Toledo had every opportunity to flee, and with the government in possession of Dr. Toledo's paper and digital records, bank information, and communications, the government should be held to a higher standard than speculation. Because Dr. Toledo's case presents a special circumstance, and because he is not a flight risk, he respectfully requests that he be released on bond with appropriate conditions while the extradition proceedings are pending.

Dated:   August 27, 2019                    Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

                    /S
GRAHAM ARCHER
MARA K. GOLDMAN
Assistant Federal Public Defenders