UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF ALEJANDRO TOLEDO MANRIQUE | Case No. 19-mj-71055-MAG-1 (VC)<br><br>**ORDER GRANTING MOTION FOR RELIEF FROM ORDER DIRECTING RELEASE ON BAIL**<br><br>Re: Dkt. No. 52 |

      The federal government has initiated extradition proceedings against Alejandro Toledo Manrique, the President of Peru from 2001 to 2006. Peru submitted an extradition request to the United States after the First National Preliminary Court in Peru approved a provisional warrant for Toledo's arrest on charges of accepting bribes from Brazilian mining company Odebrecht during his presidential tenure. If Peru's request complies with the treaty and extradition statute, Toledo will be returned to Peru to stand trial for influence peddling, collusion, and money laundering. *See* Extradition Treaty, U.S.-Peru, July 26, 2001, S. Treaty Doc. No. 107-6; 18 U.S.C. § 3184. The federal government, when responding to an extradition request, makes only a preliminary assessment of the merits of the foreign prosecution. Specifically, the magistrate judge assigned to this matter will determine whether the alleged crimes fall within the scope of the treaty and whether there is probable cause to believe that Toledo committed the crimes. *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (en banc).

      The magistrate judge's decision whether to certify a person as extraditable is an executive function, not a judicial function. *See In re Kaine*, 55 U.S. (14 How.) 103, 120 (1852) (Curtis, J., concurring); *see also Freytag v. Commissioner*, 501 U.S. 868, 909–10 (1991) (Scalia, J.,

concurring in part and concurring in the judgment). Therefore, even if a magistrate judge certifies a person as extraditable, the Secretary of State makes the final decision whether to return him to the requesting country. 18 U.S.C. § 3186; *see Ornelas v. Ruiz*, 161 U.S. 502, 508 (1896); *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1113 (7th Cir. 1997). This longstanding practice in extradition cases accords with the Supreme Court's recognition "that Congress may authorize a federal judge, in an individual capacity, to perform an executive function without violating the separation of powers." *Mistretta v. United States*, 488 U.S. 361, 403 (1989). And the legality of the extradition court's decision—like other forms of executive detention—is reviewable in court only by petition for writ of habeas corpus. *See Collins v. Miller*, 252 U.S. 364, 369 (1920); *Santos*, 830 F.3d at 1001.

The general rule that the extradition court exercises executive rather than judicial power is subject to an important exception: the magistrate judge acts in a judicial capacity when ruling on bail motions. *See In re Requested Extradition of Kirby*, 106 F.3d 855, 859–60 & n.4 (9th Cir. 1996). Thus, when a magistrate judge makes a decision about bail, the losing side may seek direct review—first to the district court and then up the appellate ladder.

In federal criminal cases, the question whether a detainee should be released on bail is governed by statute. *See* 18 U.S.C. § 3142. And in the typical case, if the government believes a defendant should remain in custody while charges are pending, it must demonstrate by a preponderance of the evidence that the defendant is either a danger to the community or a flight risk. *See United States v. Motamedi*, 767 F.2d 1403, 1406–07 (9th Cir. 1985). But in extradition cases, no statute sets forth the test for when a person should be released on bail, so the rules have developed through court opinions. Generally speaking, courts agree that the burden is on the extraditee to demonstrate that he is neither a danger to the community nor a flight risk. Some have required the extraditee to meet this burden by a preponderance of the evidence; others have imposed a heightened "clear and convincing evidence" standard. *See Nezirovic v. Holt*, 990 F. Supp. 2d 594, 599 n.1 (W.D. Va. 2013); *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1035 n.4 (C.D. Cal. 2006). In addition, the Supreme Court has recognized for more than a

century that "special circumstances" must exist to support release pending extradition. *Wright v. Henkel*, 190 U.S. 40, 63 (1903); *see Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984). In other words, there is a "presumption against bail in an extradition case." *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989). The upshot is that an extraditee, in addition to proving that he's not a danger to the community and not a flight risk, must demonstrate special circumstances justifying his release. *See Santos*, 473 F. Supp. 2d at 1035. For purposes of these proceedings, the Court assumes that Toledo is required to prove these things only by a preponderance of the evidence.

