UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF ALEJANDRO TOLEDO MANRIQUE | Case No. 19-mj-71055-MAG-1 (TSH)<br><br>**ORDER RE: SECOND MOTION FOR RECONSIDERATION**<br><br>Re: Dkt. No. 109 |

These are extraordinary times. The novel coronavirus that began in Wuhan, China, is now a pandemic. The nine counties in the San Francisco Bay Area have imposed shelter-in-place orders in an effort to slow the spread of the contagion. This Court has temporarily halted jury trials, even in criminal cases, and barred the public from courthouses.

Against this background, Alejandro Toledo has moved for release, arguing that at 74 years old he is at risk of serious illness or death if he remains in custody. The Court is persuaded. The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail. Release under the current circumstances also serves the United States' treaty obligation to Peru, which – if there is probable cause to believe Toledo committed the alleged crimes – is to deliver him to Peru alive.

The Court appreciates San Mateo County's management plan for the jail. It looks pretty detailed, although it seems to rely on self-reporting and observation to identify potentially infected people, and it doesn't say anything about testing. At oral argument, counsel for the government was unable to make any representations concerning Maguire's possession of testing kits. The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested. And, as the management plan itself

acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. That's why the Bay Area is on lockdown. We don't know who's infected. Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, *see* ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical. By then it may be too late.

There is still the problem that Toledo is a flight risk. This problem has to a certain extent been mitigated by the existing pandemic. The Court's concern was that Toledo would flee the country, but international travel is hard now. Travel bans are in place, and even if Toledo got into another country, he would most likely be quarantined in God-knows-what conditions, which can't be all that tempting. Also, international travel would itself pose a risk of infection by likely putting Toledo in contact with people in close quarters. Maybe the risk of COVID-19 is worth it if he can make a run for it and get away. The government says he faces the prospect of life in prison if he is convicted in Peru. But escape is riskier and more difficult now.

While the risk that Toledo will flee cannot be completely mitigated, certain release conditions will help. Toledo must be on home lockdown and can leave only for medical appointments, attorney visits or court appearances (once attorney visits and court appearances resume). He must wear a GPS device so his movements can be tracked. There are a bunch of other release conditions as well. They are spelled out in the separate release form that will become the actual release order once it's been fully executed.

Let's talk about bail and sureties. Toledo's prior proposed bail package consisted of $1 million secured by cash and property (mostly property) put up by friends, with nothing from his wife. This was back when he was telling the Court his wife had no money, and when his wife was saying the same thing to Pretrial Services.[1] He now offers essentially the same bail package.

---

[1] Her lawyer, Ethan A. Balogh, has submitted a declaration in which he attempts to cast this as a misunderstanding. At the hearing he admitted he wasn't on the phone call between Ms. Karp-Toledo and the Pretrial Services officer, and the Court explained that this rendered his declaration worthless.

2

However, the Court has a concern about that – a concern that can be mitigated, but a concern nonetheless. Bail isn't just about money; it's about whose money it is. We want sureties who have moral suasion over the defendant. The idea is that if the defendant flees, he will cause people he cares about to lose money or property, so out of concern for them he won't do that. If Toledo's friends were putting up their assets at a time when his wife was sitting on $1 million in cash and near-cash equivalents, and she was offering nothing, this presents the concern that they were tricked, which causes the Court to wonder how much concern Toledo has for his friends and how much suasion they exercise over him. For any of his friends who are posting assets, the Court needs to confirm in a telephonic hearing that they know his wife had $1 million to her name last August and still today (according to her counsel) has between $700,000 and $800,000, and with that knowledge the friends are still willing to act as sureties. If they know the truth and are still willing to stand by him, the Court will accept that they wield suasion. (Also, independently of suasion, the Court does not want sureties to be misled.). Two of those sureties, Martin Carnoy and Larry Diamond, participated in the telephonic bail hearing and confirmed their knowledge and continued willingness to be sureties.

Also, Elaine Karp-Toledo must post some cash bail and surrender her passports. As noted, her counsel represents that she currently has between $700,000 and $800,000 and that she has ongoing legal expenses due to a criminal investigation into her and due to Peru's attempt to get her extradited as well. And, of course, she needs money for her and Toledo to live off of during the course of this proceeding. Toledo's counsel represents that Toledo's friends can put up a combined $325,000 in cash bail, plus security in two properties in Washington state. The Court will therefore set the bail amount at $1 million, to be secured by $500,000 in cash and the Washington properties. This allocates to Toledo's wife $175,000 in cash bail.

The Court acknowledges some uncertainty about whether this is enough money from Toledo's wife. The Court suspects Karp-Toledo has access to more money through family members. However, the Court prefers to base its bail decision on evidence, not just suspicions. The evidence the Court is starting with is the $1 million the government showed that Karp-Toledo possessed as of last August. That this would have winnowed down to less than $800,000 today is

3

not that surprising if she has ongoing legal expenses. She needs enough money to deal with her own legal problems and support her and her husband for what may be quite some time. With the surrender of her passports, and for all the same reasons that Toledo may not want or be able to flee right now, this amount of cash bail and all of the other release conditions seem sufficient to prevent the couple from fleeing, even if that cannot be completely guaranteed. If the government has or comes up with evidence that Karp-Toledo has more money than her counsel represented, the Court invites a motion for reconsideration of the bail amount.

So, when does Toledo get out? When the $500,000 in cash bail is posted and his wife surrenders her passports. That will require three more sureties to be admonished, and all six of the cash sureties to post the money. The Court will not, however, wait for the Washington properties to be posted as security. Under the best of circumstances, it takes a couple of weeks to post real estate, and the pandemic in Washington is even worse than here. It could be a while before that security gets posted, and there is urgency in getting Toledo released. So, the plan is that Toledo's lawyer should line up the remaining sureties, let the Courtroom Deputy know when they can be available, and the Court will admonish them by phone. Toledo's lawyer is in charge of getting everyone to sign the bond form. After the cash sureties have been admonished and signed, the $500,000 in cash has been posted, and Karp-Toledo surrenders her passports, the Court will issue the release order. At that point, Toledo must report to Pretrial Services in San Jose (that's also where his wife must surrender her passports) to be fitted with the GPS device. Toledo's second motion for reconsideration is accordingly **GRANTED**.

The government's request for "a brief stay" of any release order pending an appeal to Judge Chhabria is **DENIED** as unnecessary. As just explained, there are a few steps left before release happens. This order (i.e., the one you are reading) is the undersigned's decision that release on bail and other conditions is appropriate, and the government can appeal it right now.

**IT IS SO ORDERED.**

Dated: March 19, 2020

THOMAS S. HIXSON
United States Magistrate Judge

4