UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE
EXTRADITION OF ALEJANDRO
TOLEDO MANRIQUE

Case No. 19-mj-71055-MAG-1 (TSH)

**ORDER RE: MOTION TO DENY EXTRADITION REQUEST**

Re: Dkt. No. 137

Alejandro Toledo Manrique moves to deny Peru's extradition request on the grounds that (1) he has not been "charged" within the meaning of the Extradition Treaty Between the United States of America and the Republic of Peru, July 26, 2001, U.S.-Peru, TIAS No. 03-825, S. Treaty Doc. No. 107-6, 2001 WL 1875758; (2) Peru has not included a copy of the "charging document" in the extradition request; and (3) there is no dual criminality for the influence peddling charge. The Court will consider the first two arguments together and address the third separately.

**A. Whether Toledo Has Been "Charged" and Whether Peru Included the "Charging Document"**

"The interpretation of a treaty, like the interpretation of a statute, begins with its text. Because a treaty ratified by the United States is 'an agreement among sovereign powers,' we have also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." *Medellin v. Texas*, 552 U.S. 491, 506-07 (2008) (citations omitted).

Let's begin with the text of the treaty. Article I provides that "[t]he Contracting States agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting State have charged with, found guilty of, or sentenced for, the

commission of an extraditable offense." "[C]harged with" is thus to be distinguished from "found guilty of" and "sentenced for," so we know that extradition of an unconvicted person is contemplated by the treaty. But there is no specific description of what it means to be "charged with" an offense.

Article VI of the treaty seems to confirm this. Sections 1 and 2 state requirements that apply to all requests for extradition. Then the article continues:

> 3. A request for extradition of a person who is sought for prosecution shall also be supported by:
>
>> (a) a copy of the warrant or order of arrest issued by a judge or other competent authority;
>>
>> (b) a copy of the charging document; and
>>
>> (c) such evidence as would be sufficient to justify the committal for trial of the person if the offense had been committed in the Requested State.
>
> 4. A request for extradition relating to a person who has been found guilty of, or sentenced for, the offense for which extradition is sought shall also be supported by:
>
>> (a) a copy of the judgment of conviction or, if such copy is not available, a statement by a competent judicial authority that the person has been found guilty;
>>
>> (b) evidence or information establishing that the person sought is the person to whom the finding of guilt refers; and
>>
>> (c) a copy of the sentence imposed, if the person sought has been sentenced, and, if applicable, a statement establishing to what extent the sentence has been carried out.

It's interesting that section 4 uses the same "found guilty of, or sentenced for" language that appears in article I. By contrast, section 3 uses the imprecise and loose phrasing "a person who is sought for prosecution" as a synonym for article I's person "charged with" an offense. Section 3 requires the requesting state to provide "a copy of the warrant or order of arrest" and "a copy of the charging document." The term "charging document" seems deliberately expansive. Certainly, it is broader and less precise than "judgment of conviction" in section 4.

Articles I and VI thus describe a well-defined group of people who have been convicted of or sentenced for an offense and what documents need to be submitted for them. But the people

2

who are "sought for prosecution," which is apparently the same thing as being "charged," are not as well described, and a "charging document" sounds like a category of things, not a particular thing. Thus, the plain language of the treaty doesn't seem to impose narrow and technical limits on the manner in which the requesting state *charges* a person. And courts have so held in interpreting other, similar treaties. *See In re Assarsson*, 635 F.2d 1237, 1242 (7th Cir. 1980) ("The term is used in the generic sense only to indicate 'accused.'"); *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1448 (9th Cir. 1987) (following *Assarsson* and concluding that "person charged with an offense" does not require that formal charges be brought).

