1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

7  IN THE MATTER OF THE                 Case No.  19-mj-71055-MAG-1   (TSH)
   EXTRADITION OF ALEJANDRO
8  TOLEDO MANRIQUE                      **CERTIFICATION OF
                                        EXTRADITABILITY TO THE
9                                       SECRETARY OF STATE (18 U.S.C. §
                                        3184)**
10
                                        Re: Dkt. No. 170
11

12

13        The Republic of Peru seeks the extradition of its former President, Alejandro Toledo

14  Manrique ("Toledo").  The Court has heard and considered the evidence of criminality and deems

15  it sufficient to sustain the charges of collusion and money laundering under the provisions of the

16  Extradition Treaty Between the United States of America and the Republic of Peru, July 26, 2001,

17  U.S.-Peru, TIAS No. 03-825, S. Treaty Doc. No. 107-6, 2001 WL 1875758 ("U.S.-Peru Treaty").

18  Accordingly, the Court **CERTIFIES** the same to the Secretary of State.  18 U.S.C. § 3184.

19                     **I.     PROCEDURAL BACKGROUND**

20        On July 15, 2019, the United States filed a criminal complaint against Toledo, charging

21  him with influence peddling in violation of Section 400 of the Peruvian Criminal Code, collusion

22  in violation of Section 384 of the Peruvian Criminal Code, and money laundering in violation of

23  Article 1 of Peruvian Act No. 27765, pursuant to the U.S.-Peru Treaty and 18 U.S.C. § 3184.  ECF

24  No. 1.  Toledo made his initial appearance in court the following day represented by retained

25  counsel Joseph Russoniello.  ECF No. 4.  On July 19, 2019, the Court ordered Toledo detained.

26  ECF Nos. 12, 16.  On July 19, Steven Kalar, the Federal Public Defender, moved to substitute in

27  as appointed counsel, which the Court provisionally granted.  Russoniello moved to withdraw,

28  which the Court granted.  ECF No. 12.  Assistant Federal Public Defender Graham Archer entered

United States District Court
Northern District of California

an appearance for Toledo on July 25, 2019, ECF No. 14, and has been Toledo's appointed counsel ever since.  *See* ECF No. 88 (January 31, 2020 order denying the government's motion to reconsider appointing counsel to represent Toledo).

The Court considered further briefing on the issue of detention or release and again ordered Toledo detained on September 12, 2019.  ECF No. 30.  On March 19, 2020, the Court determined that Toledo should be released from jail given his age and vulnerability to COVID-19.  ECF No. 115.  The release order became effective on March 20, 2020, ECF No. 120, and Toledo has been out of custody since that date.

On December 17, 2019, the United States filed the formal extradition request ("ER") submitted by Peru and authenticated pursuant to 18 U.S.C. § 3190.  ECF No. 81.  On July 10, 2020, Toledo moved to deny extradition, contending that he had not been "charged" with a crime within the meaning of the U.S.-Peru Treaty, that a copy of the charging document had not been included in the ER as the treaty requires, and that the influence peddling charge did not satisfy the treaty's dual criminality requirement.  ECF No. 137.  The United States opposed the motion, ECF No. 140, and Toledo filed a reply.  ECF No. 143.  The Court denied Toledo's motion, concluding that Prosecutor's Decision No. 6 charged him with influence peddling and money laundering and that Prosecutor's Decision No. 8 charged him with collusion.  ECF No. 147.  The two Prosecutor's Decisions were the charging documents, and they were included in the ER.  The Court declined to dismiss the influence peddling charge due to the manner in which it had been briefed.  However, the Court noted that Peru had indicated it was dropping that charge.  *Id*. at 9.

On August 12, 2021, the United States filed a supplement to the extradition request ("SER"), submitted by Peru and authenticated pursuant to 18 U.S.C. § 3190.  ECF No. 171.  The SER is two documents:  a dismissal of certain charges against other defendants, and a criminal information against Toledo and other defendants.  The criminal information reflects that the influence peddling charge has been dropped and that Toledo is now charged only with collusion and money laundering.  SER 102.

On July 8, 2021, Toledo filed a second motion to deny extradition, this time arguing that there is no probable cause to believe he committed the charged offenses.  ECF No. 170.  The

United States' opposition brief argued that there is probable cause, and also that the probable cause determination was the only remaining finding that needed to be made in order to certify Toledo's extradition.  ECF No. 173.  Accordingly, the government argued that the Court should deny Toledo's motion and certify his extradition.  *Id.*  Toledo filed a reply brief again arguing that there was no probable cause.  Toledo did not dispute that probable cause was the only remaining issue that needed to be determined in this proceeding.  ECF No. 174.

On September 10, 2021, Toledo filed 2,195 pages of financial records that Peru produced to his Peruvian counsel.  ECF No. 175.

On September 24, 2021, the Court held a public extradition hearing by Zoom Videoconference pursuant to the parties' stipulation and "consent to holding the hearing in this manner."  ECF No. 185.

## II.    THE REQUIREMENTS FOR EXTRADITION

The Court should certify a fugitive's extradition to the Secretary of State when the following requirements have been met:  (a) the judicial officer is authorized to conduct the extradition proceeding; (b) the Court has jurisdiction over the fugitive; (c) the applicable extradition treaty is in full force and effect; (d) the crimes for which surrender is requested are covered by the treaty; and (e) there is sufficient evidence to support a finding of probable cause as to each charge.  *See Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008).

The only requirement in dispute is the last one.

### A.    Authority over the Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  The judicial officer conducting the extradition hearing prescribed by section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (simplified).  Both magistrate judges and district judges may render a certification under section 3184.  *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993).  Here, Rule 7-

United States District Court
Northern District of California

3

1(b)(13) of the Criminal Local Rules for the U.S. District Court for the Northern District of California expressly delegates to magistrate judges the authority to handle extradition matters.

**B.      Jurisdiction over the Fugitive**

The Court has jurisdiction over a fugitive, such as Toledo, who is found within its jurisdictional boundaries.  18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

**C.      Treaty in Full Force and Effect**

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. 18 U.S.C. § 3184 ("Whenever there is a treaty or convention for extradition between the United States and any foreign government . . .").  The U.S.-Peru Treaty entered into force on August 25, 2003.  *See* Statutory Notes, foll. 18 U.S.C. § 3181.  There is no evidence that it has been terminated.

**D.      Crimes Covered by Treaty**

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty.  Article I of the U.S.-Peru Treaty provides for the extradition of persons charged with an "extraditable offense."  Article II of the treaty defines an offense as extraditable if it is punishable under the laws of both the United States and Peru by a deprivation of liberty for a maximum period of more than one year or by a more severe penalty.

In assessing whether the conduct alleged by Peru is criminalized both in that country and in the United States, the Court should examine the description of the criminal conduct provided by Peru in support of its charges and decide whether that conduct, if it had been committed here, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states.  *See, e.g.*, *United States v. Knotek*, 925 F.3d 1118, 1128-29 & n.10 (9th Cir. 2019); *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107-08 (9th Cir. 1981).  A requesting country need not establish that its crimes are identical to ours.  *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged;

4

the elements of the analogous offenses need not be identical.").  Rather, "the court looks at whether 'the essential character of the transaction is the same, and made criminal by both statutes.'" *Knotek*, 925 F.3d at 1131 (quoting *Wright v. Henkel*, 190 U.S. 40, 62 (1903); brackets omitted).  "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

Here, the charged conduct is described below in section E.  The conduct that is the subject of the collusion charge would be punishable under U.S. law as conspiracy to defraud the United States in violation of 18 U.S.C. § 371, and the conduct that is the subject of the money laundering charge would be punishable as money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) or as transporting funds for the purpose of laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

**E.    Probable Cause**

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by Peru were committed by the person before the Court. *See Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006); *see also* U.S.-Peru Treaty, art. VI § 3(c) (requiring "such evidence as would be sufficient to justify the committal for trial of the person if the offense had been committed in the Requested State").  The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (simplified).  The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

The government bears the burden of offering "evidence that 'will support a reasonable belief that [the extraditee] was guilty of the crime charged.'" *In re Extradition of Okeke*, 1996 WL 622213, *5 (D.N.J. Sept. 5, 1996) (quoting *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990)).

