Pages 1 - 51

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Thomas S. Hixson, Magistrate Judge

```
UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )   NO. CR 19-mj-71055 TSH
                                 )
ALEJANDRO TOLEDO MANRIQUE,       )
                                 )
            Defendant.           )
_____)
```

San Francisco, California
Friday, September 24, 2021


**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**EXTRADITION HEARING**

**APPEARANCES VIA ZOOM:**

For Plaintiff:

        STEPHANIE M. HINDS
        ACTING UNITED STATES ATTORNEY
        450 Golden Gate Avenue, 11th Floor
        San Francisco, California 94102
    **BY: KYLE F. WALDINGER**
        **ASSISTANT UNITED STATES ATTORNEY**

        U.S. DEPARTMENT OF JUSTICE
        OFFICE OF INTERNATIONAL AFFAIRS
        1301 New York Avenue, NW
        Washington, D.C. 20530
    **BY: REBECCA A HACISKI**
        **TRIAL ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED REMOTELY BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
        CSR No. 7445, Official U.S. Reporter

1    **APPEARANCES VIA ZOOM:**   (CONTINUED)

2    For Defendant:

3                              GEOFFREY HANSEN
                              ACTING FEDERAL PUBLIC DEFENDER
                              1301 Clay Street, Suite 1350N
4                              Oakland, California 94612-5254
                         BY:  **GRAHAM E. ARCHER**
5                              **ASSISTANT FEDERAL PUBLIC DEFENDER**

6                              GEOFFREY HANSEN
                              ACTING FEDERAL PUBLIC DEFENDER
7                              55 South Market Street, Suite 800
                              San Jose, California 95113-2344
8                         BY:  **MARA K. GOLDMAN**
                              **ASSISTANT FEDERAL PUBLIC DEFENDER**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **Friday, September 24, 2021**                              **10:24 a.m.**

2                            **P R O C E E D I N G S**

3                              ---o0o---

4        (Defendant present via Zoom, out of custody.)

5        **THE CLERK:**  Okay, everyone.  Good morning.  We are here in

6   Criminal Action 19-71055, U.S.A. vs. Alejandro Toledo Manrique.

7        Counsel, please state your appearances for the record.

8   The Honorable Thomas S. Hixson presiding.  Let's start with

9   the Government.

10       **MR. WALDINGER:**  Good morning, Your Honor.  Kyle Waldinger

11  and Rebecca Haciski for the United States.

12       **THE COURT:**  Good morning.

13       **MR. ARCHER:**  And good morning, Your Honor.  Graham Archer

14  and Mara Goldman on behalf of Alejandro Toledo.  Dr. Toledo

15  appears by video conference.  So we consent to video

16  conferencing today due to the pandemic.

17       **THE COURT:**  Good morning.

18       So we are here --

19       **THE DEFENDANT:**  Good morning.

20       **THE COURT:**  -- for the extradition hearing.

21       And I realize that the immediate trigger for this hearing

22  was the defense motion to deny extradition.  However, because,

23  fundamentally, this proceeding is a request by the Government

24  for relief in the form of extradition, I would like to treat

25  the Government as the moving party for purposes of today's

1    hearing.

2         So let me ask the Government first.

3         This is, in part, an evidentiary hearing.  Is there any

4    additional evidence the Government would like to offer at this

5    time?

6         **MS. HACISKI:**  Good morning, Your Honor.  Thank you.

7         At this time I'd like to formally offer the package from

8    the government of Peru, which is in three pieces.  So it

9    includes two sets of documents, which were all manually filed

10   with the Court, first on December 17th, 2019, and then on

11   August 12th, 2021.

12        The first set of documents includes a diplomatic note

13   dated May 25th, 2018, which requests Mr. Toledo's extradition

14   and an accompanying set of documents in English and Spanish,

15   along with another diplomatic note dated June 4th, 2019, and

16   accompanying supplemental documents in Spanish and English as

17   described in Docket Entry Number 81.

18        The second set of documents includes additional

19   supplemental documents in Spanish and English which comprise

20   the Acusación Fiscal, which is Peru's charging document, and a

21   translation thereof, as described in Docket Entry Number 171.

22        All these documents are accompanied by certificates of

23   authentication signed by the principal consular officer of the

24   United States resident in Peru.

25        And I know the Court had a question about that, and

1  the Government responded on the docket, but I wanted to confirm

2  for the Court today that a paralegal in the U.S. Attorney's

3  Office has confirmed that these certifications do appear in the

4  second set of documents.  I understand that it's the first page

5  in each of the nine volumes of those documents.

6      Accordingly, all of the documents are admissible pursuant

7  to 18 U.S.C. Section 3190.

8      Copies of the documents have been previously provided to

9  Mr. Toledo, and accordingly, I'd move to admit all of them.

10     **THE COURT:**  So I understand the original extradition

11 request and the supplement to the extradition request.  But you

12 said there were three sets of documents you're moving to admit?

13     **MS. HACISKI:**  The first set is sort of divided into two,

14 so -- because there's a diplomatic note dated May 25th, 2018,

15 and a subsequent diplomatic note dated June 4th, 2019; but

16 the Government manually filed all of those documents at the

17 same time.

18     **THE COURT:**  Oh, I see.  Thank you.  I think of those all

19 together as the original extradition request.

20     **MS. HACISKI:**  Okay.

21     **THE COURT:**  All righty.  Well, thank you.  I'm going to

22 admit those.

23     Anything else that the Government would like to offer in

24 evidence?

25     **MS. HACISKI:**  Yes, Your Honor.  One last thing.

1      I'd also like to move to admit the State Department

2  declaration, which was also included in the first set of

3  documents that you've been referring to as the original

4  extradition request.  This describes that the documents from

5  Peru were received by the U.S. Department of State, among other

6  things, and it attaches a copy of the U.S.-Peru Extradition

7  Treaty.

8      And a copy of this has also previously been provided to

9  Toledo.  So I would move to admit that as well.

10     **THE COURT:**  Is that all encompassed within the manual

11  filing that was the original extradition request?

12     **MS. HACISKI:**  Yes, that's right.

13     **THE COURT:**  Okay.  Then I think I've already admitted

14  that.

15     **MS. HACISKI:**  Thank you, Your Honor.

16     **THE COURT:**  All right.  Let me ask the defense.

17     You've moved to admit a number of things.  Is there

18  anything else that the defense would like to offer in evidence?

19     **MR. ARCHER:**  No, Your Honor.

20     **THE COURT:**  All right.  Thank you.

21     Well, then I would like to hear the Government's argument.

22     **MS. HACISKI:**  Thank you, Your Honor.

23     May I start by objecting to the admission of some of the

24  evidence that Mr. Toledo has offered?

25     **THE COURT:**  That's fine.  You have already made the

objections in writing, and I saw them.  If you want to

elaborate, that is fine for you to do as well.  You don't need

to, but I'm going to offer you the opportunity if you would

like to do so.

**MS. HACISKI:**  I'll just do so briefly.

As the Court has explained, the Ninth Circuit has

explained in the *Santos* case, evidence that's admissible in an

extradition hearing that is offered by the fugitive is

explanatory evidence, meaning evidence that explains away or

completely obliterates probable cause; whereas contradictory

evidence is that which merely controverts the existence of

probable cause or raises a defense.

This is an intentionally high bar because as the *Santos*

court says, extradition hearings are not intended to be

mini-trials.

And the Government submits that all of Toledo's evidence

goes only to his defense that it was Maiman, Josef Maiman, and

not he, who committed the crimes, and to other issues of

credibility which are better resolved in Peru, which is where

all the evidence in the criminal case is; or the other evidence

he's offered is simply not relevant.  Accordingly,

the Government's position is that it's all inadmissible.