The federal government initiated extradition proceedings by arresting Toledo in July 2019. After the magistrate judge denied bail, Toledo sought direct review in this Court. In October 2019, the Court made two findings that, taken together, narrowly rebutted the presumption against bail. *See* Dkt. No. 43. First, Toledo had proved by a preponderance of the evidence—on the record as it existed in October 2019—that he was not a flight risk so long as his freedom of movement was significantly restricted while on bail. Specifically, the Court concluded, based in part on the recommendation of the pretrial services office at the time, that any flight risk could be sufficiently mitigated by placing Toledo on home lockdown with GPS monitoring. Second, the Court found that special circumstances existed: Toledo was detained in administrative segregation (commonly called solitary confinement) at the increasingly notorious Santa Rita Jail in Alameda County; there was evidence that his mental health was deteriorating because of the conditions of his confinement; and the detention seemed likely to continue for many months, if not years, until the magistrate judge could decide whether to certify Toledo for extradition. These findings (combined with the fact that nobody contended Toledo would be a danger to the community if released on bail) led the Court to rule in favor of Toledo.

But it was a close question. The government credibly argued that the risk of flight for Toledo was increased by the fact that he is a well-traveled former head of state, presumably with connections around the globe. And with respect to the conditions of confinement, the Court acknowledged that the situation could change—after all, there was no requirement that the

government confine Toledo in the administrative segregation unit at Santa Rita. The Court therefore stayed its order to give the government an opportunity to file a motion with the Ninth Circuit for a stay pending appeal, or to locate alternative detention arrangements. Accepting the latter invitation, the government transferred Toledo to Maguire Correctional Facility in San Mateo County and filed a motion for relief from the order releasing Toledo on bail. *See* Dkt. No. 52. The parties briefed that motion and presented live testimony at an evidentiary hearing.[1] Although the question remains a close one, changes in the record have undermined both grounds for the original release order.

First, the record has changed with respect to the issue of flight risk. Since the order directing Toledo's release on bail, the government discovered that Toledo and his wife had concealed assets in excess of $1 million—assets that she received in the months leading up to his arrest. Toledo concealed the assets from the Court when he sought appointment of counsel. *See* Dkt. Nos. 49, 88. And his wife concealed them during interviews with the pretrial services office regarding Toledo's suitability for bail (and regarding her suitability as a bail custodian). Because of this, the pretrial services office altered its earlier recommendation and concluded that Toledo would be a flight risk even on home lockdown with GPS monitoring. The office's prior recommendation to release Toledo with GPS monitoring was based in part on the assumption that his wife was a reliable custodian—an assumption the office was no longer willing to make once it learned that she had concealed these assets rather than putting them up to guarantee against Toledo's flight.

Toledo highlights the fact that he did not flee the United States between February 2017 (when Peru announced the corruption charges) and July 2019 (when the federal government arrested him in connection with this proceeding). In his view, this supports an inference that he will stay and fight the charges. Maybe. But a lot has changed since his arrest. Toledo faces a real prospect of spending the rest of his life in Peruvian custody, and the past months in jail may have

---

[1] The Court was originally prepared to hold this hearing in December 2019, Dkt. No. 76, but at the parties' request, the hearing was pushed back to February 2020, Dkt. No. 80.

made the consequences of extradition concrete in a way they weren't before. *See In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1305 (S.D. Fla. 2017). Nor do the sureties adequately guarantee Toledo's appearance during extradition proceedings. While lifelong friends have staked their homes or considerable assets on Toledo's promise not to flee, his wife's deception with respect to more than a million dollars in assets—and the possibility that still-hidden funds could aid an escape—is reason to doubt that Toledo will hold up his end of the bargain. *See also United States v. Castaneda*, 2018 WL 888744, at *9 (N.D. Cal. Feb. 14, 2018) (describing shortfalls of GPS monitoring). Toledo did not take the stand to explain why these concerns are unwarranted.