This interpretation accords with the technical analysis of the treaty presented to the Senate, which explained that "the negotiating delegations intended that 'charged' persons include those who are sought for prosecution for an extraditable offense based on an outstanding warrant of arrest, regardless of whether such warrant was issued pursuant to an indictment, complaint, information, affidavit, or other lawful means for initiating an arrest for prosecution under the laws in Peru or the United States." S. Exec. Rep. No. 107-12 at 4 (2002). It also accords with the Fifth Circuit's interpretation of "charged" in the predecessor extradition treaty with Peru, which rejected a requirement that formal charges were required. *See Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 n.1 (5th Cir. 1971) ("Appellant's contention that he has never been properly or legally charged with a crime in accordance with the treaty" has "no merit" because "[a] provisional arrest warrant had been issued requiring the appearance of the appellant before a Peruvian Court and in addition, the Supreme Court of Peru has declared that the extradition of the appellant is lawful.").

With this understanding of what it means to be "charged," the Court finds that Toledo has been charged, and that the charging documents were included in the extradition request. Prosecutor's Decision No. 6 charged him with influence peddling and money laundering. Prosecutor's Decision No. 8 charged him with collusion. And the First National Preliminary Investigation Court in Peru has issued an arrest warrant for him. The two Prosecutor's Decisions are the charging documents, and the order issuing an arrest warrant is the order of arrest.

It's true that these documents constantly use the term "preliminary investigation," which to a U.S. reader does not sound like a charge. For example, Decision No. 6 is entitled "Decision to

Extend Formalization and Continuation of Preliminary Investigation." Req. 3191. Decision No. 8 is called the "Decision of Specification and Extension of Preliminary Investigation." Req. 3248. And the court that issued the arrest warrant is called the "preliminary investigation" court. If the U.S. federal government told you it was conducting a preliminary investigation into whether you committed a crime, you would definitely not think you had been *charged*.

But we have to remember that other countries use different terminology in their legal systems, so we need to look to substance and not get too caught up in words and labels. These Peruvian documents do not in any way correspond to what a U.S. reader thinks a "preliminary investigation" is. The Prosecutor's Decisions read like criminal complaints, spelling out the accused conduct and charging the named defendants with specific crimes. The translated version of the decision to issue a provisional arrest warrant is about 140 pages long, exhaustively lays out the evidence against Toledo, and determines that he is a flight risk. There is no exact analogy to these items in U.S. law, but you can think of them as a combination of a criminal complaint (with no requirement to indict in 30 days), an arrest warrant, and a detention order. If you asked a U.S. resident who was on the receiving end of those three items whether he had been charged with a criminal offense, he would say yes.

Indeed, the Supreme Court of Peru's lengthy order approving the extradition request states that Toledo "is currently being tried for the crimes of influence peddling, collusion, and money laundering," Req. 5946, and that he is sought "so that he can be prosecuted and tried, i.e., in order to proceed with the purposes of the declaration criminal proceeding," *id*. at 5948-49. The court refers to the Prosecutor's Decisions in the section of its order entitled "Formal Charges or Criminal Indictment," *id*. at 5980-82, and states that "[t]he documents required by the Treaty," including "copies of the prosecution's charging documents," are "attached to this extradition request." *Id*. at 6096-97. Thus, in any realistic sense, Toledo has been charged and is sought for prosecution within the meaning of the treaty.

The Court rejects Toledo's argument that only *formal* charges can satisfy the "charged" requirement in the treaty. The Court understands that under Peruvian law, only an Order of Prosecution under Article 353 of the Peruvian Code of Criminal Procedure constitutes a formal

4

charge. However, the argument that this treaty requires that formal charges be filed is unpersuasive. As a textual matter, Toledo's "argument converts the treaty's language that individuals be 'charged,' a verb, into a requirement that 'charges,' a noun, be filed. It is based on semantics, not substance." *Assarsson*, 635 F.2d at 1242-43.

Toledo's argument is the equivalent of contending that under U.S. law, only an indictment counts as a charging document for purposes of the treaty. After all, the Fifth Amendment to the U.S. constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless upon a presentment or indictment of a Grandy Jury . . ." And Rules 7 and 10 of the Federal Rules of Criminal Procedure make clear that, unless the defendant waives his right to an indictment, an indictment is the only way to charge a felony. Yet, as described above, this formalistic interpretation of the treaty is exactly what the technical analysis that was presented to the Senate rejected, and courts have rejected it as well.