United States District Court
Northern District of California

While "the government's evidence need only be properly authenticated" to be admitted, the Ninth Circuit has cautioned against "conflat[ing] the admissibility standard with the standard required to satisfy probable cause." *Santos v. Thomas*, 830 F.3d 987, 1006 (9th Cir. 2016). "Simply because evidence has been authenticated does not mean any evidence the government submits is sufficient to satisfy probable cause. Were that the case, the judiciary's role in the extradition process would be meaningless." *Id.* In assessing whether the government has met its burden, "[t]he credibility of witnesses and the weight accorded to their testimony is solely within the province of the extradition magistrate." *Quinn*, 783 F.3d at 815.

### 1.    Evidentiary Rulings

The United States bases its extradition request on the evidence contained in the ER and SER. "Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required." 18 U.S.C. § 3190. The United States has provided the certificates required by section 3190 for the ER and SER.[1] Accordingly, the ER and SER are **ADMITTED**.

A party seeking to avoid extradition "is not permitted to introduce evidence on the issue of guilt or innocence," *In re Extradition of Chavez,* 408 F. Supp. 2d 908, 911 (N.D. Cal. 2005) (simplified), but he can "present his own evidence to explain away the requesting government's evidence of probable cause," *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) (en banc).

---

[1] For the ER, there is a section 3190 certificate at the start of each volume (e.g., Volume 1) and sub-volume (e.g., Volume VI-B-2). The eight certificates accompanying the SER are attached as Exhibit 1 to the government's filing at ECF No. 183. The government stated its belief in ECF No. 183, and confirmed at the hearing, that these eight certificates also accompanied the eight English-language original volumes that were manually filed with the Clerk's Office. Regardless, section 3190 does not require that the certificate be physically affixed to the evidence at the time it is filed with the Clerk's Office. Rather, what matters is that the Court has the certificate by the time it makes evidentiary rulings in connection with the extradition hearing.

As a general rule, "explanatory" evidence is admissible, but "contradictory" evidence is not. *Santos*, 830 F.3d at 992.  Broadly speaking, this means that an extraditee may present "evidence rebutting probable cause," but cannot present "evidence in defense."  *Collins v. Loisel*, 259 U.S. 309, 316 (1922).  Thus, for example, the accused may not present alibi evidence or evidence of an affirmative defense like insanity.  *Santos*, 830 F.3d at 993.  Evidence of witness coercion, on the other hand, is admissible "explanatory" evidence, "because a coerced statement is not competent evidence and cannot support probable cause."  *Id.* at 1001.

Toledo moves to admit eight exhibits.  In his motion to deny extradition, Toledo moves to admit exhibits A, B, D, E and F that are attached to his motion, as well as the 2,195 pages of financial documents he filed at ECF No. 175.

Exhibit A is pages 2-3 and 39-42 of the *acusacion fiscal*, showing an order of dismissal for Sabih Saylan ("Saylan") and Gideon Weinstein ("Weinstein").  Exhibit B is pages 1083-84 from the *acusacion fiscal*, quoting a portion of Josef Arieh Maiman Rapaport's ("Maiman's") January 22, 2020 testimony concerning his relationship with Avraham Dan On ("Dan On").  Subsequent to that filing, the United States filed the entire *acusacion fiscal* in the record as the SER.  The government therefore has no objection to the admission of Exhibits A and B, as they are merely portions of the SER, which was properly authenticated under section 3190.  Accordingly, Exhibits A and B are **ADMITTED**.

Exhibit D is the December 26, 2019 Judgment of Effective Collaboration concerning Maiman, Toledo's former longtime friend who participated in the alleged collusion and money laundering scheme, then turned state's evidence against Toledo.  The Court finds that Exhibit D contradicts the government's evidence and does not explain it.  The government's evidence states that Maiman "did not profit in any way from receiving money on behalf of Alejandro Toledo." ER 489; *see also* ER 514 ("I did not receive any cash from Alejandro Toledo Manrique, Odebrecht, or Camargo Correa.").  Exhibit D makes clear that Maiman profited handsomely from receiving money on behalf of Toledo and absolutely received cash from Odebrecht and Camargo Correa.  The money he received is quantified in paragraphs 4.3.2.4, 5.2.3, 5.3.2, 5.3.3, and 7.1, among other places.  Much of this document is devoted to the payments Maiman has to make

returning money that he received.  Toledo is offering Exhibit D into evidence to support his defense that somebody other than him committed the crimes at issue – specifically, that Maiman committed them.  Because Exhibit D contradicts the government's evidence, it is **NOT ADMITTED**.

Exhibit E is a relatively complete transcript of the April 24, 2019 video deposition of Jorge Henrique Simoes Barata ("Barata"), the other principal witness against Toledo, which was transcribed in stages on July 19, 2019 and September 20, 2019.  Exhibit E is explanatory of the SER in several respects.  The SER quotes Barata's statements numerous times.  What you would never be able to figure out from the SER, and what Exhibit E explains, is that with a few exceptions,[2] every quotation of Barata is from the April 24, 2019 deposition.  It is helpful to understand that for the most part, the statements by Barata in the SER come from one, single deposition.

Without Exhibit E, some of the SER's quotes from Barata would be hard to understand.  Take a look at SER 1131:  "The witness Jorge Henrique Simoes Barata's statement, dated 20 September 2019 and sent by the International Judicial Cooperation and Extraditions Unit of the Office of the Public Prosecutor of the Nation on 18 June 2019, attached to official letter 7175-2019-MP-FN-UCJIE (AJ 2079-18), must be followed up by a videotaped transcript of the statement," which then goes on to quote Barata.  That's a head scratcher.  How can a statement dated September 20, 2019 have been sent on June 18, 2019?  This mystery is repeated in the SER at 202, 1093, 1106, 1290, 1292.  And there is also the odd language about "must be followed up by a videotaped transcript of the statement," which reads like a poor translation.  Exhibit E clears this up by explaining that Barata's testimony was given on April 24, the mp4 video file was sent on June 18, and the transcript was made on September 20.  Exhibit E also tells us that Barata's statements that seem to be dated July 19, 2019 (SER 211, 293, 654) or September 20, 2019 (SER 928, 964, 1139), or that have no date (SER 386, 388, 1332, 1478) were all given on April 24, 2019.

---

[2] SER 171-73 seems to come from ER 353.  The Court is unsure where the quotes at SER 455 and 478 come from.

United States District Court
Northern District of California

The brief excerpts from Barata's April 24 testimony in the SER tend to quote conclusions or the ultimate points Peru is trying to establish. Exhibit E is explanatory because it shows the foundation for Barata's testimony, including background, context, and detail. Reading a relatively complete deposition transcript also provides narrative flow.

The Court notes that Exhibit E does not seem to be a complete official transcript of the April 24 deposition. For example, a comparison of Exhibit E to the SER indicates to the Court that the Barata quotations at SER 202 to 206 (top of page), SER 1093-98, SER 1139-44, SER 1291 (mid-page) to 1292, SER 1317 (bottom of page) to 1319, SER 1335 (bottom of page) to 1344, SER 1364, SER 1408-10, and SER 1482-91 are missing from Exhibit E. This does not deprive Exhibit E of its explanatory quality, however, because it still provides useful foundation and context even for those excerpts that are not contained within the exhibit itself. Accordingly, Exhibit E is **ADMITTED**.