And if Your Honor would like me to address any specific

piece of evidence, I'm happy to do so; but otherwise, I can

move on.

1    **THE COURT:**  Well, sure.

2        With Barata's testimony, the defense has offered

3    Exhibit E, which is a relatively complete transcription of his

4    deposition.  And I guess I don't understand how that's

5    contradictory.

6        It's certainly explanatory.  It provides foundation.  It

7    describes how he knows these things.  It gives more background

8    about him and more detail.  It gives context and detail and

9    narrative flow.  That certainly enables me to better understand

10   the excerpts from that deposition that appear in

11   the Government's evidence.

12       But I guess I don't understand why you think that's

13   contradictory.

14   **MS. HACISKI:**  Understood, Your Honor.

15       Well, Mr. Toledo himself claims that Barata's statement,

16   like Maiman's later statements, are -- in his words in his

17   reply, they contradict their own previous statements.  And he

18   also describes the contradictions in these statements.

19       So the reason Mr. Toledo is offering this document is to

20   prove that there are contra- -- to contradict the evidence that

21   has already been offered by the Government of Peru.  And so the

22   Government submits it's contradictory evidence for that reason,

23   by Toledo's own admission.

24       **THE COURT:**  But in what way is Exhibit E contradictory?

25   Is there a specific thing you think it contradicts?

1          **MS. HACISKI:**  Mr. Toledo has pointed to a few small

2     inconsistencies in the statement, Barata's later testimony as

3     compared to his earlier testimony.

4          For example, the participants in the November 4th, 2004,

5     meeting at the Marriott Hotel in Rio de Janeiro, Barata

6     describes the participants in that meeting slightly differently

7     in his two statements.

8          So to the extent the 2019 testimony contradicts his

9     statement in the 2016 testimony, it's contradictory and,

10    therefore, inadmissible.

11         **THE COURT:**  Well, now we're diving into the merits.  So

12    why don't we just go there.

13         Do we have an issue that in the Acusación Fiscal, Peru

14    dismisses their collusion charges against Saylan and Weinstein?

15    And it seems like it's not just a discretionary dismissal.  At

16    least the way I'm reading it, it seems like Peru made a

17    determination that, in fact, they were not the people who

18    bargained with Barata about the payment of the bribe and the

19    meeting in Rio.  And maybe you read that different from me, but

20    that's evidence that the Government is admitting.

21         And does this introduce some mystery to us about who

22    Barata negotiated the bribe with?

23         **MS. HACISKI:**  Respectfully, I don't think it demonstrates

24    that Peru doesn't think that those two individuals participated

25    in the meeting.  In fact, in the Acusación Fiscal, there's

language indicating that they did still participate in the meeting.

Rather, what the Government of Peru stated was that there was no clear, specific, direct, and unquestionable evidence proving that they were at the meeting, largely based in part on the fact that it was Barata's testimony alone placing them in that meeting.

And so I understand that the Peruvian government decided not to proceed with the charge, given this lack of abundant evidence of their participation. But they're not retracting their statement that Gideon Weinstein and Sabi Saylan were still participating in the meeting at the time. So I don't believe there's a problem in that regard.

**THE COURT:** I see.

**MS. HACISKI:** More- --

**THE COURT:** Go ahead.

**MS. HACISKI:** Sorry.

Moreover, there's other corroborating evidence that places Dr. Toledo at that meeting. And I think that's the important point, is that Barata, like Maiman, both agree that Toledo was present in the Marriott Hotel in Rio de Janeiro, along with Barata and Maiman themselves and Weinstein and Saylan, as well as Marcelo Odebrecht.

There seems to be some confusion in the testimony over who participated in which meeting, and this seems to be, at least

1  in part, because the suite, as described by the witnesses, was

2  large and had several different meeting areas.  So it seems

3  that there may be some confusion over whether presence in the

4  suite counted as participation in the meeting.

5      But Toledo doesn't contest that he was there in the

6  Marriott suite.  There is other evidence, including travel

7  records and official documents, recording his need to be in

8  Brazil at that time which place him in Rio de Janeiro.

9      So I think the argument about Sabi Saylan and

10 Gideon Weinstein is somewhat beside the point, given that

11 Toledo isn't contesting that there was a bribe agreement that

12 was reached or that he was there when it was reached.  He's

13 only contesting his knowledge of it.

14     And as I've said, the witnesses clearly place him in the

15 room at the relevant time, and the witnesses say that they

16 understood that he was aware that the bribe was being discussed

17 at that time.

18     **THE COURT:**  Well, sure.  Barata and Maiman both put him in

19 the suite, but neither of them says that he was a direct

20 participant in the negotiations.  And I think that's what the

21 defense is focusing on in claiming that he wasn't aware of it.

22     **MS. HACISKI:**  Right.  I think they're saying he wasn't

23 aware of it at that time.

24     But, of course, there's other evidence as well indicating

25 that Toledo was aware of the bribe agreement.  For example, we

 1   have Barata's testimony saying that toward the end of 2004,

 2   Dan On contacted Barata on behalf of Toledo to broach the idea

 3   of a bribe.

 4        And similarly, Maiman says at the same time period Toledo

 5   contacted him to receive what were described as donations in

 6   substantial amounts.

 7        So we see evidence that Toledo was working to lay the

 8   groundwork for the bribe prior -- presumably prior to the

 9   meeting that occurred in the Marriott Hotel.

10        **THE COURT:**  What specifically were the terms of the

11   collusive agreement?  What did Toledo promise to do?

12        **MS. HACISKI:**  Barata describes that Toledo promised to

13   keep the deadlines for the tender process as they were, for

14   them to not be extended; and also, to modify the conditions of

15   the tender process to be more favorable to Odebrecht in

16   exchange for him receiving a $35 million bribe.

17        **THE COURT:**  And Toledo ultimately does one of those

18   things, but not both.  Correct?

19        **MS. HACISKI:**  That's my understanding, yes.

20        **THE COURT:**  All right.  Do we have accurate information

21   about the exact number of dollars that made its way to Toledo,

22   or is that not necessary for the Court to decide?

23        **MS. HACISKI:**  I think both is correct.  I think we do have

24   good information that some of the money did end up in

25   properties that are linked to Toledo.  But I don't think that

1   this Court needs to reach that issue in order to find probable

2   cause about Toledo committing collusion and money laundering.

3   Neither of those statutes in Peru requires that the defendant

4   have received funds.

5       And here, there's evidence in the bank records that show

6   the money filtering from Odebrecht down through Ecoteva and

7   other companies into the Peruvian properties that various

8   witnesses tie Toledo to.

9       **THE COURT:**  All right.  It's an interesting question

10  because Maiman has two different versions of events.   In the

11  Ecoteva scandal, he claims ownership and control of the

12  Costa Rican companies and, basically, Ecoteva itself; but then,

13  later, when the Odebrecht scandal breaks, he takes the view

14  that once he has delivered the money to the Costa Rican

15  companies, then he's done; that was delivery to Toledo.

16      But I wonder -- I mean, this is just a probable cause

17  hearing.  I don't have to pick a story.  But it seems like

18  under either story, getting the money, whether it's still in

19  Maiman's hands or whether it's in companies controlled by

20  Toledo -- is it your view that either story would be sufficient

21  to supported money laundering?

22      **MS. HACISKI:**  Absolutely, because of the other evidence

23  that ties Toledo, first, to the bribe agreement and then, also,

24  to the laundering, given that the evidence is that he was the

25  one directing that the money go first to Maiman's companies;

1   then, later on, to other companies.

2        **THE COURT:**  I see.