Furthermore, Toledo's conditions of confinement have improved significantly. At Maguire, Toledo is no longer held in administrative segregation. To be sure, he has only minimal contact with other inmates, given his status as a former head of state and his request for protective custody. Although he shared a living space with another person for a few months, the adjoining cell in his suite is now empty. But Toledo has far greater freedom of movement at Maguire than at Santa Rita, including constant access to a day room connected to his cell. What's more, that day room provides nearly unlimited access to a telephone, which Toledo uses frequently to call people all over the world. *See* Dkt. No. 52 at 4. And Toledo (like all detainees at Maguire) is generally permitted two 45-minute sessions with a visitor every seven days. While his detention is a weighty deprivation of liberty, the conditions of confinement are too much like the regular incidents of incarceration to be a special circumstance warranting release from custody pending extradition. *See In re Extradition of Smyth*, 976 F.2d 1535, 1536 (9th Cir. 1992) (rejecting finding of special circumstances premised on hardships endured by "all incarcerated defendants").

As the Court's prior order noted, prolonged isolation from other inmates can seriously harm a person's mental health. *See also Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring). Incarceration at Maguire under improved conditions could still present a special circumstance if Toledo is forced to choose between severe harm to his physical health (caused by

exposure to other inmates who might hurt him) and severe harm to his mental health (caused by isolation from all inmates for his own protection). That is so because "a serious deterioration of health while incarcerated" can justify bail during extradition proceedings. *Salerno*, 878 F.2d at 317. On the other hand, the mere fact that an extraditee is separated from the general population can't be enough to rebut the strong presumption against bail. Many people facing extradition have attained a degree of notoriety for their alleged crimes, and isolation in the context of protective custody is often justified by the government's "compelling interest in prison safety." *Johnson v. California*, 543 U.S. 499, 514 (2005).

Toledo contends that the actual and probable effect of his relative isolation at Maguire on his mental health is a special circumstance justifying his release on bail. According to a staff psychiatrist, detention at Santa Rita had initiated a marked decline in Toledo's mental health. *See* Ex. M, Dkt. No. 41. And now Dr. Craig Haney, an expert on prison isolation, has testified that this decline is continuing at Maguire. Based on two in-person interviews of Toledo, Dr. Haney reported warning signs of depression, anxiety, and mental deterioration, and he predicted that these impacts will grow only more severe over time. Toledo is not completely isolated; indeed, he spends large amounts of time each day conversing on the phone. But Dr. Haney testified that phone conversations and routine interactions with guards are an inadequate substitute for meaningful social interaction with other inmates in congregative settings—think, the yard or the mess hall.

Dr. Haney is no doubt qualified on this subject—especially on the adverse consequences of prison isolation in general. Accordingly, Dr. Haney's opinions received deep consideration. But his testimony is insufficient to establish that the particular conditions at Maguire are causing or will cause this particular inmate to suffer serious mental health problems. Dr. Haney, who is not a medical doctor, based his specific opinions about Toledo's condition largely on Toledo's personal account of his incarceration, as well as his own observations of Toledo during the two in-person interviews he conducted. Thus, the reliability of Dr. Haney's conclusions depends largely on Toledo's veracity in reporting his symptoms. Yet jail records from Santa Rita describe

6

instances in which Toledo allegedly changed his demeanor from cheerful to depressed prior to mental health evaluations, seemingly in an attempt to influence the mental health professional's opinion. *See* Ex. 12. Another record—from a psychiatry follow-up at Maguire that occurred between Dr. Haney's two interviews of Toledo—recites statements by Toledo that he was taking medication and was not depressed or anxious. *See* Ex. 13. Dr. Haney apparently did not consider these records in formulating his opinion. And again, Toledo did not take the stand to explain the extent of his isolation, to explore the depth of its psychological impact, or to counter the suggestion of malingering. Dr. Haney's presentation of a disputed, secondhand account from a questionable narrator is not a reliable enough basis to rebut the presumption against bail on these facts.

Accordingly, the government's motion for relief from the October 2019 release order is granted, and Toledo's motion for bail is denied.

**IT IS SO ORDERED.**

Dated: March 4, 2020

VINCE CHHABRIA
United States District Judge