Article VI's requirement that the extradition request contain a copy of "the" charging document, rather than *a* charging document does not support Toledo. If someone has been "charged" with an offense, then presumably there is a charging document for that defendant, so whatever it is, it should be included in the extradition request. *Cf. Sacirbey v. Guccione*, 589 F.3d 52, 67 (2d Cir. 2009) (provisions like this describe "the proof required under the Treaty to establish that an individual has been 'charged' with a crime"). The use of the definite article does not suggest anything about what the charging document ought to be.

It is true that *dicta* in *Aguasvivas v. Pompeo*, 405 F. Supp. 3d 347 (D.R.I. 2019), supports Toledo's argument that only formal charges are sufficient under the treaty. That case concerned the U.S. extradition treaty with the Dominican Republic. Similar to the treaty with Peru, for a person sought for prosecution, that treaty required:

> (a) a copy of the warrant or order of arrest or detention issued by a judge or other competent authority;
>
> (b) a copy of the document setting forth the charges against the person sought; and
>
> (c) such information as would provide a reasonable basis to believe that the person sought committed the offense or offenses for which extradition is requested.

5

*Id*. at 354.

In that case, the extradition request included only the arrest warrant and did not include a separate charging document. The court held that "[t]he Treaty's requirement that the Dominican Republic government must include 'the document setting forth the charges against the person,' refers to a formal charging document." *Id*. at 355. The court reasoned that "[t]he Government has not set forth any evidence to show that the Dominican Republic government has formally charged Mr. Aguasvivas because there was no charging document." *Id*. In that case, "the Government argue[d] that formal charges are not required, and . . . the arrest warrant itself satisfies the Treaty's requirement under both sections (a) and (b) cited above." *Id*. However, the court "reject[ed] the Government's interpretation of Article 7." *Id*. The court explained that "[t]he plain language of the Treaty supports the requirement that the requesting country must produce a formal charging document in addition to the warrant to support extradition." *Id*. The court explained that "[t]he use of the qualifier 'the' instead of 'a' in front of 'document setting forth the charges' in § 3(b) signifies that there must be a specific charging document presented. Additionally, the canon against surplusage supports this interpretation of § 3(b). If section (b) is to have any meaning, it must impose a requirement beyond what is required by subsection (a). In other words, if a warrant, required by § 3(a), satisfied both the warrant requirement and the charging document requirement, § 3(b) would be stripped of any meaning." *Id*.

The *Aguasvivas* court's reasoning is persuasive as far as it goes. The fact that the arrest warrant and the charging document are listed separately in the treaty suggests that they are different things, and the treaty does say that both are required. So, if the arrest warrant could count as both documents, that would seem to effectively wipe out the requirement for a separate charging document. This Court has no problem with that reasoning. However, the adjective "formal" – used to modify the term "charging document" – crept into the court's decision without any analysis. *Aguasvivas*'s reasoning does not actually support the notion that a formal charging document like an indictment is the only type of charging document that can satisfy the treaty. The court's holding was simply that the arrest warrant cannot also be the charging document. Here, Peru's extradition request contains Prosecutor's Decisions Nos. 6 and 8, which are charging

documents, and they are separate from the arrest warrant order.

Toledo's response is to compare two different types of extradition treaties. In some, such as the treaties at issue in the Seventh Circuit's decision in *Assarsson*, the Ninth Circuit's decision in *Emami*, and the two prior extradition treaties between the U.S. and Peru, the extradition requests did not need to include a charging document; an arrest warrant was sufficient evidence that the person had been charged. However, in other treaties, such as the one at issue in *Aguasvivas* and the one now before the Court, a charging document is also required. Toledo argues that this additional proof requirement of a charging document narrows what it means to be "charged" such that only formal charges count. In his favor, *Assarsson* and *Emami* pointed to the absence of a requirement to include the charge document in the extradition request as an indication that formal charges were not required. 635 F.2d at 1243 ("Since the parties chose not to require production of the charge document, we can easily infer that they did not require the 'substance' of a charge either."); 834 F.2d at 1448.