Exhibit F is the February 2, 2012 Nominee Agreement between Ecoteva Consulting, S.A. and the Merhav Group. Toledo offers the Nominee Agreement to contradict the government's evidence and to support his defense that Maiman (not Toledo) committed the alleged crimes. The government's evidence includes Maiman's 2017 testimony that the beneficiary of the money laundering scheme was Toledo, and that the receipt of the money by Ecoteva, a company owned by Toledo's mother-in-law, is further evidence of that. ER 489. The government's evidence also includes Maiman's 2017 testimony that his 2013 testimony to the contrary was untrue and was given as a favor to Toledo. ER 495-96. The Nominee Agreement is being offered in an attempt to show that the mother-in-law's ownership interest in Ecoteva was nominal in nature and that true control over the company was exercised by Merhav, a company under Maiman's control, which tends to undermine Maiman's 2017 testimony that Toledo was the beneficiary of the scheme. Because Exhibit F is offered to contradict the government's evidence, it is **NOT ADMITTED**.

Next, Toledo moves to admit the collection of 2,195 pages of financial documents he filed manually on September 10, 2021. ECF No. 175. Toledo submits a declaration by paralegal Caitlin Costello in the Federal Public Defender's office (attached as Exhibit C to Toledo's motion), which describes these records as bank records that her office obtained from Toledo's

legal counsel in Peru.  More specifically, according to the declaration, they are LGT Bank (Switzerland) Ltd. bank records for account numbers H189782AA & H189782AC of company Confiado International Corporation; Banque Privee, Edmond De Rothschild S.A. bank records for account number 704.654; Barclays United State Currency Account bank records for account number ending in 6799 of company Warbury & Co; and Barclays European Currency Account for account number ending in 6022 of company Warbury & Co.

No one seems to know how many of these 2,195 pages of bank records are already in the ER and SER that were authenticated under 18 U.S.C. § 3190.  Toledo states that "the financial records that Dr. Toledo seeks to introduce are the complete versions of the excerpted financial records Peru relies upon in the Extradition Request and the Acusacion Fiscal."  ECF No. 174 at page 4 of 11.  This suggests that Toledo is trying to add something to the record but doesn't clarify what.  For its part, the United States says that it "has not compared the financial records provided by Toledo with the numerous financial records included in the extradition request to determine the extent to which they are duplicative."  ECF No. 173 at 23 n.27.

This puts the Court in a difficult situation, as it does not know what Toledo is moving to add to the record.  Concerning Barata's testimony discussed above, it was relatively easy for the Court to read Exhibit E and determine how much of it was an addition to the existing record (nearly all of it, as the SER just quoted snippets).  But it would be a monumental task for the Court to compare each page of the 2,195 pages of records Toledo offers to the bank records spread across more than 6,000 pages of the ER and more than 3,000 pages of the SER to determine what is new – an effort that the parties themselves were unwilling to take.

The Court also thinks that Toledo is offering these financial records to contradict the government's evidence, not to explain it.  Toledo argues that "[u]sing these records, the defense has retraced the path of Odebrecht's payments.  The defense's analysis, along with a detailed explanation of how the defense arrived at its conclusions, is set forth in Caitlin Costello's Declaration."  ECF No. 170 at page 13 of 25.  That declaration (attached as Exhibit C to Toledo's motion) summarizes the financial records and then states in paragraph 22 that Attachment 1 is a graphic representation of what Ms. Costello understands is "Peru's theory" of how much

Odebrecht paid and where that money ended up, while paragraph 23 states that Attachment 2 "is a graphic representation of how much money Odebrecht paid and where it *actually* ended up." (emphasis added).  As before, Toledo offers this evidence to support his defense that somebody else committed the alleged crimes.  Because these financial documents are offered to dispute the government's evidence about where the bribe money ended up, they are being offered for the purpose of contradiction, not explanation.

Accordingly, for both of these reasons, the financial documents are **NOT ADMITTED**.

In his reply brief, Toledo asks the Court to admit two more items.  Exhibit G is a complete official transcript of Maiman's January 22, 2020 deposition.  Excerpts of this transcript are cited in the SER.  SER 1099-1104, 1111-14, 1121-23, 1124-25, 1137-39, 1144-48, 1159-78, 1241-42, 1285, 1286-89.  So far as the Court can tell, all of these excerpts in the SER are also in Exhibit G. (In other words, it is not like Exhibit E, where the SER makes it facially apparent that Exhibit E is incomplete.)  The Court finds that pages 1 through the first line of page 157 of the 193-page transcript are explanatory of the excerpts quoted in the SER.  These sections provide foundation for how and why Maiman came to know certain things, they provide useful context and detail, and they provide a narrative concerning his involvement in the facts of the case that allows the Court to better understand the portions quoted in the SER.  Accordingly, page 1 through the first line of page 157 of Exhibit G are **ADMITTED**.

The remainder of Exhibit G must be rejected as contradictory.  The government's evidence states that Maiman "did not profit in any way from receiving money on behalf of Alejandro Toledo."  ER 489; *see also* ER 514 ("I did not receive any cash from Alejandro Toledo Manrique, Odebrecht, or Camargo Correa.").  In the remainder of Exhibit G, cross examination by defense counsel causes Maiman to admit that of the approximately $34 million in bribe money he received, only $21 million went to Toledo.  Maiman skimmed off the rest, to the tune of about $13 or $14 million, through payments to family members and business associates, some of which were transferred back to him, all of which he justified by claiming that Odebrecht owed him money arising out of a prior business deal.  The final exchange between the judge and Maiman makes clear that Maiman had or had control over all of that skimmed-off money:

Judge:  How much will you return?

Witness:  The total amount to be returned to Peru is 13 or 14 million dollars.

Judge:  Are you keeping part of the money you have received?

Witness:  No, not really.

Ex. G at 193.  Toledo is again offering this evidence to support his defense that Maiman, not he, committed the crimes at issue.  Accordingly, this section of the transcript contradicts the government's evidence and is **NOT ADMITTED**.

Exhibit H is a literal transcript of the portion of Maiman's January 22, 2020 testimony consisting of the cross-examination by Toledo's Peruvian counsel.  Exhibit H corresponds to pages 157-77 of Exhibit G.  The difference between a literal transcript and an official transcript is that Exhibit G leaves out objections by counsel, legal arguments by counsel, the judge's evidentiary rulings, and sometimes combines Maiman's answers.  Because Exhibit H is part of the defense's cross-examination of Maiman and develops evidence that he skimmed off bribe money for his own benefit, it is contradictory to the government's evidence and is **NOT ADMITTED**.

## 2.    Whether There Is Probable Cause

Peru charges Toledo with collusion and money laundering.  Section 384 of the Peruvian Criminal Code, criminalizing collusion, provides:  "The government officials or civil servants who, in contracts, supplies, tenders, competitive biddings, auctions or any other similar operation in which they participate by reason of their office or on a special commission, swindle the Peruvian State or State-supported bodies or entities, pursuant to law, by making arrangements with the concerned parties in agreements, adjustments, liquidations or supplies, shall be punished by imprisonment for not less than three (3) years and not more than fifteen (15) years."  ER 3280.  This requires proof that:  (1) the defendant was a government official or civil servant; (2) by reason of his or her position, the defendant participated at any stage in contracts, supplies, tenders, competitive biddings, auctions, or any other similar operations conducted by the government; and (3) in connection therewith, the defendant defrauded the State of Peru or state-supported bodies or entities by making arrangements with the concerned parties in agreements, adjustments, liquidations, or supplies.  *See* ER 3280-85.