3        All righty.  Anything further before I hear from the

4   defense?

5        **MS. HACISKI:**  I'm happy to address any other questions

6   the Court has.  Otherwise, I can reserve my time to respond to

7   what the defense says.

8        **THE COURT:**  All righty.  Thank you.

9        Mr. Archer?

10       **MR. ARCHER:**  Thank you, Your Honor.

11       First, I'd like to take issue with a couple of

12  the Government's statements.

13       First, the statement that Dr. Toledo does not contest that

14  he was in a meeting where the bribe was negotiated, we

15  absolutely contest that.  Not only do we contest that, but it

16  is contested by Maiman's own testimony.

17       Maiman's testimony in January of 2020 -- and I believe

18  this is contrary to what the Government stated.  It's not an

19  issue just of there are some discrepancies about the exact

20  attendees at the meetings.  Maiman testified in January of 2020

21  under oath that there was, in fact, no meeting to negotiate the

22  bribe at the hotel in Rio.  I believe he said that he had

23  meetings in Rio with Marcelo Odebrecht, Barata, and Weinstein

24  to discuss business interests and had a social lunch with

25  Dr. Toledo, Saylan, Weinstein, and Dan On.  That's from his

1   testimony at pages 75, to 88, and 75, 76.

2        So we don't even have agreement within Maiman's own

3   testimony that the meeting that Barata stated occurred actually

4   happened.  There are no details, no reliable testimony about

5   how an agreement came to be made, let alone an agreement that

6   was made with Dr. Toledo's knowledge or Dr. Toledo's presence.

7        I think as to the Court's point earlier about the issues

8   that were raised as to supposedly what Dr. Toledo was supposed

9   to be doing in response to being paid an enormous bribe,

10  Dr. Toledo did none of the above other than what was completely

11  consistent with the actions of a sitting president, which was

12  to -- which was to support and encourage the speedy and proper

13  implementation of a massive, massive public works project.

14       And if we look at the extradition request itself at 355,

15  we have Barata saying that he was extraordinarily frustrated

16  because in spite of Maiman's promises to him that Dr. Toledo

17  was going to do certain things, Dr. Toledo wasn't doing them.

18       And so that is direct evidence that Barata understood that

19  there were things that were supposed to be done and that they

20  were not, in fact, done.  And the commonsense answer to that is

21  because Dr. Toledo had no idea that this was going on in the

22  background, that there was this agreement between Maiman and

23  Barata to pay some amount of money and that Dr. Toledo was

24  supposed to fill out these expectations on the project.

25       Dr. Toledo did nothing out of the ordinary, nothing that

1  wouldn't be consistent with the actions of a president in

2  trying to implement a public works project.

3       That's what's sort of shocking here, is that there's --

4  that these innocent actions, these action which would be

5  necessary on the part of an executive president in this

6  situation, can then be circled back to being something improper

7  that was done on Odebrecht's behalf simply because there is a

8  claim by someone, who is otherwise found not credible, that

9  those things were supposed to have been done by Toledo.

10      Now, if they --

11      **THE COURT:**  Well, let me --

12      **MR. ARCHER:**  -- are suggesting --

13      **THE COURT:**  -- ask you about that.

14      There is testimony that in Peru, awarding contracts like

15  this is typically a two-year process; and here, it was done in

16  about six months.  And Barata points to that as something that

17  was beneficial to Odebrecht because it narrowed the number of

18  companies that could compete.

19      **MR. ARCHER:**  Right.  So, well, let's sort of break that

20  down into a couple of pieces.

21      One, this is an extraordinarily high-profile and

22  extraordinarily important project.  So it's understandable that

23  there would be a focus on making sure that it was implemented

24  as quickly as possible.

25      We're also in a context where Dr. Toledo is taking over

now after a decade of dictatorial rule under Fujimori.  It
would certainly be understandable that he would want to make
his mark immediately.  And this public works project was one of
the largest -- one of the largest projects that could be
undertaken.

Dr. Toledo -- it's not as though this was existing in a
vacuum.  It's not -- it's not as though this is something that
Dr. Toledo wasn't doing otherwise.  He was known throughout his
presidency for modernizing Peru's economic system, for reducing
corruption in the economic system.  He massively increased the
GDP and the overall wealth of the country.

And the quick pace of the bidding process already existed.
So just to be clear, there's no allegation that Dr. Toledo set
the quick bidding process.  So understanding that there's an
allegation that it's suspicious, that it should be two years
instead of six months, but that suspicion falls away when it's
seen that that pace already existed.

Barata's claim is that he was promised by Maiman, or
through Maiman's emissaries, that Dr. Toledo would not disturb
the bidding process.  Right?  So --

**THE COURT:**  Right.  He didn't set the six-month bidding
process.  What he did is he rejected postponements of it.

**MR. ARCHER:**  Correct, which is completely consistent with
someone who wants to get a public works project done.  Right?

I mean, what I'm saying is that there's nothing untoward

1    about having a bidding process set.  And then promising

2    something to -- promising something to be done which is

3    completely consistent with what he would do anyway, that's

4    exactly what underpins Maiman's wrongdoing.  He knew that the

5    project was going to move along quickly.  He knew the

6    importance to focus on it.

7         Dr. Toledo in 2003 had made multiple public statements

8    about how this was going to be a high priority for his

9    administration to try to get this done, get it done as quickly

10   as possible.

11        There's a -- what predates this supposed meeting in 2004

12   by over a year is a joint statement between Peru and Brazil

13   that this highway project is a priority.

14        And so the idea that an absolutely innocent act, an act

15   that is, in fact, politically beneficial, it's beneficial to

16   Peru, which is to try to move along the construction of a

17   highway, and then other things that were also promised, other

18   things that Toledo was supposed to do that he did not do -- so

19   we have one innocent action and two actions that were promised,

20   but not delivered on -- it's not consistent with someone who

21   has entered into an agreement or was aware of an agreement to

22   accept bribes.

23        It is, in fact, contrary to that.  It is consistent with

24   someone who is engaged in the business day-to-day of being the

25   president of Peru.

1     And those actions are not criminal.  They did not -- to

2  the extent that they benefited Odebrecht, it did so not out of

3  an illegal motive, but out of the motive of trying to complete

4  the project.

5     As the Government points out, other contracts were awarded

6  to other companies for different stages.

7     There was -- the idea that this can be considered in a

8  sort of microcosmic vacuum of the construction of this project,

9  that Dr. Toledo is sort of meddling on a day-to-day basis with

10  it is just not correct when you take it in the context of what

11  his presidency was and what he was doing, as well as the

12  actions of and the importance of the other people involved in

13  the approval of this contract.

14     The Proinversión board was the one responsible for making

15  determinations awarding contracts.

16     As we noted, even to fund this project, it required an act

17  of the Peruvian Congress, akin to what our country is dealing

18  with now in terms of raising a debt ceiling.  There is a

19  minimum -- sorry.  There is a maximum financing restriction

20  that things could not be financed to over a certain percentage

21  of the GDP.  To fund these projects, the Congress of Peru was

22  required to and did, in fact, raise that limit.

23     So the idea that Dr. Toledo -- that this sort of -- the

24  suggestion that by declining to extend a bidding period --

25  something which would be completely reasonable to do for

1  someone with an incentive to make a public works project

2  happen -- that that is what tipped this in Odebrecht's favor,

3  there's so many other pieces in play, including the fact that

4  it was quite obvious that as the major construction concern in

5  Peru, that they were by far the leader in winning this

6  contract.