However, that was a subsidiary argument. *Assarsson*'s primary argument, which was repeated in *Emami*, was that: "The word 'charge' is thus used in contrast to 'convicted;' that is, persons convicted or charged with certain crimes may be extradited. The term is used in the generic sense only to indicate 'accused.'" 635 F.2d at 1242. It is difficult to understand why a requirement to include "the charging document" in the extradition request could change the meaning of the word "charged" so significantly as to limit it to formal charges, especially when the term "charging document" is itself so expansive.

Further, in rejecting a requirement of formal charges, *Assarsson* and *Emami* both heavily emphasized that "[w]e are . . . not expected to become experts in the laws of foreign nations." 635 F.2d at 1244; *see also* 834 F.2d at 1449 ("this court refuses to entangle itself in the present parties' arguments concerning the procedural requirements of German law."). Requiring that the requesting state file charges that meet all of the procedural formalities of that state's domestic laws would condemn U.S. courts to become experts in the laws of foreign nations. It would mean that every extradition case (at least where "the charging document" is required in the request) would require close scrutiny of the criminal procedural laws of another country, a task likely to lead to

7

error. *See Emami*, 834 F.2d at 1449 ("we recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles"). The Court is unwilling to believe that a rigorous analysis of the formalities of another country's criminal procedural laws is required absent some strong textual indication, and there is not such a strong indication here.

Indeed, the Ninth Circuit's decision in *Emami* counsels against that type of analysis in a factual setting that is closely on point. In that case, the defendant argued that Germany had not formally charged him under paragraph 157 of the German Code of Criminal Procedure but instead sought his extradition for detention and investigation under paragraph 112 of the German Code of Criminal Procedure. *See id*. at 1448-49. The Ninth Circuit refused to decide that question of German law, noting simply that "[t]he German government has stated that Emami is wanted for prosecution both in its request for Emami's provisional arrest and in its request for Emami's extradition." *Id*. at 1449. Toledo is in much the same factual position as Emami was, and his arguments are similar. True, the treaty in this case requires "the charging document," whereas the treaty in Emami's case did not, but the Court does not believe that is enough to change the outcome.

Accordingly, the Court finds that Toledo has been "charged" within the meaning of the treaty and that "the charging document[s]" were included in the extradition request.

**B.     The Influence Peddling Charge**

Article II, section 1 of the treaty provides that "[a]n offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." Section 3(a) clarifies that "an offense shall be an extraditable offense, regardless of . . . whether the laws in the Contracting States place the offense within a different category of offenses or describe the offense by different terminology, so long as the underlying conduct is criminal in both States . . ."

Here, Peru claims that its influence-peddling statute is similar to the U.S. crime of bribery as codified in 18 U.S.C. § 201(b)(1). Req. 84. Toledo argues otherwise, contending his alleged conduct would not violate section 201(b)(1). However, it is obvious that Peru simply made a

mistake in the extradition request and that it should have cited 18 U.S.C. § 201(b)(2). Section 201(b)(1) criminalizes *bribing* a public official, and section 201(b)(2) criminalizes *accepting* the bribe. Since Toledo was a public official allegedly on the receiving end of the bribes, obviously his conduct would not have violated section 201(b)(1).

In its opposition, the government argues that Toledo's alleged conduct would have violated section 201(b)(2). In reply, Toledo does not address the issue. Thus, the state of the briefing is that the Court has received no briefing from Toledo on whether his alleged conduct would have violated section 201(b)(2). Accordingly, Toledo's motion to dismiss the extradition request as to the influence peddling charge is denied. The Court understands that this denial will be short lived. The government has informed the Court that Peru has dropped the influence peddling charge. ECF No. 142. Peru is in the processing of translating the *acusación fiscal* and presenting it to the United States pursuant to article VII of the treaty, and the Court will await the outcome of that process before taking action as to the influence peddling charge.

**C.    Conclusion**

Toledo's motion to deny extradition is **DENIED**.

**IT IS SO ORDERED.**

Dated: September 4, 2020

THOMAS S. HIXSON
United States Magistrate Judge

9