United States District Court
Northern District of California

12

Article 1 of Peruvian Act No. 27765, criminalizing money laundering, provides: "Whoever converts or transfers money, property, instruments, or proceeds, knowing or suspecting their unlawful origin, with the intention to prevent the identification of their origin, their seizure or forfeiture, shall be punished by imprisonment for not less than eight (8) and not more than fifteen (15) years, and by a fine of one hundred and twenty (120) to three hundred fifty (350) days." ER 5974. This requires proof that: (1) the defendant converted or transferred money, goods, effects, or earnings; (2) the defendant was aware or presumed that the money or other items had illegal origins; (3) the defendant sought to prevent the money or other items from being seized or confiscated, or to prevent their illegal origins from being identified. *See* ER 3228-33.

Toledo argues that the two principal witnesses against him, Maiman and Barata, are liars and that the true beneficiary of the bribery scheme, of which Toledo knew nothing, was Maiman himself. The United States argues that although Peru's extradition request contains numerous, substantial pieces of evidence from multiple sources supporting the charges against Toledo, the Court could base its probable-cause determination solely on statements provided by Barata and Maiman. Because of the weight both sides place on the testimony of these two witnesses, the Court summarizes it here.

### a.    Barata and Maiman's Testimony

#### i.    Barata's November 21, 2016 Statement

In 2001, Barata became the superintendent of Odebrecht, a Brazilian company, in Peru, a position he held until 2012. He decided that Odebrecht should participate in the bidding for sections 2, 3 and 4 of the Southern Interoceanic Highway, a Peruvian public works project. ER 352.

Toward the end of 2004, during a social event at the Government Palace, Barata was contacted by Dan On, Toledo's chief of security, who offered to favor Odebrecht in the bidding process. He was later summoned by Dan On to attend further meetings at the Palace, which Barata entered through a side door with no record of his visit, and in one of these meetings Dan On informed him that if Odebrecht won the bidding, it would have to make corrupt payments to Toledo, the amounts of which would be identified later by Maiman. ER 353. Dan On had a close

United States District Court
Northern District of California

relationship with Maiman, and Barata understood that Maiman exercised a major influence on Toledo.  ER 353-54.

Subsequently,[3] in the first week of November 2004, "if I remember right," Barata participated in a meeting held in the presidential suite of the Hotel Marriott in Rio de Janeiro, where Toledo, Maiman, and two business associates of Maiman's (Saylan and Weinstein) were present.  Saylan and Weinstein told Barata that if Odebrecht was awarded the contract in the bidding, it would have to pay a bribe of $35 million to Toledo, via several of Maiman's companies through the adoption of fictitious contracts with Odebrecht.  ER 354.  Barata stated that he negotiated this deal directly with Saylan and Weinstein in the presidential suite.  He said he did not negotiate it directly with Toledo.  Rather, the fact that Toledo and Maiman were in a different part of the presidential suite convinced him that Saylan and Weinstein were acting on Toledo's behalf.  Further, after Toledo was no longer president (his term was 2001-06) and Odebrecht was behind in the bribes, Toledo summoned Barata to his house in Camacho "to pressure me into continuing with the payments."  ER 359.  This also confirmed to Barata that Saylan and Weinstein had negotiated on Toledo's behalf, because it showed Toledo knew of the deal.

After the meeting in Rio, Barata had other meetings with Maiman in 2004 and early 2005 in Lima, Peru, and Toledo was present at least sometimes.  ER 354.  Toledo's assistance consisted of maintaining the fast timetable for execution of the bidding, despite the requests for postponement, which reduced the level of competitiveness of the process.  The fulfillment of the short term of the bidding process, of approximately six months, was important for Odebrecht to win the bid, as bidding in Peru normally takes two years.  ER 354-55.

However, Toledo did not entirely uphold his end of the bargain.  Weinstein and Saylan had said that Toledo would not only keep the bidding process on a fast track but would also amend the provisions of the bidding conditions to favor Odebrecht, and that did not happen.  Because of that, Barata decided not to pay the agreed upon amount of $35 million.  Instead, Odebrecht paid

---

[3] ER 353 states that the meeting in the Palace during which Dan On mentioned the bribes took place in 2005, which of course is after 2004.  Below the Court will discuss the more general issue of the inconsistencies within and between Barata's and Maiman's accounts of events.

approximately $20 million between 2006 and 2010.  It used unrecorded slush funds, that is, funds that were deposited in offshore accounts, through bank transfers abroad to Maiman's companies. ER 355-56.  Barata indicated that Odebrecht's department of structured operations, which paid the bribe, had disorganized information and worked "in a disorderly fashion," and he had no understanding of where its money came from.  ER 357.

After Odebrecht won the bid, there was a ceremony in the golden room of the Palace for the contract signing.  About 200 people were present.  During the ceremony, a fax came in from the Comptroller General's Office stating that Odebrecht was not eligible for the contract because it had pending litigation with the state.  Many of the ministers who were present, most of whom were lawyers, commented that the mere existence of pending litigation should not render a company ineligible.  In any event, the contact was signed.  ER 358.  The project ultimately yielded Odebrecht a profit of $80 or $90 million.  ER 359.

### ii.      Barata's April 24, 2019 Statement

Barata's 2019 statement is much longer and more detailed than his 2016 statement, and the Court summarizes it in a more general way.

The essential elements of the story remained the same.  The first conversation that kicked things off was still with Dan On, who reached out to Barata and stated that Toledo would support Odebrecht in the bidding process in exchange for a bribe.  The final negotiation was in the presidential suite of the hotel in Rio during a conference of the Presidents from the region.  Barata now seems to recall that the amount of the bribe was a more precise $34,300,000 or "something like that."  This time Odebrecht's Marcelo Odebrecht was present at the meeting.  Ex. E (7/19/2019 Tr. at 6).

It remained true that Barata did not negotiate the bribe directly with Toledo.  *Id*. at 7; Ex. E (9/20/19 Tr. at 3-4).  He discussed it with Dan On, Saylan and Weinstein, Ex. E (7/19/10 Tr. at 7), and finalized the negotiation with Saylan and Weinstein in the presidential suite during the meeting in Rio.  *Id*. at 11.  In his 2016 statement, Barata had said that Saylan and Weinstein said that there would have to be fictitious contracts between Odebrecht and Maiman's companies to facilitate the bribe payments.  In the 2019 statement, there is at least one excerpt in which Barata

1    discussed the negotiation and execution of a contract addendum between Odebrecht and one of

2    Maiman's companies (Merhav) calling for a payment of $34,300,000.  SER 1093-98.  Although

3    the contract itself was a fiction, its purpose was to ratify the agreed amount of the bribe.  SER

4    1096 ("it was written in order to keep the memory, but not to declare the problem, not to declare

5    the bribe . . . I know that it was a document that had been signed just to uh . . . ratify that we had

6    reached an agreement and that we were going to pay thirty-four million.").

7        Barata continued to maintain that after Toledo was out of office, he asked for payments,

8    but now Barata also said that Toledo personally demanded payments from him while still in

9    office.  Ex. E (7/19/2019 Tr. at 7); Ex. E (9/20/19 Tr. at 34) ("and the President calls me and

10   makes me a . . . how do you say it in Peru?  He gives me a tongue lashing."); *id*. at 35.; *id*. at 36

11   (estimating that the first time Toledo asked him for bribe money while still in office was "I think

12   mid-September, October of 2005").

13       In this deposition, Barata went into much greater detail about his discussions with Dan On,

14   Toledo and others about the mechanics of the bidding process and also the difficulties and delays

15   in getting the highway built.  The pre-award discussions tend to look corrupt because they indicate

16   everyone knew who would get the bid, *see, e.g.*, Ex. E (9/20/19 Tr. at 4), but many of the post-

17   award actions Odebrecht undertook just look like attempts to fight its way through bureaucratic

18   red tape and get a highway built.  Barata also went into a fair amount of detail into the joint

19   ventures that submitted the bids and the communications Barata had with the other joint venturers

20   about the allocation of the costs of the bribe.  (Like the parties did in their briefing, the Court will

21   generally refer to "Odebrecht's" bid and "Odebrecht's" bribe because Odebrecht was the chief

22   architect of the bid and paid most of the bribe money, but to be precise, they were joint ventures.)