7        There's nothing there.  I mean, I think that's the -- not

8  only do we have an abject lack of credibility on behalf of

9  Maiman and Barata, but nothing happened.  I mean, not only was

10  the money not transferred to Toledo --

11  **THE COURT:**  Counsel, this isn't a tort case; and it's no

12  defense to say:  Well, even if there hadn't been a bribe, he

13  would have done the same thing anyway.

14        I think in a lot of construction bribery cases, the major

15  players in the market are the ones who pony up the bribe; and

16  there's always the argument available that even if the bidding

17  had been fair, they would have won anyway.  They were the major

18  players.

19        The issue here is, the allegation is that Odebrecht didn't

20  want to just be the major player; they wanted it to be a sure

21  thing.

22        So all of this argument that, well, they would have gotten

23  it anyway or he would have kept the short bidding time anyway,

24  maybe that's true; but in a criminal context, as opposed to a

25  civil context, I don't think that the same decision argument

1   really holds the sway that you're putting on it.

2       **MR. ARCHER:**  So, but what it requires, Your Honor, I think

3   it's certainly good evidence to the Court that he wasn't aware

4   of an agreement.  Right?  Because it's not as though

5   Dr. Toledo's guilty of collusion if he simply does things that

6   benefit Odebrecht.  There has to be an agreement that he is a

7   party to -- that he is a party to, that he is aware and then

8   takes those actions to defraud the country on behalf of that

9   agreement.

10      And so what I'm saying is that if he had -- if he had

11  acted in accordance with the agreement, as opposed to acting in

12  accordance with his role as the president and not doing

13  two-thirds of what was supposedly required of him to comply

14  with an agreement, then, you know, that would be strong

15  evidence that he might have known that it existed; but when

16  he's not complying with it -- right? -- I mean, I think that is

17  certainly evidence that the Court can consider for a lack of

18  knowledge on his part because that's --

19      **THE COURT:**  What about Barata's testimony that after

20  Toledo left office, he demanded payment of the bribes from

21  Barata; and then, later, Barata amends that to say that he also

22  made those demands while he was still in office?  Wouldn't

23  those demands demonstrate knowledge of the deal?

24      **MR. ARCHER:**  They're not remotely credible.  And they're

25  not remotely credible because they conflict also with

1    the Government's theory, with Peru's theory.

2        Not only has -- and the Court's reading of Peru's

3    dismissal of Saylan and Weinstein is correct.  This is not an

4    issue where that dismissal is a basis for -- or it's undertaken

5    because there's a lack of evidence.

6        What they say -- and this is -- you know, Barata's

7    testimony is very clear.  He says that he negotiates these --

8    the terms of the deal with Weinstein and Saylan.  That is

9    Barata's testimony.

10       Maiman's testimony is that that meeting didn't even occur;

11   that Weinstein and Saylan were not there.

12       And Peru's conclusion is that -- and I want to make sure I

13   get their language right, but I believe they said it

14   categorically disproves the prosecution's thesis about how the

15   agreement occurred.

16       And, frankly, the thesis -- the persistent thesis that

17   Peru advances is that Toledo used a series of middlemen and

18   used other people to funnel money, used other people to

19   negotiate the process.

20       The idea that Barata's -- the idea that Toledo would then

21   approach Barata directly, whether by phone or in person, to

22   demand the payment of the money is ludicrous.  It just

23   doesn't -- it doesn't align with Peru's own theory of the case.

24       And, again, the Court is absolutely in a position to weigh

25   the credibility of testimony of witnesses taken under oath by

1    the Peruvian authorities.

2        And in this case, the Peruvian authorities have said

3    themselves that they don't find -- by basically discounting a

4    core aspect of the agreement, that they do not find credible

5    Barata's testimony.

6        So, again --

7        **THE COURT:**  Is that such a big deal, though?  It's more

8    than a decade after the meeting took place.

9        According to Maiman, there were a whole series of meetings

10   that day in Rio.  Just looking at his personal agenda for

11   that day, it seems like he was a busy guy with a lot meetings

12   that day.  And all the people that Barata places in the meeting

13   were at least in one meeting with him on November 4th, 2004.

14       So, okay, fine, he jumbles things up.  He says these two

15   people negotiated with him, and he got it wrong.  Really, it

16   was in a bar or something where he worked out the deal with

17   Maiman.

18       Is that such a big deal when there's other testimony by

19   Barata that, in fact, there was an agreement reached?  Does it

20   matter that he might have misremembered exactly how it went

21   down?

22       **MR. ARCHER:**  So, Your Honor, I don't agree that it's an

23   issue of a jumbling or even an issue of a venue, and that's for

24   two reasons.

25       One, the idea that it's an issue of venue is, in fact,

1   important because there's the claim that Dr. Toledo is present,

2   and there is -- there's the claim that Dr. Toledo is present

3   and then that offers some sort of endorsement of the

4   discussion.  And that is directly contradicted by Maiman.  And

5   Peru has indicated that Maiman's statements about the meetings

6   are credible and that they -- basically, that they override --

7   they believe those statements over Barata in terms of the

8   meeting.

9        Second, we're not talking about auxiliary people present.

10  We're not talking about who may have been present here or

11  there.  This is a negotiation of the details -- of the details

12  of this supposed agreement with Weinstein and Saylan.  And so

13  it's not that he's not remembering what everyone had to drink

14  or exactly who came when, or even not remembering where it was

15  from; but they're saying that -- but he's saying that there's a

16  contradiction about even who he negotiated the bribes with.

17       And so that is absolutely -- that certainly undermines his

18  credibility when he later claims, with absolute -- contrary to

19  logic and with absolutely no corroboration, that Toledo had

20  come to his home and demanded money.  And there's no discussion

21  at all.  So Barata expresses frustration with Toledo not doing

22  anything, but there's no discussion that he claims that he

23  contacted Toledo and asked him to do these things.  Right?

24  He's expressing frustrating in the void, which is completely

25  consistent with the fact that Toledo is unaware of this

1    agreement that was made between Maiman and Barata.

2         And so I don't think those are minor details at all.  And

3    I think when the Court is left with a reliance entirely on the

4    testimony of two cooperating witnesses who are internally

5    inconsistent, as well as contradict each other, I don't think

6    that that is sufficient to establish probable cause.

7         And the Government indicates that they're borrowing from

8    the language of some of the cases that they've cited.  We're

9    talking about discrepancies and minor inconsistencies, and

10   that's not where we are.

11        Barata, in his testimony, originally claims that the

12   arrangement was to receive $20 million and then, later on,

13   admits that it was 34 million.

14        Maiman's testimony -- I mean, among the many

15   inconsistencies with Barata, he's extraordinarily inconsistent

16   with himself, as the Court acknowledged that he has two

17   completely different versions of things.  He claims full

18   ownership of Ecoteva, of Milan Ecotech, Ecostate, and his

19   attorney verifies that.

20        And the issue -- I think what's really fundamentally

21   important to consider in this case is that the Court not only

22   can evaluate credibility of witnesses, but also can use common

23   sense to determine whether probable cause exists.

24        And the consideration of money going to Toledo, the only

25   thing that is in evidence is that Toledo received a loan

1   some years later of a half million dollars to pay off the

2   mortgages of two properties in Peru.

3       **THE COURT:**  Well, let me ask you about that.  You do cite

4   Maiman's 2013 testimony where he characterized that as a loan,

5   but that was back when he was saying that the $20 million was

6   his money.  Once the Odebrecht scandal breaks, we learn that

7   that money was Odebrecht bribe money.  And I don't know that

8   the loan story survives that revelation.  If Odebrecht bribe

9   money flowed through Maiman and half a million dollars of it

10  ended up in Toledo's hands, how can that be a loan from Maiman?

11      **MR. ARCHER:**  So the issue there is:  Where is the

12  knowledge?  Right?  So where is the -- what establishes the

13  knowledge that that money was from Odebrecht?  Right?