23       Barata continued to maintain that Toledo partially came through on his end of the deal by

24   keeping up the speed of the bidding process, which meant there were fewer bidders.  *Id*. at 6-7.

25   And he continued to maintain "that the only thing we achieved were time frames," *id*. at 15, and

26   he felt "frustrated" that he "wasn't getting anywhere with President Toledo" because "he hadn't

27   made the modifications that we wanted" to the bid.  *Id*.

28       Barata also went into much more detail about the timing of the bribe payments.  Odebrecht

United States District Court
Northern District of California

16

faced two competing considerations.  First, it wanted public officials that it had bribed to be confident that they would receive their bribe money even if they left office.  Former public officials remain powerful and can come back into power (*id*. at 29 ("It's not good to be an enemy of the president or former president, right?  Because he's always a very powerful figure, very important within the process, and he'll be there tomorrow"); and beyond that, when it came time to bribe the next public official, Odebrecht needed to have a reputation for living up to its deals, including the illegal parts.  *Id*. at 28 ("if you come and . . . and don't follow through, you definitely lose your credibility in the process, totally"); *id*. at 39 (agreeing that "it was acknowledged in Peru during those years that you guys came through on the licit, legal things, and even on the illicit ones").  But second, Odebrecht didn't want to pay bribe money up front before it knew if it would reap the benefit of its bargain.  *Id*. at 29 ("So I had the, the, the conviction that I had to pay, but it was always conditioned, because this was part of the agreement that matters be resolved.  That is, if there were no resolution of the issues, of the problems, and if the job didn't go forward and if the job didn't yield profits, payment was not unconditional.").

Because of the many delays in the highway project, Odebrecht paid only $4 million in bribes during Toledo's administration; all the rest was paid after he was out of office.  *Id*. at 27, 30.  There were all kinds of project delays during Toledo's administration, and things got better under his successor, Alan Garcia.[4]  *Id*. at 28-29; *id*. at 37 ("During Alejandro Toledo's administration, that was all the work done on the roadway system:  five kilometers of pavement, that's all.").  Odebrecht paid the remaining $27 million in bribe money for Toledo during Garcia's administration.  *Id*. at 41.

As for the mechanics of the payment, "someone from Maiman's team, Mr. Leo Malamud, if I'm not mistaken, calls our people, right?  Uh . . . probably Gilberto Silva, who was head of the structured transactions department. . . . And the transfers begin getting made . . ."  *Id*. at 30.  As in his 2016 statement, Barata said he did not know where the structured transactions department got the money to pay the bribe.  As described by Barata, that department was essentially a bribery

---

[4] On April 17, 2019, Garcia shot himself in the head and died as Peruvian police officers were preparing to arrest him in connection with the Odebrecht scandal.

1    department.  *Id*. at 33.  Barata was dependent on information provided by that department to know

2    how much bribe money had been paid and when.  *Id*. at 30.

3                            iii.        **Maiman's February 27, 2017 Statement**

4          Maiman gave this statement anonymously under collaborator code 05-2017, ER 479-97,

5    which he confirmed was him in his September 5, 2017 statement.  ER 500.  Thus, throughout the

6    February 27 statement, Maiman refers to himself in the third person.

7          As of 2017, Maiman and Toledo had known each other for 50 years.  They met when they

8    were playing a game of pick-up soccer in Lima.  At the time Maiman was working at the Central

9    Reserve Bank and Toledo was either just finishing up or had just finished his university studies.

10   Since the two men were economists by profession, they became friends, but they were in touch

11   intermittently, as Toledo went to get his PhD at Stanford, while Maiman continued his studies at

12   Cornell.  ER 480.  The two of them connected at various times over the years.  ER 481-83.

13         Maiman met Elaine Karp, Toledo's future wife, in 1972, that is to say, independently of

14   Toledo.  When he ran into her in the mid-1990s, he learned that she had married Toledo.  ER 483.

15         Toward the end of 2004, Toledo told Maiman he was going to establish a foundation, and

16   he asked Maiman to help with the receipt of donations.  Toledo said they might add up to a

17   substantial sum, and later said they might approximate $20 million.  Maiman suspected that the

18   donations might be intended to cover up less-than-transparent activities.  But because the two of

19   them were friends, and because he did not want to ask any more questions about the matter, he

20   agreed to help.  ER 484.

21         In November 2004, there was a presidential summit at the Marriott Hotel in Rio.  Maiman

22   was staying in a suite in the hotel because Toledo was taking part in the summit.  Maiman took

23   advantage of his stay in Brazil to conduct business concerning his ethanol project in Columbia.

24   His executives Saylan and Weinstein were in Rio as well, since they were part of his ethanol

25   project.  In his suite, there was a meeting between Maiman, Toledo, Weinstein, Saylan and Barata.

26   It would have been difficult for Maiman and his people to get into Toledo's presidential suite

27   because of security and other concerns.  ER 485.

28         What took place in Rio was a series of meetings among Maiman, Marcelo Odebrecht, and

18

Barata.  Maiman and Marcelo[5] discussed several projects and possible opportunities for cooperation on the implementation of different works.  ER 485-86.  In addition to the aforementioned meetings, at some point Barata told Maiman that there were going to be donations for Toledo's foundation, but he didn't offer any specific details.  Maiman confirmed to Barata that Toledo had mentioned to him the matter of the donations.  ER 486.

During the first half of 2006, Toledo told Maiman that the first donations were about to come in, and that the Brazilians would be contacting him (Maiman) so he could tell them which accounts to make the transfers to.  After the funds were deposited, Maiman was to keep them in his accounts until he received further instructions.  Maiman's companies that were designated to receive the cash transfers were TrailBridge, Merhav Overseas Limited, and Warbury & Co.  Eventually, these companies did in fact receive the transfers.  ER 486.  Maiman told Weinstein and Saylan to contact Barata and let him know these were the companies that Odebrecht should transfer the money to.  ER 497.

Maiman provided some additional information about those companies.  ER 487-88.  The funds Warbury received were then transferred to Confiado, a Swiss company registered in Panama, per Maiman's instructions.  ER 487-88.

In late 2006 or early 2007, Toledo told Maiman that Dan On would inform him of the destination companies to which Maiman was supposed to transfer the money.  The transfers to Confiado began around the second half of 2007 and continued until 2010.  The company received approximately $17.5 million.  As the money was received, it was then sent to two Costa Rican companies, Ecostate Consulting S.A. and Milan Ecotech Consulting S.A.  The transfers continued until the amounts received by Confiado reach the quantities that Odebrecht had promised to Toledo.  ER 488.

In Maiman's opinion, the fact that these supposed donations were sent to companies in Costa Rica appeared to confirm that all of these transactions involved money paid in exchange for awarding Odebrecht contracts for public works in Peru.  ER 488-89.  The actual beneficiary of the

---

[5] The Court uses his first name to avoid confusion with the company.

United States District Court
Northern District of California

money was Toledo.  This was confirmed when the two Costa Rican companies transferred money to a company owned by Toledo's mother-in-law (Ecoteva).  ER 489.

Maiman participated in this scheme in order to develop a closer relationship with Odebrecht, which could benefit him in other business activities.  Maiman says he did not profit "in any way" from receiving money on behalf of Toledo.  Maiman's involvement terminated when the funds were transferred from Confiado to the two Costa Rican companies.  ER 489.  Maiman's understanding was that Dan On founded the Costa Rican companies, and once they received the cash, Dan On performed further transfers at Toledo's request.  ER 492.  Maiman's understanding was that the true purpose of these transactions was to make money available to Toledo in a way that did not link his name to the transactions.  ER 495.