14      So I think the context that needs to be considered here is

15  that Maiman holds himself out -- and it's throughout his

16  testimony -- that he is a very successful businessman; that

17  he's had a number of oil and gas concerns; massive profits from

18  an oil -- or from a gas line sale, 25 percent of which he

19  owned, between Israel and Turkey.

20      And so the idea -- right?  What I'm saying is that when

21  you take that amount, that loan amount, and you put it in

22  context of $34 million that Maiman has received, there is no

23  indication that Dr. Toledo had knowledge of the flow of the

24  money.  There's no indication, either, that -- there's

25  certainly nothing reliable that Dr. Toledo directed how Maiman

moved the money around.  Now, the properties purchased in Peru

were, according to the nominee agreement, completely controlled

by Maiman.

     And so what I'm asking the Court is to say, look, there's

common sense here that says if Dr. Toledo were, in fact,

receiving -- knowingly receiving the proceeds of Maiman's

crimes, then Dr. Toledo, one, has to be aware of them; and

common sense says that Dr. Toledo would be asking for a lot

more than a half million dollars to pay off mortgages in Peru

when he was suffering from interest rates that ranged, I think,

up to about the 15 percent rate.

     And so it just doesn't -- it doesn't make any sense that a

crime occurred and Dr. Toledo had 30 -- I think Maiman claims

at different points that he was going to take a commission of

about 10 percent.  So let's say that under Maiman's -- under

Maiman's perspective on it, he's taking his commission; and

then 31 percent -- $31 million would go, approximately, to

Dr. Toledo.

     What happened instead is documented in the financial

records.  It's documented in Maiman's cooperation agreement,

which is that Maiman funneled the money to his family.  Maiman

spent a bunch of the money on himself.  Maiman funneled it to

his other companies, and Maiman --

     **THE COURT:**  I have a question about that.  You're allowed

to introduce evidence that explains the Government's evidence,

1    but you're not allowed to introduce contradictory evidence.

2         There are two points in Maiman's statements in the

3    extradition request where he said that he didn't benefit and

4    didn't receive any cash and didn't profit personally from this

5    whole series of transactions.

6         And now, the effect -- the judgment of effective

7    collaboration and then the cross-examination of Maiman by

8    defense counsel in Exhibits G and H -- well, the judgment of

9    effective collaboration indicates that money did go to Maiman

10   personally.  And then the cross-examination leads to Maiman

11   basically admitting that he skimmed off about 13 to 14 million

12   dollars for his own benefit through transactions to friends and

13   family.

14        Is that evidence contradictory of the Government's

15   evidence?

16        **MR. ARCHER:**  So, Your Honor, I think -- first, I think

17   that that is -- I think the Government misunderstands the

18   standard because I don't think -- it's not that the Court is

19   not permitted to consider any evidence which bears on the

20   credibility of the evidence before the Court, the credibility

21   of the witnesses.  That case law is there, as the Government

22   indicated, to prevent a mini-trial.

23        What is being presented to the Court here is evidence that

24   has already been collected by Peruvian officials.  These are

25   bank records not sought by the defense.  These are bank records

that have been not -- wasn't a subpoena process from the

defense.  This is the Peruvian government tracing the money and

finding, as they incorporated in the collaboration/cooperation

agreement, that Maiman had kept the money for himself.

And so I think it would create an absurdity to say that

the Court is barred from considering evidence that shows

inconsistency in what has previously been presented.  It would

make a fool of the Court for precedent to be considered that

would prohibit the Court from considering reliable information

submitted from the requesting country, information gathered by

the requesting country that contradicts other evidence that was

presented previously.

And so to the extent that the Government has been able to

sort of, quote/unquote, update the Court with new information

that wildly contradicts the information that was set forth in

the original complaint, it would be ridiculous for the Court

not to be able to consider evidence that -- it's also certainly

explanatory as well.

And the Court's also allowed to consider that testimony

may be self-contradictory.  So explaining what happened to the

money, even if it -- even if it conflicts with a statement

given by the witnesses, is certainly within the purview of

the Court.

And, again, the Court absolutely has the ability to

consider the credibility of the witnesses.  And so explaining

1   the path of the money -- and the Government, as far as I can

2   tell, is not contesting the authenticity of the records, nor

3   the defense's summary of those records.  I understand

4   the Government's saying that they have not -- they have not

5   gone through and checked all the bank records to verify it, but

6   the Government is not contesting the authenticity of what's

7   being presented to the Court.

8        **THE COURT:**  Well let me ask you.  I think now you're

9   referring to the 2,195 pages of financial documents that the

10  defense manually filed.

11       Because the task would be overwhelming, I have not

12  compared all 2,195 pages to the other financial records that

13  are already in the extradition request or the supplement to the

14  extradition request.

15       Do you know how many of them are already in those records?

16  If I were to admit the 2,195 pages, what would be added to the

17  record?  That's what I can't figure out.

18       **MR. ARCHER:**  Sure.  So I think what we did -- and Caitlin

19  Costello, the paralegal in our office who did the financial

20  summary, did a fantastic job and reviewed the records.

21       It's -- I can't give you a number off the top of my head

22  in terms of the additional transactions that are reflected in

23  our manual filing.  But what we realized is that we could tell

24  that this was not a complete financial picture that was being

25  presented to the Court.

1     And so our summary reflects what we understand to be a

2     complete record of the financial records that have been -- that

3     have been acquired by Peru from the Swiss banks and other

4     sources.  And so what it shows is a more accurate presentation

5     of what actually occurred in terms of the transfers of money.

6     And one of the things we wanted to present to the Court

7     for that is that the complaint, originally, which has already

8     been basically superseded or contradicted by the Government's

9     own submissions subsequently, the complaint was not accurate at

10    all about where the money went, where the transfers occurred,

11    and whose benefit they were for.  And the complaint states

12    absolutely incorrectly that basically 20 million was

13    transferred to accounts in Dr. Toledo's control, and that's

14    just not correct.

15    The bank records show -- they explain the path of the

16    money, and they show the actual control over those accounts.

17    And without any exception, the ultimate control over all those

18    accounts rests with Joseph Maiman, whether it be through

19    holding companies that he created, whether it be at the

20    direction of his attorney or other employees in his company.

21    There's no allegation that Dr. Toledo has control over those

22    accounts.

23    And so --

24    **THE COURT:**  Well, let me ask you this, then:  After the

25    Odebrecht scandal breaks, then Maiman and Toledo become adverse

1  because Maiman agrees to be an effective collaborator.  So he's

2  basically turning state's evidence against his friend of

3  several decades.

4      But before the scandal breaks, why is it necessary for the

5  money to literally end up in a bank account that has Toledo's

6  name on it?  Why isn't it good enough to get the money in the

7  hands of his mother-in-law or his longtime friend Maiman?  Why

8  isn't that good enough to effectively put it under his control?

9      I understand that once Maiman severs connections with

10  Toledo, then it makes a world of difference whether the money

11  is in Maiman's hands or in an account controlled by Toledo, but

12  I'm talking about before.  Before that happens, wouldn't it, in

13  fact, be preferable for Toledo not to have all of that money

14  actually end up in an account that he literally controls but

15  have the friends and family plan, where the money is near him

16  and available to him?

17  **MR. ARCHER:**  So on this record, there's not evidence that

18  the money is available to him, nor that he had knowledge that

19  that -- that the money was something that Maiman had collected

20  from Odebrecht.

21      The money being in -- you know, the money being briefly

22  under the name of his mother-in-law is -- the theory that that

23  causes it to be somehow for Dr. Toledo's benefit or under his

24  control is out the window because of the nominee agreement.  It

25  is -- that is in name only.  It is something maintained only by

Maiman.