Maiman's February 2017 statement contradicts testimony he gave on July 5, 2013 (ER 5019-58) in an investigation of Toledo's mother-in-law, Eva Fernenbug, for money laundering.  In that case he testified that Fernenbug incorporated Ecoteva Consulting Group with Dan On's help, that she was the legal representative and shareholder of the company, and that Dan On handled all banking and administrative matters for it.  However, Maiman stated that as of the beginning of 2012, because of the Nominee Agreement, the company could only act under his control and instructions "since I have total control over the disposition of funds and investments and purchases."  ER 5036.

Maiman stated that he set up a $20 million fund for Ecoteva for investments in projects that he approved.  All the proceeds went to him, and Fernenbug received $10,000 plus 0.3% of the value of the assets under management.  ER 5039-40.  Maiman explained that the $20 million was transferred from other accounts registered in his name and in the name of his company Merhav to the Costa Rican accounts of Ecostate and Milan and from there to Ecoteva.  ER 5046.  When asked about the $217,007 that Fernenbug transferred to Toledo to pay off the mortgage on his house in Camacho and the $277,309 she transferred to Toledo to pay off the mortgage on his house in Punta Sal, Maiman said that in fact he approved those transfers, and they were loans that Toledo was expected to repay.  ER 5049-50.  The loan was "an oral agreement," ER 5049, but "I had his word and after forty odd years of friendship, he deserved my respect."  ER 5050.

United States District Court
Northern District of California

So, to recap, in his 2013 statement, the $20 million was Maiman's money, he controlled all the companies it flowed through, including the two Costa Rican ones, and the further transferee company (Ecoteva) that was only nominally Fernenbug's, and he approved the loan of about $500,000 of what was really his own money to Toledo, which the latter was expected to repay. After the Odebrecht scandal broke and Maiman turned state's evidence against his former friend, this was all Odebrecht bribe money, which Maiman lost possession and control of as soon as it was transferred to the Costa Rican companies. Needless to say, in the 2017 version, the approximately $500,000 in Odebrecht bribe money that made its way to Toledo wasn't a loan from Maiman.

In his February 2017 statement, Maiman explained that he gave his prior testimony because Toledo "personally asked him to take responsibility, which meant claiming that all of the transactions were in order, and that they were performed in accordance with his own [i.e., Maiman's] decisions, as investments." ER 496.

### iv.    Maiman's September 5, 2017 Statement

Maiman's September 2017 statement is longer and more detailed (ER 499-535) but doesn't change much of the story. The Court mentions the highlights.

Maiman still suspected that the donations Toledo wanted him to accept were suspect "[b]ecause I thought that a donation to his foundation wouldn't have to be made through a third party." He recalled a conversation with Toledo about a specific project, the Interoceanic Highway. But Maiman also thought that "the amounts involved might have more to do with some sort of support for his political ambitions, in which Odebrecht might have a future interest, rather than the foundation." ER 500.

Maiman provided a great deal more detail about the trip to Rio and his meetings there. ER 501-06. He continued to maintain that he met Barata in his suite, where they discussed the donations and his willingness to accept them. He continued to maintain that the meeting was "general." Sharpening a conflict with Barata, Maiman stated that Saylan and Weinstein were not part of that conversation because Maiman had asked them to go to a different part of his suite. ER 503.

21

1       Maiman was unable to state the total amount of bribe money paid by Odebrecht, as he was

2  still reviewing account statements he had received.  ER 512.  He had additional information about

3  bribe money received from Trailbridge and Merhav and its path of transfer to Confiado.  ER 511-

4  12.  Maiman maintained that all of Toledo's funds were transferred from Confiado to the Costa

5  Rican companies.  ER 511.  He continued to state that Toledo told him to transfer the money to

6  destination companies that Dan On would identify to him.  In the September statement there were

7  now three:  Ecostate Consulting S.A., Milan Ecotech Consulting S.A., and Sirlon Dash

8  Consulting.  ER 513.

9       Maiman reiterated that he received no cash from Toledo or Odebrecht.[6]  ER 514.  In this

10  statement he said that the funds that Toledo received amounted to approximately $15 million.  ER

11  518, 521.

### v.    Maiman's January 22, 2020 Statement

13       The English translation of Maiman's January 2020 statement is 193 pages.  The Court will

14  describe only the particularly relevant parts in the 157 pages that have been admitted.

15       The meeting with Barata is now no longer in Maiman's suite.  Rather, Maiman, Weinstein,

16  Marcelo and Barata had a meeting, Ex. G at 55-56, and then "after the meeting with Marcelo . . .

17  we must have crossed paths two or three times at the hotel, in one of those occasions he did tell me

18  about some contributions, but he did not mention amounts and asked me if I was willing to be the

19  recipient, to which I answered yes."  *Id*. at 58.  As for where those meetings with Barata occurred:

20  "We met several times in the hall, in the lobby of the hotel, in the bar.  It was a formal meeting.

21  We sat on both sides of a desk, but yes, in the bar, in the hall, there were several meetings in Rio."

22  *Id*. at 56-57.  When Barata spoke with him about the donations, "[w]e were alone, he pulled me

23  aside."  *Id*. at 60.

24       As for firming up the deal, Barata and Maiman "agreed to go into further detail in

25  November, in a subsequent meeting we had in Lima," *id*. at 65.  Barata explained that there was a

26  direct relationship to the Interoceanic Project, and he said he was going to need a service contract

---

[6] The statement also refers to Brazilian company Camargo Correa, a member of a joint venture.
As stated earlier, the Court usually refers solely to Odebrecht for simplicity.

United States District Court
Northern District of California

with Maiman's company to be able to justify the transactions for the Brazilian banks.  Maiman asked Barata to send him a draft contract.  *Id*.  Maiman continued to maintain that no amounts were defined at that time.  Rather, the amounts were first set in January 2005 when he got the first draft of the contract.  *Id*. at 69-70.  "Definitely, in January, there was an amount close to 35 million U.S. dollars.  If he mentioned it to me at the end of November, I don't remember.  In fact, I did not take notes of that meeting, it was just me and him, I had no one to consult with, or who else had heard about it.  And I was waiting for the draft contract."  *Id*. at 71.  Maiman reported back to Toledo about his meetings with Barata.  *Id*. at 71-72.

Maiman received the draft contract in January and approved it.  The first contract referred to a commission on a percentage basis.  *Id*. at 72.  "The second contract made specific reference to the Interoceanic Highway, to the different sections, to the progress of the work, etc., and it made reference to an exact number.  I have it written down, but it is between 34 and 35 million U.S. dollars.  I do not remember the exact amount."  *Id*. at 73.  Maiman then identified both documents on the record, clarifying that the second contract was a July 2005 addendum to the first contract, and the exact amount of the bribe was $34,300,000.  *Id*. at 74-87.  The January contract is at SER 1150-52, and the July addendum is at SER 1153-56.

Maiman's statement then jumps forward in time to the payments.  As before, Dan On gave Maiman the list of companies that should receive the payments, and it was again Milan, Ecostate and Sirlon.  After getting that list from Dan On, Maiman checked with Toledo to confirm it was correct, and Toledo said yes.  Maiman then used three companies to receive the funds from Odebrecht:  Trailbridge, Merhav and Warbury.  He sent those names to Odebrecht.  Ex. G at 87-88.  The Odebrecht money came in first to Trailbridge, then to Warbury, then to Merhav.  The funds were all transferred to Confiado, and it sent the money to Milan, Ecostate and Sirlon.  *Id*. at 88-89.