So the question then, I guess, would be:  Where is the actual evidence of knowledge?  And why would -- why would Dr. Toledo not be spending that money or requesting it?

And that's -- the really interesting thing is, is that Maiman does not testify, because he cannot, that -- he cannot testify to Toledo demanding the money from him.  That's sort of what -- there's this assumption that simply because Maiman requested the money and that Maiman was considered at a time a friend of Dr. Toledo because he had ingratiated himself to Dr. Toledo when he saw that he had political promise, that would make sense if there were actual transfers of money.

And I understand the Court's, sort of, suggestion that this is a friends and family plan, but that has practical limitations.  That money -- the idea that Dr. Toledo, who is, you know, coming up on age 76, was sitting around for a decade plus and having no concerns about the fact that these tens of millions of dollars that he supposedly risked his career and his freedom to extract from Odebrecht, that those could just sit around.  Why wouldn't they be spent?

That's the sort of commonsense practical question here is, why are we assuming -- why -- the Government's asking the Court to take this leap and this assumption that Dr. Toledo is aware of the money, but yet somehow was this extraordinarily patient criminal that would be fine sitting around into his

later years, working his butt off to get jobs as a professor,
to write his second book, and living a very modest lifestyle,
while not complaining at all that Maiman was hanging on to all
of these 31 million that was promised to him.

Maiman has no explanation for why he claims that he was
owed a small commission and then is now admitting that he
actually spent 14-plus million on himself.  And the reason is
that it doesn't make sense.

The only fact pattern that this fits with is that Maiman
separately negotiated with Barata and claimed that certain
goals would be met.  Barata himself testifies that those goals
weren't met.  They were reasonable, practical goals that could
have been met by accident through Toledo's actions as
president.

**THE COURT:**  Well, but to your point about Toledo being a
very patient criminal, once the Ecoteva scandal breaks in 2013,
doesn't everyone just panic that the Odebrecht scandal is going
to blow open soon?  Would that be a deterrent to further
transfer to his accounts?

**MR. ARCHER:**  Well, I mean, it could, but we're talking
about -- we're talking about years where the only transfer
is -- so the presidency ends, and we're 2006 on to 2013, and
the only transfer is the exact amounts that are outstanding in
these predatory loans that Dr. Toledo is suffering under for --

**THE COURT:**  Well, but Odebrecht paid very little bribe

1   money while Toledo was president.   It was only $4 million.

2   They keyed the turnover of the bribe money to construction of

3   the Interoceanic Highway and their receipt of funds, and most

4   of that happened during the Garcia Administration.

5        So the money was paid out between 2006 and 2010.   So it's

6   really not that long a time before the Ecoteva scandal breaks

7   and everyone freaks out.

8        **MR. ARCHER:**   So -- but, again, Your Honor, I disagree with

9   that evaluation of that timeline, because we have 4 million

10  during the administration, and then you have the balance paid

11  three years prior to the Ecoteva issue, during which time --

12  why would a week pass?   Why would six months pass?   You know,

13  why would a year pass, let alone -- why wouldn't the 4 million

14  be disbursed immediately, minus Maiman's supposed 10 percent

15  commission, when it was received?   It doesn't make sense.

16       We're not talking about a matter of weeks.   We're not

17  talking about -- so I understand the Court's concern that there

18  may be, you know, sort of a freeze of activity; but it's not

19  consistent with when the money was paid and it's not consistent

20  with what the expectations Toledo would have if he were a party

21  to this agreement in any way or even aware that it had happened

22  behind his back.

23       So I don't think that that --

24       **THE COURT:**   So what are we supposed to think, though,

25  about the money that went to Toledo to pay off the mortgages on

1    the house in Camacho and the house in Punta Sol?

2        He's just:  Oh, my friend loaned me half a million

3    dollars.  And thank you; that's great of you to loan me half a

4    million dollars.

5        We're not supposed to think, well, he might know where

6    that money came from?

7        **MR. ARCHER:**  No.  So, certainly not.

8        And I think the things that are indicative otherwise are,

9    one, this is a tiny drop in the bucket compared to what was

10   paid out to Maiman -- right? -- what was supposedly a portion

11   of the agreement.

12       So let's take the Government's theory at face value for a

13   second.  Toledo is the architect of all of this.  Right?  So

14   for the money laundering theory, Toledo is the architect of all

15   of it, and he directs all these shell companies that are

16   obviously Maiman's actions.  But the Government's allegation is

17   that he, in violating the money laundering statute in Peru,

18   directed how and where this money was to be moved, in spite of

19   there being no evidence of that.

20       And then let's take at face value the collusion

21   allegation.  The face value of the collusion allegation is that

22   Dr. Toledo was the architect of a corrupt agreement to accept

23   35 or so million dollars in exchange for doing certain things

24   to ensure that Odebrecht would be -- would be the recipient of

25   the contract.

1        So taking those at face value, then we step back and we

2   say:  Okay.  Dr. Toledo then knows the exact amount of this

3   agreement.  Right?  So he knows that he is supposed to be

4   receiving $35 million.  And so some number of years later, he

5   asks Maiman for a loan to pay off two properties.  Not more

6   than the amount of the properties, but the amount of the

7   mortgages outstanding on the properties.

8        **THE COURT:**  Well, but his mother-in-law ends up with a lot

9   of this money, at least in her name.  You can dispute whether

10  she has control.  But it got pretty close to him.

11       **MR. ARCHER:**  So the mother-in-law was -- the mother-in-law

12  did not have actual control over it, let alone Toledo having

13  actual control over it.  And it wasn't her money in any real

14  aspect.  She was used as a name for tax purposes for Maiman.

15  And as is indicated in Maiman's testimony, he had direct

16  contact with her.

17       And so getting close to something when all of the

18  indicators otherwise point the other direction is certainly not

19  enough to establish a crime.  It's not enough to establish

20  probable cause that a crime occurred.

21       But I'd like to sort of complete the analysis, since we're

22  looking at the Government's allegations.

23       You have this half million dollars.  And this is somebody

24  that is -- Maiman is -- has ingratiated himself with Toledo.

25  He has -- he has held himself out to be this sort of

illustrious billionaire with projects all over the world, as is
very clear in the record.  He had prior dealings -- his
testimony is that he had prior dealings with Peru, that he had
been involved in these hundreds of millions of dollars of
currency transactions disguising the location or the source of
money to pay down debt and being this intermediary for
countries in moving millions of dollars around the world.

That's his public persona.  That's who he holds himself
out to be, and that's how he ingratiates himself to leaders
like Dr. Toledo.

But in doing so, the idea that he could loan Dr. Toledo a
half million dollars out of his supposed hundreds of millions
or billions of dollars of personal net wealth when Dr. Toledo
is suffering with a modest income in the United States and
these extortionate interest rates from mortgages in Peru, the
idea that that would show that Dr. Toledo was aware of this
massive agreement, $35 million, why he would be asking for,
basically, just some relief from a predatory -- from predatory
mortgages doesn't line up with the knowledge of someone who
understands that they have $30 million coming to them.

So I understand that there's concern about it.  Obviously,
in retrospect, if he had any idea that Maiman had secretly
collected tens of millions of dollars, he wouldn't have
associated with him.

But it's evidence that while at first blush could be

1    considered suspicious, but when taken in context of the total

2    amounts of money involved here, and if you look at face value

3    the allegations against Dr. Toledo for collusion and then money

4    laundering, the idea that -- the money laundering allegations

5    are that Dr. Toledo directed the flow of funds, which would

6    necessarily require that he knew where the money came from and

7    he knew and directed the flow of it through Maiman's shell

8    companies.