Maiman began receiving Odebrecht's money in the second half of 2006.  "The moment I started receiving the funds, I started to transfer them to the Panamanian, Costa Rican accounts that they told me, and Dan On was the one who informed Toledo."  *Id*. at 94.  The total amount deposited by Odebrecht was "[w]ithout seeing my notes, more than 34 (Thirty-Four) and less than

23

35 (Thirty-Five) million." *Id*. It was all payment meant for Toledo. *Id*. at 95.[7] As in his 2017 statements, Maiman stated that he knew little or nothing about the Costa Rican companies, which were outside of his control, and that his involvement was over with the transfer to Ecostate, Milan and Sirlon. *Id*. at 106-09. The last transfer was made in 2010. *Id*. at 111.

Maiman now states that he had never heard of Ecoteva until "I learned about the Ecoteva affair, through the newspapers, in 2013, if I remember correctly," *id*. at 111. That's also how he learned that the three Costa Rican companies transferred money to Ecoteva, at which point Toledo's mother-in-law became the signatory on any transfers. *Id*. at 110. In any event, when the Ecoteva scandal broke, Maiman became concerned that the investigation "was eventually going to reach me," since the money had come through him. *Id*. at 111. And, because this money was Odebrecht bribe money, the Ecoteva scandal threatened to blow open the Odebrecht scandal. *Id*. at 112 ("For me, that was something extremely delicate, the fact that there were transfers from a supplier in Peru, that there were going to be transfers that eventually would benefit Toledo."). Firming up a disagreement with Barata, Maiman insisted that he kept Weinstein and Saylan and his other executives in the dark about the bribes to Toledo. *Id*. ("They did not have to know, and that was the case of Weinstein, that was the case of Saylan, that was the case of my sister. They simply did not know anything . . .").

Toledo asked Maiman "to give him a hand to quiet[] the matter, to calm it down," *id*. at 113, which he did by "[c]laiming that the money was mine and that the properties were mine, which, unfortunately, I did and which, unfortunately, was a mistake and was false. Those properties were never mine; I never saw them. I mistakenly believed that I was helping him." *Id*. at 114. "That was a sin and a mistake." *Id*. at 115.

There is then a lengthy section of the deposition during which Maiman authenticated a long series of financial transactions. *Id*. at 123-50. He concluded by saying that "[a]ll the money was for Mr. Toledo, according to the agreement he made with Odebrecht." *Id*. at 151.

---

[7] Maiman clarified that Odebrecht itself paid between $30 and $31 million, and Camargo Correa paid around $4 million. Ex. G at 96. Thus, on the issue of how much bribe money was paid by Odebrecht itself (as opposed to other members of the joint ventures), Maiman's 2020 statement and Barata's 2019 statement are on the same page.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.    Discussion

Barata and Maiman's testimony, combined with Toledo's admissions in this extradition proceeding that he ultimately received approximately $500,000 in Odebrecht bribe money and concerning the path that money and other money took to get to him and to a company and real estate in his mother-in-law's name, establish probable cause to believe that Toledo committed collusion and money laundering.

Barata's testimony provides evidence of the collusive agreement.  His testimony is that Toledo, as President of Peru, entered into an agreement with Odebrecht to keep the bidding process for the Interoceanic Highway project on a fast track and to modify the conditions of the bid, both to Odebrecht's favor, in exchange for U.S.$34,300,000.  Toledo followed through on one half of that deal, keeping the bidding process short, which did in fact help Odebrecht win the bid. Although Barata did not negotiate the agreement with Toledo himself, his testimony that Toledo later directly demanded payments from him, both while in office and afterwards, provides evidence that Toledo was the counterparty to this agreement because it shows that he knew about it and believed he was entitled to those payments.

In a criminal trial in Peru, there will be fertile ground to question Barata's testimony. Barata and Maiman disagree on important aspects of the November 4, 2004 meeting, such as who was there, where the meeting was, and whether they agreed on a number at that meeting.  Still, the meeting was in 2004, and Barata's testimony was given in 2016 and 2019 – more than a decade later.  It is in accord with the normal limits of human memory that Barata may not have reconstructed the meeting exactly as it happened.  Maiman's testimony makes clear there were several meetings on that day in Rio.  Barata says that there was an agreement on the number at the November 4 meeting, and Maiman says that agreement was reached two months later in January 2005.  But there is no evidence that either man took notes during the November meeting, and this discrepancy in exactly when a number was agreed on could just be a difference in memory. Moreover, they both agree on what the number was and that it was memorialized in a contract addendum for a fictitious contract related to services in connection with the Interoceanic Highway.

Toledo says it is implausible that he would negotiate through intermediaries in the way

1    Barata describes, and then later demand payments in direct conversation with him.  But as

2    discussed below, Peruvian prosecutors are skeptical that Barata actually did negotiate the bribe in

3    quite the way that he describes.  In any event, discussions through intermediaries early on are not

4    inconsistent with direct discussions later.  Toledo could have become more comfortable with

5    Barata the longer he dealt with him, and certainly once he was out of office, he might have felt

6    that he was under less scrutiny.

7            Barata's statements are not 100% consistent with each other.  His 2016 and 2019

8    statements differ on how much bribe money Odebrecht ultimately paid out, but this can be

9    ascribed to the limits of memory and the fact that Barata did not make the payments, which were

10   handled by a different department within Odebrecht.  Also, there is no dispute between the parties

11   that Odebrecht did pay out substantial sums in bribe money, and the exact amount is not material.

12           In addition, in 2019, Barata added Marcelo Odebrecht to the bribe negotiation meeting,

13   although he did not identify him as a participant in the negotiations.  His explanation is not that he

14   had previously forgotten Marcelo's attendance, but that he was there only briefly.  SER 27.  In

15   2019 he also added that Toledo demanded payment from him while still in office.  That doesn't

16   contradict his 2016 statement, but it was quite an omission from the earlier statement.

17   Discrepancies like these in statements given three years apart about events that happened more

18   than a decade before may be good material for cross-examination, but they do not defeat probable

19   cause.  The broad contours of Barata's testimony establish probable cause to believe that Toledo

20   committed collusion.

21           There is something of a mystery about who Barata negotiated the amount of the bribe with.

22   He says he discussed it with Saylan and Weinstein, but Maiman disagrees, and the Peruvian

23   prosecutors seem to have determined that Maiman is right.  In SER 1-101, Peruvian prosecutors

24   requested dismissal of certain charges against certain defendants, including the collusion charges

25   against Saylan and Weinstein.  The prosecutors concluded that the bribery arrangements between

26   Barata and Toledo occurred months before the meeting in Rio.  SER 66, 86.  "[T]his Prosecutor's

27   Office concludes that the lack of direct knowledge on the part of Josef Maiman Rapaport of the

28   arrangement of illicit payments that was made between Alejandro Toledo Manrique, as President

of Peru, and Jorge Henrique Simoes Barata, as representative of Odebrecht, *would make it impossible for him to know of the existence thereof, as well as his dependent workers*, as is the case of the defendant Sabih Saylan Ojalvo . . ." SER 73 (emphasis added).  "[W]e find . . . an element of acquittal that determines that *non-existence of proof* about the involvement of the defendant Sabih Saylan Ojalvo in such collusion acts." SER 74 (emphasis added).  The prosecutors reached the same conclusion as to Weinstein:  It was "impossible" for him to have known about the collusion scheme, SER 93, and the prosecutors found the "non-existence of proof about the involvement of the defendant Gideon Weinstein in such collusion acts." SER 94.[8]

The Court is aware of its limited role in an extradition proceeding, and in particular that it should not be making findings of fact.  But here, the evidence submitted by the government shows that Peruvian prosecutors themselves concluded not merely that Saylan and Weinstein likely would not be convicted of collusion, but that there is a "non-existence of proof" that they were involved in it.