9         But then, at the end of it, at the end of directing all of

10   that money and supposedly committing the act of money

11   laundering, he stopped short and doesn't ask for it to go a

12   step further to actually transfer him the money, that doesn't

13   make any sense at all, and that's what obliterates probable

14   cause.

15        Just as much as the contradictory testimony -- internally

16   contradictory testimony, absolutely incredible testimony of

17   Maiman and Barata are not available or not sufficient to

18   establish probable cause, it's common sense that buttons this

19   up and absolutely obliterates probable cause in the end.

20        Why would someone risk their life to solicit $35 million

21   in bribes and then not deliver on the supposed promise and then

22   not ask for the money once it's been paid?  None of that makes

23   sense.

24        THE COURT:  Let me ask you this.  And I apologize if this

25   is an unfair question.  And you don't have to know the answer.

1          What does a trial in Peru look like?  For example, would

2    Barata and Maiman have to testify?

3       **MR. ARCHER:**  My understanding is that they would have to

4    testify.  I think the -- my understanding -- and I cannot

5    profess to be an expert on this -- is that their -- their

6    deposition testimony under oath so far is what would be

7    presented to the judge to eventually issue a formal charging

8    document.

9          And, again, I think -- it may not be relevant to the

10   probable cause determination, but I think it's important for

11   the Court to know that shortly after the Court denied our

12   motion to dismiss for lack of a formal charging document, the

13   Peruvian authorities moved the case back into the investigatory

14   stage, and that's where it is today.

15         So, again, as we indicated in our briefing, there is still

16   not a formal charge.  It has not been presented to the Court

17   for formal charge.  The intermediary stage --

18      **THE COURT:**  But it's your understanding that Barata and

19   Maiman would have to testify in a trial?  They couldn't just

20   show the transcript of their prior testimony?

21      **MR. ARCHER:**  I believe so, but I'm not an authority on

22   that.

23      **THE COURT:**  Okay.  I mean, you have -- it'd be a long

24   cross-examination.  There's no doubt that there would be a lot

25   that the defense lawyers could explore with them.

1          **MR. ARCHER:**  But, Your Honor, if I could just -- if I

2     could draw the Court to something that the Court deals with

3     possibly even on a daily basis, and that's the decision about

4     whether to issue a warrant based on probable cause.

5          As the Court is familiar, every time informant testimony

6     is presented in either a complaint or a warrant affidavit,

7     asking for either -- asking for either the issuance of an

8     arrest warrant or a search warrant, there's a determination of

9     probable cause.  And there's always that footnote that is

10    dropped which says:  This information is provided by an

11    informant.  I have a basis to believe, because of their prior

12    good information, that in spite of the fact that they are

13    either being paid to provide this information or working off

14    another case, that there is their indicia of reliability based

15    on that.

16         If the Court were presented with the testimony of people

17    that were constantly contradicting each other and had already

18    been determined to be not credible as to material aspects of an

19    agreement -- and, again, I disagree with the Court's, sort of,

20    characterization of Barata and Maiman's contradictory

21    statements as to the agreement.  This agreement, the aspects of

22    the agreement, Dr. Toledo's knowledge and input in the

23    agreement is the only thing that would make it a crime on

24    Dr. Toledo's behalf.

25         Again, the Government is correct that we are not -- we're

1   not arguing that no crime occurred here.  Absolutely the

2   evidence establishes probable cause that a crime occurred on

3   behalf of Maiman and Barata and Odebrecht, generally, as well

4   as a number of Maiman's associates.  But the contradictions are

5   relevant to Toledo's -- Toledo's knowledge of the existence of

6   that agreement, let alone his input into that agreement to

7   direct the agreement.

8        So if the Court were considering this in a warrant

9   application, I would certainly hope that the Court would have

10  extraordinary pause in issuing a warrant where the only

11  evidence is contradictory evidence presented by people who have

12  been found to have lied under oath, contradicting their own

13  statements under oath over and over again.

14       And so in that sort of -- in that day-to-day consideration

15  of a warrant, this would be -- especially with what

16  the Government is objecting to the Court's consideration of,

17  which is -- I can't imagine a situation, with the Government's

18  *Brady* obligations in the United States, where they would

19  present an affidavit to the Court including informant testimony

20  but then either learn about later or know at the time that

21  there was contradictory evidence that there was much more --

22  much more testimony and then not present that.  It would be

23  savaged in a *Franks* challenge to a warrant.

24       And so I think in that kind of analysis, this presentation

25  to the Court, it's not just some allegation that a crime

1  occurred, but there has to be probable cause to believe that

2  the crime occurred.

3      And when you have witnesses that are just so fundamentally

4  unreliable -- and not on minor details, not on discrepancies or

5  minor inconsistencies as the cases that are cited by

6  the Government describe, but absolutely fundamental,

7  fundamental underpinnings of this agreement -- and then you

8  look at what actually occurred, the practical sort of extrinsic

9  evidence of what occurred -- when the money was transferred,

10  who it went to, and the relative tiny amount that went to

11  Dr. Toledo -- as well as the absolute lack of demand by

12  Dr. Toledo of any of these finances, the only conclusion that

13  can be drawn is that Dr. Toledo was unaware of this agreement,

14  had no benefit, and took no action on behalf of Odebrecht

15  outside of what he was doing otherwise as a president.

16      And so it seems that it's well short of probable cause.

17  It's bare allegations unsupported by the evidence submitted by

18  the Government and certainly unsupported by the complete record

19  which has been submitted by the defense.

20      **THE COURT:**  All righty.  Thank you, Counsel.

21      Let me hear from the Government.  And one question I would

22  like the Government to address is that in Exhibit G, Maiman

23  seems to flat-out admit that he skimmed off about a third of

24  the bribe money for his own benefit.  And I see that Peru

25  certainly did not include that testimony in the evidence it

submitted to the United States.

     Does the omission of that evidence and the content of that
evidence show that Maiman is just completely untrustworthy?

     **MS. HACISKI:**   Thank you, Your Honor.

     I'll start with that question.   No, it doesn't.   I mean,
certainly, the story of where all the money has gone has
evolved over time, and that is due in part to the fact that
initially documents showing the money trail hadn't been
reviewed or presented.   And so, once those documents were
produced, the allegations were crystallized more clearly.

     But regarding whether the money went to Maiman or how much
money went to him, it doesn't change the allegations that some
of the money was used to purchase properties that have been
tied to Toledo.   The allegations regarding Maiman's money don't
change those allegations about the properties, and they don't
undermine Maiman's credibility as a witness either.

     I think it's not unrealistic to think that a witness might
change his story about how much of the bribe money he was
receiving.   And indeed, Maiman explains that there are some
inconsistencies about his connection to the money.

     Your Honor was asking about Ecoteva earlier.   And Maiman
says in his 2013 testimony that it was his company and that he
bought the properties that are at issue in this case; but then,
in his later testimony, he explains that, well, actually, as
soon as the Ecoteva scandal broke, Toledo came to him asking

for help, and that was why he claimed the company and the
properties for himself.  But, in fact, he didn't actually know
about the property or the company until he read about it in the
news.

So there has been an evolving story in terms of exactly
what Maiman has been doing to help cover up this bribe; but
certainly, there's no evidence that even if Maiman received a
third of the money, that money also wasn't going to Toledo.

An example of this would also just be the loan, as
Your Honor has pointed out, which even if it was a loan,
although I don't know that we have evidence in the record to
show directly that it was ever repaid, it still shows that
Toledo was benefiting, at least in some way, from the Odebrecht
money.