This means that the exact negotiation of the bribe is somewhat opaque.  However, that opacity is not enough to undo probable cause because there is still evidence that Toledo and Odebrecht entered into a collusive agreement.  The fact that Barata misstated or misremembered exactly who he negotiated the deal with, and when, may be good cross-examination material, but it doesn't require rejecting the rest of his testimony about the fact of the deal, its terms, and that Toledo demonstrated that he was indeed the counterparty to it when he later demanded payments.

Maiman's testimony provides evidence to support the money laundering charge.  Maiman stated that Toledo asked him to receive funds on Toledo's behalf and to transfer them to companies of Toledo's choosing.  Maiman said that Dan On told him what companies to transfer the funds to, and that Maiman confirmed that list with Toledo, which demonstrates Toledo's direction of the scheme.  The evidence of collusion and the fact that the transferred money is bribe money shows Toledo's awareness that the money had illegal origins.  And using Maiman and his companies as a path to the Costa Rican companies as a way of getting Odebrecht bribe money to

[8] The Court is not citing evidence that contradicts the government's case.  Rather, the SER is part of the government's case.

United States District Court
Northern District of California

1   Toledo and his mother-in-law demonstrates an intent to conceal the origin of the funds.

2        Toledo argues that both the collusion and the money laundering schemes are implausible

3   because the large majority of the bribe money never made its way to him in the sense of being

4   deposited in a bank account in his name or used to purchase real estate titled to him.  Only

5   $500,000 made it that far.  But even in Toledo's description of the path the bribe money took

6   (Castello Decl., attachment 2), $21 million made it into accounts that Maiman testified were under

7   the control of Toledo's former chief of security, $17.5 million made it to a company owned by his

8   mother-in-law, and $4.5 million was used to purchase real estate in her name.  That is enough for

9   probable cause.

10        Toledo disputes that Fernenbug had control over Ecoteva, citing Maiman's 2013

11   testimony, and he contends that the $4.5 million in real estate purchases in her name were really

12   held on behalf of Maiman.  Those are disputes of fact to litigate at trial.  Maiman's 2017 and 2019

13   testimony establishes probable cause to believe that once the bribe money was transferred by

14   Confiado, it was out of Maiman's hands and under the control of Toledo and those who worked

15   for him (Dan On) or his mother-in-law.  Maiman's 2017 and 2019 testimony also explains why he

16   testified otherwise in 2013 and that the 2013 testimony was untrue.  In this extradition proceeding,

17   the Court will not weigh the evidence that establishes probable cause against other, competing

18   evidence and make a factual finding about which story is true.  That is what a trial is for.

19        And we have to talk about the half million dollars of Odebrecht bribe money that did

20   indeed make its way to Toledo.  The actual receipt of bribe money supports an inference that

21   Toledo knew what he received.  Further, in Toledo's own description of the path the money took,

22   the $500,000 in bribe money that made its way to him came from $17.5 million in bribe money

23   received by a company owned by his mother-in-law, which also spent $4.5 million of that bribe

24   money to buy real estate in his mother-in-law's name.  The origin of the half million and its path

25   through his mother-in-law support probable cause to believe that Toledo knew he had received

26   bribe money.  Toledo is free to argue at trial that he thought this money was a loan from an old

27   friend, and to cite Maiman's 2013 recanted testimony to that effect, but that contrary story does

28   not defeat probable cause.

1    Finally, even if the Court admitted and considered all the evidence that Toledo has offered,

2  that evidence would not dispel probable cause.  The Judgment of Effective Collaboration, pages

3  157-93 of Exhibit G, and Exhibit H show that Maiman skimmed off millions of dollars in

4  Odebrecht bribe money for his own benefit and lied about that in his 2017 testimony.  Peru's

5  allegations of collusion and money laundering, however, actually make more sense if Maiman

6  financially benefited from participating in this scheme.  That gives him the normal human motive

7  for participating in financial crimes:  direct financial gain.  And Maiman's taking his own

8  substantial cut of the bribe money still left plenty for Toledo.  In pages 191-92 of Exhibit G,

9  Maiman testified that he received a total of $34 million in funds, and $21 million of that went to

10  Toledo.

11    At trial, Toledo is free to argue that Maiman's willingness to lie in his 2017 testimony

12  about the financial benefits he received from participating in this scheme more generally undercuts

13  his credibility as a witness.  However, "[a]n extradition proceeding is not a trial, but rather is

14  similar to a preliminary hearing."  *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993).  The

15  extraditee "has no right to attack the credibility" of the witnesses against him because "issues of

16  credibility are to be determined at trial."  *Id*.  Regardless, there is no rule that a court must believe

17  either everything or nothing that a witness says.  Maiman's willingness earlier on to minimize his

18  own role in the scheme does not broadly call into question his other testimony.  Indeed, his most

19  specific and detailed description of the scheme is in the same January 2020 deposition in which he

20  admits he siphoned off substantial funds for himself.

21    The Nominee Agreement between Ecoteva and Merhav also does not dispel probable

22  cause.  Toledo offers it to show that while his mother-in-law was the owner of Ecoteva, the funds

23  it possessed were really under Maiman's control.  However, just from reading an agreement, you

24  can't reasonably infer that it was implemented exactly as it was written.  That would be a

25  particularly unwarranted leap of faith in this case, where the two main witnesses have testified that

26  the contract addendum that memorialized the size of the bribe was an otherwise fictitious contract.

27  Here, everyone agrees that Odebrecht was trying to bribe Toledo, not Maiman.  That so much

28  bribe money ended up in the hands of Toledo's mother-in-law is part of the evidence of probable

United States District Court
Northern District of California

1   cause that Odebrecht did bribe him.  Contrary evidence that money in her name might not have

2   been under her control at most generates a fact dispute for trial.  *See In re Extradition of Chavez*,

3   408 F. Supp. 2d 908, 915 (N.D. Cal. 2005) ("Ultimately, this court declines to weigh the evidence

4   offered by [the] accused against the evidence offered by the Mexican government.").

5            Finally, with respect to the 2,195 pages of financial documents, as explained above, the

6   Court cannot discern what exactly Toledo is seeking to add to the record, since neither side has

7   explained which of these 2,195 pages are or are not in the ER or SER.  However, from a

8   comparison of attachments 1 and 2 to the Costello Declaration, the Court gathers that the defense

9   thinks that admitting these financial documents will create fact disputes about the exact amount of

10  bribe money Odebrecht paid out ($34.2 million vs. $35.5 million), the exact amount of money

11  received by Trailbridge and Merhav ($2.7 million vs. $4 million), the exact amount of money that

12  went to Ecoteva ($16.3 million vs. $17.5 million), whether the $4.5 million in real estate held in

13  Toledo's mother-in-law's name was really for the benefit of Maiman, and whether the $6.6 million

14  in funds seized by Peru were under Maiman's control.  But generating factual issues for trial is not

15  the same as defeating probable cause.

16           The case against Toledo is not airtight.  There are contradictions between the two principal

17  witnesses against him and inconsistencies in each witness's statements over time.  If defense

18  evidence that the Court believes is inadmissible were admitted, it would show there are additional

19  fact disputes for trial.  However, these issues do not defeat probable cause to believe that Toledo

20  committed collusion and money laundering.

### III.    CONCLUSION

22           For the reasons explained above, pursuant to 18 U.S.C. § 3184, the Court **CERTIFIES** to

23  the Secretary of State that the evidence of criminality is sufficient to sustain the charges under the

24  U.S.-Peru Treaty.

25           **IT IS SO CERTIFIED.**

26  Dated: September 28, 2021

27

28
                                            THOMAS S. HIXSON
                                            United States Magistrate Judge

United States District Court
Northern District of California

30