If I can just address everything that was just said,
I think you can pretty much only accept what was just said if
you find Barata and Maiman's statements not to be credible, and
that's something the case law prohibits.

So the Court in *Colmar*, which is a case from this
district, expressly says that extradition fugitives have no
right to attack credibility.

Similarly, the Court in *Santos* explained that fugitives
can't offer evidence that would contest the credibility of
original statements, and it cited to cases from the Seventh
Circuit and Second Circuit that say that extradition courts

1   should not be making credibility determinations.

2        There's been a reference to a comparison with obtaining a

3   U.S. warrant, but that's not the case that we have here.  There

4   is still sort of a preliminary examination of the evidence; but

5   in an extradition case, the criminal case is in a foreign

6   country.  That's where all the evidence is.  That's where the

7   trial's going to go forward.  And so credibility determinations

8   should be reserved for that forum.

9        But in any event, the statements that have been provided

10  by Barata and Maiman are, in fact, credible.  They're providing

11  firsthand accounts of events that they themselves eyewitnessed

12  and are admitting that they, in fact, participated in.  They

13  provide myriad details.  Their accounts are also generally

14  corroborated by other evidence in the package, at least to some

15  extent.

16       So the inconsistencies that defense counsel has complained

17  about are minor.  If you look at the big picture, both Barata

18  and Maiman agree that there was a bribe agreement that was

19  reached toward the end of 2004; that Odebrecht paid money

20  pursuant to that agreement beginning in 2006; and they're both

21  quite clear that it was their understanding that the money was

22  intended for Toledo.

23       Regarding the bribe meeting, what the evidence shows is

24  that there wasn't just one meeting where the bribe was

25  consummated.  It was a gradual process that was the product of

1   a number of meetings.

2       So it's also not correct that, as defense counsel claims,

3   Maiman says that there was no meeting to discuss the bribe.

4   There's no such express statement that I'm aware of in the

5   record.  He discusses a few different meetings that are held in

6   Rio, and he doesn't clarify that the bribe was discussed at

7   them.  And I think there's one meeting when he specifically

8   says that the bribe wasn't discussed.

9       But he's conflated a bunch of different meetings in his

10  filing; and, again, he did so today.

11      And as the Court noted, Maiman himself may have jumbled

12  them a little bit as well in his own memory.

13      Just to respond briefly to the point that Toledo's actions

14  were not those consistent with a sitting president.  Well,

15  there's evidence in the record indicating that witnesses say

16  otherwise.

17      There are witnesses who testified that Toledo's

18  participation in the tender process by holding meetings in

19  the government palace and asking only about the highway project

20  and not the other public works projects being discussed at

21  those meetings, seeking to shorten the time frame for the

22  project, witnesses say that that was not usual conduct.

23      Meetings that were held at the government palace, both for

24  the Proinversión board meetings and, also, there's

25  the government -- there's the log from the government palace

1    that documents meetings between Toledo and Barata.  I don't

2    think it's necessarily clear that meetings between a sitting

3    president and the head of a public works project were a common

4    occurrence.

5         I also --

6         **THE COURT:**  I have the same reaction when you talk about

7    Toledo's conduct as when the defense talks about Toledo's

8    conduct, in terms of his participation in the project, which is

9    kind of:  So what?

10        I mean, he can be an idiosyncratic president.  He can have

11   lots of meetings when other people wouldn't, and push forward

12   projects that other people might not have pushed forward.

13        The issue is just:  Was there a bribe?  So I don't know.

14   That doesn't strike me as very persuasive, the things that he

15   did in office to push the project forward.  There could be all

16   kinds of reasons for that.  The issue is just:  Was there a

17   bribe?  And even if he might have done the same things within

18   the absence of a bribe, it just kind of doesn't really matter.

19        **MS. HACISKI:**  Agreed.  And I think it's certainly

20   consistent with a bribe agreement, at the very least.

21        And regarding the claim that it's not possible that Toledo

22   didn't know about the agreement, that's just not possible if

23   you take into account Barata's testimony saying that he

24   personally was delivering cash to Toledo and that Toledo was

25   pressuring him to continue payments of the bribe money.

1          And it's also not consistent with the trail of money that

2     filters to properties that were unquestionably purchased by

3     Mr. Toledo's mother-in-law and that were also linked more

4     directly to Toledo, given his involvement in those purchases.

5          Regarding the laundering of the money, the fact that

6     Maiman received some of it -- he forfeits only 5 million of it

7     in his cooperation agreement.  And, you know, as I said, I

8     don't think this detracts from the fact that Peru claims that

9     other money went elsewhere, and that's really the base -- the

10    meat of their laundering claims in terms of linking it back to

11    Toledo.

12         **THE COURT:**  Let me ask you a question I posed to the

13    defense.  The judgment of effective collaboration makes clear

14    that Maiman did personally get enriched from this money.  And

15    then the cross-examination by defense counsel leads to those

16    admissions as well in his January 2020 deposition.

17         I know you've objected to everything that's outside the

18    extradition request on the grounds it's contradictory.

19         Do you think that that evidence of Maiman's personal

20    benefit is contradictory to the Government's evidence?

21         **MS. HACISKI:**  I do.

22         But I think the bigger problem with the cooperation

23    agreement is that it's only going to Toledo's defense, which is

24    that it was Maiman, and not he, who committed this conduct.

25         And *Santos* clearly says that evidence going to that kind

1    of defense, particularly one that's premised on an argument of

2    credibility, is not admissible in an extradition proceeding.

3        I also wanted to address the claim about all the money

4    filtering to Ecoteva.  I mean, I think a lot of defense

5    counsel's argument is premised on the notion that Maiman was

6    controlling Ecoteva through the nominee agreement, but that

7    argument falls flat given Maiman's testimony that he actually

8    didn't control the company, his explanation as to why there was

9    the inconsistency in his statement in that regard.

10       I think it also goes -- the testimony about trying to

11   cover up the Ecoteva connection shows the lengths to which

12   Toledo was willing to go to try to conceal the connection

13   between the Odebrecht money and himself.

14       So, I mean, I think there's -- given all this voluminous

15   conduct -- or voluminous evidence connecting Toledo to the

16   bribe agreement and to the money, there's only one answer,

17   which is that there is more than ample probable cause that

18   Toledo committed collusion and money laundering.

19       And to find otherwise, this Court would have to improperly

20   engage in a credibility determination.  It would have to find

21   that Barata isn't credible.  It would separately have to find

22   that Maiman is not credible.  And it would have to reject all

23   the other evidence that demonstrates Toledo's criminal conduct.

24       So unless the Court has further questions, I would just

25   conclude by asking that the Court should deny Toledo's motion

1    to deny extradition based on probable cause.

2         And I would also say -- I would request -- noting that

3    the Court has rejected Toledo's other arguments in defense of

4    extradition and that Toledo hasn't otherwise contested the

5    requirements for certification, I would ask that the Court also

6    find that all five requirements for certification have been met

7    and issue an order finding the same, certifying the request for

8    Toledo's extradition for consideration by the Secretary of

9    State.

10        **THE COURT:**  All righty.  Thank you, Counsel.  I appreciate

11   the argument from both sides.

12        I will take the matter under submission, and I will hope

13   to get a written decision out within a few days.

14        The matter stands submitted.

15        **MR. ARCHER:**  Thank you, Your Honor.

16        **MR. WALDINGER:**  Thank you, Your Honor.

17        **MS. HACISKI:**  Thank you, Your Honor.

18        **THE CLERK:**  Thank you, everyone.

19        We're off the record.  Court is in recess.

20             (Proceedings adjourned at 11:35 a.m.)

21                         ---o0o---

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Wednesday, October 20, 2021

*Ana Dub*

---

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter